UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | Case No. 20-mj-1069-DLC |
| MICHAEL L. TAYLOR | ) | |

The United States, in fulfilling its extradition treaty obligations to Japan, requests that the fugitive in this case, Michael L. Taylor ("Michael Taylor"), be detained until the conclusion of the extradition process. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Michael Taylor should be detained. In short, Michael Taylor should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing both that he poses no risk of flight and that special circumstances warrant his release. In fact, Michael Taylor is an exceptionally high flight risk and that fact alone requires his detention. Moreover, even if Michael Taylor were somehow deemed not to be a flight risk, there are no special circumstances unique to Michael Taylor warranting his release.

## **BACKGROUND**

### I.      **FACTUAL BACKGROUND**

Japan has requested Michael Taylor's provisional arrest, with a view towards extradition, so that he can face charges stemming from his role in helping Carlos Ghosn ("Ghosn") flee Japan while Ghosn was released on bail pending trial for serious financial crimes.

Ghosn served as Chairman of the Board of Directors and/or Chief Executive Officer of Nissan Motor Co., Ltd. ("Nissan") from 2001 through 2018. During his tenure at Nissan, Ghosn allegedly engaged in major financial wrongdoing, including, among other things, conspiring with others to falsely state his compensation in Nissan's Annual Reports and shifting financial losses

of his asset management company to Nissan. Ghosn was indicted and arrested for these crimes in Japan. On April 25, 2019, the Tokyo District Court released Ghosn on bond with conditions that included, among other things, not hiding or fleeing or taking any overseas trips.

In the months leading up to Ghosn's escape, Michael Taylor's son, Peter Taylor, traveled to Japan at least three times, first in July 2019, then in August 2019, and again in early December 2019, as evidenced by Japanese immigration records. During these visits, Peter Taylor met with Ghosn at least seven times, as reflected in meeting records that Ghosn was required to maintain as a condition of his bail and/or video surveillance camera images. On December 28, 2019, Peter Taylor arrived in Japan and proceeded to the Grand Hyatt Tokyo, according to immigration records and video surveillance camera images. Hotel records show that he checked into Room 933 at approximately 11:49 a.m. A copy of Peter Taylor's passport was attached to the hotel registration form. After Peter Taylor checked into the hotel, Ghosn arrived at the Grand Hyatt and met with Peter Taylor for approximately one hour, as evidenced by the hotel's video camera surveillance images.

On December 29, 2019—the day of the escape—Michael Taylor and George Antoine Zayek ("Zayek"), traveled on a private jet from Dubai, United Arab Emirates, to Kansai International Airport in Japan, as reflected in Japanese immigration records. Michael Taylor and Zayek entered the country transporting two large black boxes, as shown in video camera surveillance images. The black boxes looked like they were for music equipment, and Michael Taylor and Zayek told Kansai airport workers that they were musicians. Michael Taylor and Zayek landed at Kansai International Airport at approximately 10:10 a.m. and went to the Star Gate Hotel Kansai Airport, where they checked into rooms 4009 and 4609 at approximately 11:06 a.m., as

2

evidenced by hotel records.  The two men brought the two large boxes into Room 4609.  At approximately 11:50 a.m., Michael Taylor and Zayek left the hotel and went by taxi to Shin-Osaka Station, where they boarded a train bound for Tokyo Station, as evidenced by video camera surveillance images.

At approximately 2:30 p.m., while Michael Taylor and Zayek were making their way to Tokyo, video surveillance camera images show Ghosn leaving his house with no luggage and walking to the Grand Hyatt Hotel Tokyo.  Upon arriving at the hotel, Ghosn went alone to Peter Taylor's room and changed his clothes.  Ghosn's luggage had been dropped off at the hotel earlier in the day and received by Peter Taylor, as evidenced by video camera surveillance images. Ghosn's ability to operate the hotel elevator himself indicates Peter Taylor had given him a copy of the room key the previous day, as a room key was necessary to access guest floors.

Michael Taylor and Zayek arrived in Tokyo at approximately 3:24 p.m.  They joined Peter Taylor at the Grand Hyatt and entered Room 933.   Then, Ghosn, Peter Taylor, Michael Taylor, and Zayek all exited Room 933 together.  The video surveillance camera images show they were all carrying luggage.  Peter Taylor separated from the rest of group, traveling to Narita Airport where he boarded a flight to China.

Ghosn, Michael Taylor, and Zayek traveled to Shinagawa Station by taxi and boarded a train bound for Shin-Osaka Station.  At approximately 7:24 p.m., the three men exited Shin-Osaka Station and took a taxi to the Star Gate Hotel, where Michael Taylor and Zayek had checked-in earlier that day.    At approximately 8:14 p.m., Ghosn, Michael Taylor, and Zayek arrived at the Star Gate Hotel and entered Room 4609.  At approximately 9:57 p.m., Michael Taylor and Zayek left Room 4609 with luggage, including the two large boxes, and departed for

3

Kansai International Airport.  There is no image of Ghosn leaving Room 4609.  Instead, Ghosn was hiding in one of the two large black boxes being carried by Michael Taylor and Zayek.

Michael Taylor and Zayek arrived at Kansai International Airport at approximately 10:20 p.m., with luggage, including the two black boxes, one of which contained Ghosn.  Once at the airport, their baggage passed through the security check without being screened and was loaded onto a private jet.  The two men boarded the private jet with the large boxes and departed for Turkey at approximately 11:10 p.m.  Two days later, on December 31, 2019, Ghosn made a public announcement that he was in Lebanon.

## II.   PROCEDURAL HISTORY

On January 30, 2020, the Tokyo District Court issued a warrant for Michael Taylor's arrest, which was renewed on February 28, 2020.  On February 16, 2020, Michael Taylor flew from Dubai to Boston.  Japan then submitted to the United States a request for Michael Taylor's provisional arrest, with a view towards his extradition.  On May 6, 2020, the United States, in accordance with its obligations under the extradition treaty between the United States and Japan[1] and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Michael Taylor's arrest.  The same day, United States Magistrate Judge Donald L. Cabell issued an arrest warrant.  U.S. law enforcement subsequently discovered that Peter Taylor had booked a flight from Boston to Beirut, Lebanon—the same place to which Ghosn fled—departing on May 20, 2020, with a layover in London, United Kingdom.  Michael Taylor was arrested on May 20, 2020, and he is currently in the custody of the United States Marshals Service.

---

[1] *See* the Treaty on Extradition Between the United States of America and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892 (the "Treaty").

## ARGUMENT

## I.   LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.   The limited role of the Court in extradition proceedings

Extradition is a means by which a fugitive is returned to a foreign country, typically pursuant to a treaty, to face criminal charges or to serve a sentence of imprisonment. In the United States, it is primarily an executive function, with a limited role carved out for the judiciary pursuant to the federal extradition statute. *See* 18 U.S.C. § 3184; *see also, e.g.*, *In the Matter of the Extradition of Hilton*, No. 13-7043, 2013 WL 1891327, at *3 (D. Mass. May 3, 2013) ("Extradition is an executive, not judicial, function.") (citing *Martin v. Warden*, 993 F.2d 824, 828 (11th Cir. 1993)). Pursuant to 18 U.S.C. § 3184, the judicial officer's inquiry is confined to whether (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to the charges for which extradition is sought. *See, e.g.*, *In re Extradition of Howard*, 996 F.2d 1320, 1324 n.1 (1st Cir.1993); *Skaftouros v. United States*, 667 F.3d 144, 154-55 (2d Cir. 2011). "If the judicial officer makes such a determination, he 'shall certify' to the Secretary of State that a warrant for the surrender of the relator 'may issue.'" *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997) (quoting 18 U.S.C. § 3184).

After a fugitive is certified as extraditable, the Secretary of State, and not the judicial officer, decides whether the fugitive will be surrendered to the requesting country. *See* 18 U.S.C. §§ 3184, 3186; *Kin-Hong*, 110 F.3d at 110; *Lo Duca v. United States*, 93 F.3d 1100, 1103-04 (2d Cir. 1996). "This bifurcated procedure reflects the fact that extradition proceedings contain legal

5

issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *Kin-Hong*, 110 F.3d at 110.

**B.    The requirements for certification**

1.    <u>Authority of the Court over the proceedings</u>

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  Both magistrate judges and district judges may render a certification under Section 3184.  *See, e.g.*, *Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also* Rules for United States Magistrates Judges in the United States District Court for the District of Massachusetts, Rule 1(e) ("Each United States Magistrate Judge appointed by this court is authorized to . . . [c]onduct extradition proceedings, in accordance with 18 U.S.C. Section 3184.").

2.    <u>Jurisdiction over the fugitive</u>

The Court has jurisdiction over a fugitive, such as Michael Taylor, who is found within its jurisdictional boundaries.  *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

3.    <u>Treaty in full force and effect</u>

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. Following Japan's submission of its formal extradition request, an attorney in the Office of the

Legal Adviser of the U.S. Department of State will attest to the fact that there is an extradition treaty in full force and effect between the United States and Japan.

4.     Crime covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty.  Article I of the Treaty applicable in this case provides for the return of fugitives charged with, or convicted of, certain extraditable offenses as defined in Article II.  *See* Treaty, Art. I.  Article II defines extraditable offenses to include any offense that is "punishable by the federal laws of the United States and by the laws of Japan by death, by life imprisonment, or by deprivation of liberty for a period of more than one year."  *See* Treaty, Art. II.   In addition to violations of federal law, the Treaty provides that extraditable offenses can include violations of state law if: (i) the offense is punishable by deprivation of liberty for a period of more than one year under both the state's law and Japanese law and (ii) the offense is listed in the Schedule annexed to the Treaty.

Accordingly, in assessing whether the offense for which extradition is requested is covered by the Treaty, the Court should examine the description of criminal conduct provided by Japan in support of its charge and decide whether that conduct would be criminal under U.S. federal law if it had been committed here.  In addition, the Court may look to Massachusetts law, or the law of a preponderance of the states, if the alleged offense is listed in the Schedule annexed to the Treaty.

"The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the *particular act* charged is criminal in both jurisdictions."  *Collins v. Loisel*, 259 U.S. 309, 312 (1922) (emphasis added).  In other words,

7

"[d]ual criminality requires that an accused be extradited only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations." *In re Gambino*, 421 F. Supp. 2d 283, 306 (D. Mass. 2006) (quoting *United States v. Saccoccia,* 18 F.3d 795, 800 n. 6 (9th Cir.1994)) (emphasis added).

5.    <u>Probable cause that the fugitive has committed the offense</u>

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that Michael Taylor committed the offense for which his extradition is sought. *See, e.g.*, *Kin-Hong*, 110 F.3d at 120 ("An extradition hearing does not require a higher standard of evidence than a probable cause hearing."). It is well-established that the "required probable cause hearing entails no determination of the guilt or innocence of the relator, but only whether there is 'competent legal evidence which . . . would justify [the relator's] apprehension and commitment for trial if the crime had been committed in that state.'" *Koskotas v. Roche*, 931 F.2d 169, 177 (1st Cir. 1991) (quoting *Collins* v. *Loisel*, 259 U.S. 309, 314-15 (1922)). Accordingly, "extradition proceedings are not to be converted into a dress rehearsal trial." *Koskotas*, 931 F.2d at 175.

**C.**    **An extradition hearing follows unique procedures**

Extradition hearings are neither criminal nor civil proceedings. *See, e.g.*, *Austin*, 5 F.3d at 603 ("We have repeatedly noted, for example, that an extradition hearing is not a criminal prosecution: the order of extraditability expresses no judgment on Austin's guilt or innocence."); *Hilton*, 2013 WL 1891327, at *3 ("An extradition proceeding is not an ordinary Article III case or controversy and it is not a criminal proceeding."). "By design, 'the procedural framework of international extradition gives to the demanding country advantages most uncommon to ordinary

civil and criminal litigation.'" *Skaftouros*, 667 F.3d at 155 (quoting *First Nat'l City Bank v. Aristeguieta*, 287 F.2d 219, 226 (2d Cir. 1960)); *see also Hilton*, 2013 WL 1891327, at *3 ("Given the limited purpose of extradition hearings, the individual whose extradition is requested . . . does not benefit from most of the protections traditionally afforded to defendants in criminal proceedings.").  A summary of those advantages is set forth below.

1.   Extradition hearings rely on written submissions and do not require live witnesses

The Federal Rules of Evidence do not apply to extradition proceedings.  *See* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition.").  Indeed, the evidence at the extradition hearing "may consist of hearsay, even entirely of hearsay."  *Kin-Hong*, 110 F.3d at 120 (citing *Collins*, 259 U.S. at 317).  Accordingly, a certification of extraditability is properly based on the authenticated documentary evidence and information provided by the requesting government.  *See, e.g.*, *Harshbarger v. Regan*, 599 F.3d 290, 294 (3d Cir. 2010) (affidavits of Canadian law enforcement officers are competent and "provided ample evidence of probable cause"); *Bovio v. United States*, 989 F.2d 255, 259-60 (7th Cir. 1993) (relying on statement of Swedish investigator); *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1450-52 (9th Cir. 1987) (relying on affidavit of German prosecutor).  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  *See, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Shapiro v. Ferrandina*, 478 F.2d 894, 902 (2d Cir. 1973).

2.   Limitations on fugitives' defenses in extradition proceedings

The fugitive's defenses in an extradition proceeding are heavily circumscribed.  For example, the fugitive has: (i) no Sixth Amendment right to a speedy extradition, *see, e.g.*, *Yapp v.*

*Reno*, 26 F.3d 1562, 1565 (11th Cir. 1994); (ii) no Fifth Amendment guarantee against double jeopardy with respect to successive extradition proceedings, *see, e.g.*, *In re Extradition of McMullen*, 989 F.2d 603, 612-13 (2d Cir. 1993); (iii) no ability to invoke the exclusionary rule, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); (iv) no right to confront his or her accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517; (v) no right to invoke defenses that "savor of technicality," *see id.*; (vi) no right to introduce affirmative defenses, *see, e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 461 (1913); and (vii)  no right to discovery, *see, e.g.*, *Koskotas*, 931 F.2d at 175.

Relatedly, a fugitive's right to present evidence is severely constrained.  "Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded." *Id.* (citations omitted).  Accordingly, "evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's hearing." *Shapiro*, 478 F.2d at 901.  "[S]tatements [that] would in no way explain . . . or . . . obliterate the government's evidence, but would only pose a conflict of credibility . . . should properly await trial in [the country seeking extradition]." *Id.* at 905 (internal quotation marks omitted).

### 3.   Rule of non-inquiry

All matters raised by the fugitive as defenses to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186; *see also, e.g.*, *Kin-Hong*, 110 F.3d at 109 ("The Secretary may . . . decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations.").  This is consistent with the long-held

understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852); *see also, e.g.*, *Ahmad v. Wigen*, 910 F.2d 1063, 1066-67 (2d Cir. 1990).

## II.     MICHAEL TAYLOR SHOULD BE DETAINED

"The availability of bail in international extradition cases is extremely limited." *Drumm v. McDonald*, 15-cv-14221, 2016 WL 111411, at *2 (D. Mass. Jan. 11, 2016).  The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, "[e]xtraditions are not criminal matters and the familiar standards of the Bail Reform Act, 18 U.S.C. § 3141, do not govern."  *In the Matter of the Extradition of Drumm*, 150 F. Supp. 3d 92, 96 (D. Mass. 2015) (Cabell, J.); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 128 (E.D.N.Y. 2001).[2] As the First Circuit has held, bail in international extradition cases is "limited to situations in which the justification [for release] is pressing as well as plain." *United States v. Kin-Kong*, 83 F.3d 523, 524 (1st Cir. 1996) (internal quotation marks and citation omitted).  And as this Court has recognized, "the overarching theme is that bail is appropriate only where the defendant's circumstances are extraordinary and will subject the defendant to difficulties beyond those applicable to all defendants facing extradition." *Drumm*, 150 F. Supp. 3d at 96 (internal quotation marks and citation omitted).

---

[2] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, and 3156(a)(2).  Here, MichaelTaylor is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with an offense committed in violation of the law of the requesting state, Japan.

A.    **Applicable law**

1.    A strong presumption against bail governs in an international extradition proceeding

"There is a presumption against bail in extradition cases and only 'special circumstances' justify release on bail." *Kin-Kong*, 83 F.3d at 524 (quoting *Wright v. Henkel*, 190 U.S. 40, 62 (1903)).  The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted.  The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling.  Where, as here, Japan meets the conditions of the Treaty, the United States has "an overriding national interest in complying with treaty obligations" and delivering the fugitive.  *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 56 (D. Mass. 2010) (citation omitted).  It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States.  *See, e.g.*, *In the Matter of the Extradition of Martinelli*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017) ("No amount of money could answer the damage that would be sustained by the United States were the appellant to be released on bond, flee the jurisdiction, and be unavailable for surrender, if so determined.") (quoting *Jimenez v.*

12

*Aristiguieta*, 314 F.2d 649, 653 (5th Cir. 1963)). "In fact, because of treaty obligations, admission to bail should be in practice an unusual and extraordinary thing." *In the Matter of the Extradition of Koskotas*, 88–MJ-73, 127 F.R.D. 13, 17 (D. Mass. July 13, 1989) (internal quotation marks and citation omitted).

> 2.   <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, "the burden is on the defendant to prove *both*: 1) that he is neither a flight risk, nor a danger to the community; *and* 2) that there are special circumstances [that] justify release on bail." *Drumm*, 150 F. Supp. 3d at 96 (internal quotation marks and citation omitted) (emphasis added).[3] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In the Matter of the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See, e.g.*, *Kin–Hong*, 83 F.3d at 524 (reversing district court's order granting release where defendant failed to show special circumstances justifying release). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special

---

[3] Courts in this District and elsewhere have required fugitives to meet this burden with clear and convincing evidence, reasoning that the presumption against bail in extradition cases justifies a heightened standard of proof. *See, e.g.*, *Castaneda-Castillo*, 739 F. Supp. 2d at 55 (citation omitted); *In re Extradition of Patel*, 08-mj-430, 2008 WL 941628, at *1 (D. Or. Apr. 4, 2008); *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996). Some other courts have applied a preponderance of the evidence standard, *see, e.g.*, *In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1035 n.4 (C.D. Cal. 2006), and still other courts have found it unnecessary to resolve the issue because of the difficulty of satisfying either standard. *See, e.g.*, *Perez-Cueva*, 16-0233, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016).

circumstance. *United States v. Leitner*, 784 F.2d 159, 161 (2d Cir. 1986); *see also, e.g.*, *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 130 (E.D.N.Y. 2001) ("Absence of risk of flight is not a legally cognizable 'special circumstance' justifying release from bail.") (citing cases); *United States v. Tang Yee–Chun*, 657 F. Supp. 1270, 1272 (S.D.N.Y. 1987) (same).   Conversely, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances.

In light of the strong presumption against bail in international extradition cases, courts have considered and rejected a lengthy list of claimed special circumstances, including:

- COVID-19, as discussed in more detail below. *See, e.g.*, *Risner v. Fowler*, 3:19-cv-03078, 2020 WL 2110579, at *7 (N.D. Tex. May 1, 2020); *Valentino v. United States Marshal*, 4:20-cv-304, 2020 WL 1950765, at *2 (S.D. Tex. Apr. 15, 2020); *Flynn v. Barr*, 20-cv-60610, Docket Entry 18 (S.D. Fla. Apr. 29, 2020) (hereinafter, "Flynn Order," attached as Exhibit A);

- Medical conditions that can be attended to while incarcerated. *See, e.g.*, *Martinelli*, 263 F. Supp. 3d at 1301-02 (collecting cases); *United States v. Latulippe*, 08–mj–59, 2008 WL 2704230, at *1 (D.N.H. July 3, 2008); *In re Extradition of Hamilton-Byrne*, 831 F. Supp. 287, 290-91 (S.D.N.Y. 1992);

- The complexity of the litigation, or the need to consult with an attorney and participate in the litigation. *See, e.g.*, *Kin-Hong*, 83 F.3d at 525; *In the Matter of the Extradition of Smyth*, 976 F.2d 1535,1535-36 (9th Cir. 1992); *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271-72 (S.D.NY. 1987);

- The fugitive's character, ties to the community, or fact that he was living openly. *See, e.g.*, *Leitner*, 784 F.2d at 161; *Duran v. United States*, 36 F. Supp. 2d 622, 628 (S.D.N.Y. 1999); *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1089-90 (C.D. Cal. 2010);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings. *See, e.g.*, *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *In re Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status.  *See, e.g.*, *In re Extradition of Pelletier*, No. 09-22416, 2009 WL 3837660, at *3-4 (S.D. Fla. Nov. 16, 2009) (businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor); *Borodin*, 136 F. Supp. 2d at 127, 131 (State Secretary of the Union of Russia and Belarus); and

- The availability of electronic monitoring.  *See, e.g.*, *Risner*, 2020 WL 2110579, at *4; *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997).

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration.  Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### B.      Analysis

The Court should detain Michael Taylor without bond because he cannot meet the exacting standard for release in international extradition proceedings.  First, he presents an enormous risk of flight.  Indeed, the very offense for which Michael Taylor is charged in Japan demonstrates his aptitude for hatching escape plans on a grand scale and his blatant disrespect for bond conditions.  Second, even if this Court were to find that Michael Taylor carried his burden to show that he is not a flight risk, there are no special circumstances unique to him that warrants bail.

### 1.      Michael Taylor is an extraordinary flight risk

Michael Taylor is not just capable of fleeing while on bond—he is an expert in the subject.  According to publicly available information, Michael Taylor founded the company American International Security Corp. and he has facilitated the extractions of other individuals.  The plot to spirit Ghosn out of Japan was one of the most brazen and well-orchestrated escape acts in recent history, involving a dizzying array of hotel meetups, bullet train travel, fake personas, and the

chartering of a private jet. Ultimately, Ghosn was hidden in a large black box and whisked out of Japan in the private jet without detection by Japanese authorities. Ghosn now resides in Lebanon, which has no extradition treaty with Japan, and thus he has been able to evade justice. Michael Taylor cannot overcome the presumption that he would be willing to go to even greater lengths to avoid facing justice in Japan himself.

In facilitating Ghosn's escape, Michael Taylor demonstrated not only his expertise in coordinating complex plans to avoid detection by law enforcement, but also exhibited his complete disregard for the bond conditions that Japan imposed on Ghosn. Michael Taylor cannot overcome the presumption that he would similarly ignore any release conditions that this court might fashion as to him.

Michael Taylor also has a strong incentive to flee given the strength of Japan's case against him, which is supported by video camera surveillance images and other evidence showing how he facilitated Ghosn's escape. *See, e.g.*, *Drumm*, 150 F. Supp. 3d at 97 ("The Court does find that the seriousness of the charges pending against the defendant in Ireland provides the defendant with an incentive to flee."); *see also, e.g.*, *In re Extradition of Adame*, Misc. H-13-287, 2013 U.S. Dist. LEXIS 41682, at *7-8 (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico").

In addition, Michael Taylor has a history of travel to countries that have no extradition treaty with either the United States or Japan, including the United Arab Emirates, where he went after Ghosn's escape and before he returned to the United States. Michael Taylor cannot overcome the presumption that he would return to the United Arab Emirates, or travel to yet another location,

in order to avoid justice. *See, e.g.*, *Drumm*, 150 F. Supp. 3d at 97 ("The Court further finds that the defendant's background and experience in international matters and his presumed substantial assets provide him with the ability to flee if he were so inclined.").

There is no way to effectively mitigate the risk that Michael Taylor would flee while on bond. Current travel bans do not extend worldwide and do not prevent him from escaping to an underground domestic location. *See, e.g.*, *Risner*, 2020 WL 2110579, at *4 ("The COVID-19 pandemic does not materially alter the Court's assessment of [the fugitive's] risk of flight. He has failed to show any domestic travel restrictions, or that he would be prohibited from travelling to numerous international destinations."); *United States v. Yu Zhou*, No. 2:19-cr-163, 2020 WL 1643634, at *3 (S.D. Ohio Apr. 2, 2020) (concluding that the pandemic "plays no *material* role as to whether there are conditions of release that will reasonably assure the future appearance of [defendant] in court") (emphasis in original). Moreover, electronic monitoring is not foolproof. *See, e.g.*, *Risner*, 2020 WL 2110579, at *4 ("GPS monitoring would not alleviate the flight risk. An ankle monitor—even assuming one were available—can be removed.").

Accordingly, Michael Taylor's flight risk alone precludes his release during the course of the extradition proceedings.

2.   No Special Circumstances Unique to Michael Taylor Warrant Release

As discussed above, for special circumstances to be legally relevant, the Court would need to find that Michael Taylor has carried his burden to show that he poses no flight risk and no danger to the community. *See, e.g.*, *id.* ("Because [the fugitive] has failed to show he is not a flight risk, the Court need not consider whether he is a danger to community, or whether there are special circumstances warranting his release."). In this case, even if the Court somehow was satisfied that

Michael Taylor does not pose a risk of flight, the United States is unaware of any special circumstances that would justify bail in this case.

> a. *COVID-19 is not a special circumstance unique to Michael Taylor that requires his release.*

Michael Taylor may try to argue that COVID-19 warrants his release.  However, extradition courts have made clear that a fugitive's "general concern that he may contract COVID-19 while incarcerated, while understandable, does not warrant release."  *Id.* at *7; *see also, e.g.*, *Valentino*, 2020 WL 1950765, at *2 (the fugitive's "general arguments based on the pandemic, without any specific identified risks to him, do not suffice as a 'special circumstance'"); *Flynn* Order at 2 (rejecting COVID-19 as a special circumstance); *c.f. e.g.*, *United States v. Mackenzie*, 13-10149, 2020 WL 2104786, at *3 (D. Mass. May 1, 2020) (denying compassionate release to criminal defendant who had failed "to show that he is materially more at risk for a serious medical condition due to the COVID-19 pandemic than the general prison population."); *United States v. Diaz*, 20-cr-10035, 2020 WL 1974257, at *1 (D. Mass. Apr. 23, 2020) ("Defendant's generalized and systemic concern regarding the virulent pandemic is insufficient to demonstrate entitlement to revocation of the pretrial detention order issued by the Magistrate Judge.");[4] *but see Matter of*

---

[4] Myriad other courts in this District and elsewhere have denied release to criminal defendants based on COVID-19 even where such defendants had underlying health issues.  *See, e.g.*, *United States v. Perez*, 15-10256, 2020 WL 1991161, at *4 (D. Mass. Apr. 22, 2020)  ("While I am sympathetic to the valid health concerns of an asthmatic during the pandemic, I do not find that the pandemic and the risks it poses for Perez change the detention decision."); *United States v. Guzman*, 15-cr-10338, 2020 WL 1974332, at *3 (D. Mass. Apr. 24, 2020) ("defendant has not shown that his specific medical conditions and prison conditions create such a high risk of serious illness that it would qualify as an 'exceptional reason' for release"); *United States v. Oladimu*, 1:01-cr-10198, 2020 WL 1866253, at *2 (D. Mass. Apr. 14, 2020) (denying release to defendant with high blood pressure); *Boyer v. United States*, 14-cr-10163, 2020 WL 1978190, at *2 (D. Mass. Apr. 24, 2020) (same).

*Extradition of Toledo Manrique*, 19-mj-71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (finding special circumstances where 74-year-old fugitive claimed he was "at risk of serious illness or death if he remains in custody"). For example, in *Valentino*, the court rejected the fugitive's bid for release based on COVID-19 even though the fugitive was 73 years old and had hypertension. 2020 WL 1950765, at *1. Similarly, in *Risner*, the court found that COVID-19 was not a special circumstance warranting release even though the fugitive was 76 years old and had a litany of health issues which he claimed put him at higher risk under the current circumstances. 2020 WL 2110579, at *4-5.

Here, Michael Taylor's case for release is considerably weaker than in other extradition cases where the court ordered detention, including the *Valentino* and *Risner* cases where the courts rejected COVID-19 as a special circumstance even though the fugitives were septuagenarians and had underlying medical issues. The government is unaware of Michael Taylor having any condition or characteristic that would elevate his risk of becoming seriously ill from COVID-19 under the current guidelines promulgated by the Centers for Disease Control and Prevention ("CDC"). To the contrary, Michael Taylor's participation in Carlos Ghosn's escape, combined with his extensive international travel history, suggests that he is in good health. *See, e.g.*, Flynn Order at 2 (the "Petitioner has shown no special vulnerability to the Corona virus while in custody at the Broward County Jail. Indeed, the Petitioner's reasoning would compel release of all inmates at the jail because there is a health crisis throughout the entire community.").

The prospect of exposure to infectious disease is a risk faced by all incarcerated individuals and the general population. It is therefore not a special circumstance unique to Michael Taylor in the specific context of this international extradition proceeding. *See, e.g.*, *Drumm*, 2016 WL

111411, at *3 (the special circumstances "requirement is fairly read as meaning that the 'special' circumstance must be more or less unique to the supplicant and not be one that is applicable to extraditees generally").

> **b. Michael Taylor cannot show that detention poses a unique risk to him given Norfolk's extensive COVID-19 precautions.**

Even if this Court found that COVID-19 could theoretically constitute a special circumstance, Michael Taylor still could not meet his burden to show that detention poses a unique risk to him given all the measures taken by the Norfolk County Correctional Facility ("Norfolk"), the facility where Michael Taylor would be detained pending extradition, to protect against, and mitigate, any spread of COVID-19.  This office has consulted with officials at Norfolk to obtain relevant information as to its handling of the public health crisis.  Danielle Boomhower, Assistant Deputy Superintendent in the Norfolk County Sheriff's Office, who oversees the facility and housing operations at Norfolk, reported that the facility is undertaking extraordinary measures to keep inmates safe during the COVID-19 pandemic.  These measures include:

1) Adopting enhanced inmate intake procedures, including scrutiny of travel and exposure to illness;
2) Adopting treatment and detection practices consistent with guidelines issued by the Center for Disease Control ("CDC") and the Department of Public Health ("DPH");
3) Suspending family and friend visits;
4) Restricting attorney visits to non-contact, behind glass;
5) Restricting non-security and non-essential staff from entering the facility;
6) Requiring all staff to wear masks and submit to regular temperature checks;
7) Requiring all inmates to wear masks;
8) Arranging for court hearings to be conducted by videoconference and telephone to limit inmate travel outside of the facility and resulting possible exposure;
9) Maintaining an aggressive (3x daily) cleaning schedule for the housing units; and
10) Educating staff and inmates on proper social distancing and sanitation practices.

Boomhower also advised that Norfolk is currently below maximum capacity which has afforded the facility flexibility in making housing assignments and allowed for greater social distancing

between inmates.  She also noted that the medical staff is equipped to treat inmates who have medical conditions that are associated with increased risk of complications from COVID-19.

On April 29, 2020, Boomhower reported that a new arrest on April 20 had tested positive for COVID-19.  That inmate was, per protocol, quarantined upon intake and then brought immediately to the medical unit, where he was placed in isolation.  As a result of this swift action, Norfolk was able to avoid spread of the virus within the housing units.  In a public filing from May 18, 2020 in state court, Norfolk disclosed that one inmate and two staff members had tested positive for COVID-19.  Inmates have had and will continue to have access to medical consultation and treatment, and Norfolk has now instituted a process whereby an inmate can receive immediate access to medical staff and treatment if the inmate deems it emergent.  Given all of these measures, Norfolk is taking all precautions to prevent and minimize the transmission of COVID-19 in its facility and to otherwise maintain a safe environment for its detainees.

Collectively, these precautionary measures significantly lessen the risk that Michael Taylor would contract, and then become seriously ill from, COVID-19 while detained during the extradition proceedings.  *See, e.g.*, *Grinis v. Spaulding*, 20-cv-10738, 2020 WL 2300313, at *3 (D. Mass. May 8, 2020) (noting "significant changes in operations in response to COVID-19" by BOP at both the national and institutional level).  While there may still be some risk of potential exposure, that does not warrant Michael Taylor's release in this specific context.  In fact, extradition courts routinely detain fugitives who already have serious health issues.  *See, e.g.*, *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 601-02 (W.D. Va. 2013) (post-traumatic stress disorder); *United States v. Snyder*, No. 13-mj-7082, 2013 WL 1364275, at *8 (D. Ariz. Apr. 3, 2013) (ovarian cancer); *United States v. Nolan*, No. 08–M–97, 2009 WL 4544699, at *3 (N.D. Ill. Dec. 1, 2009)

(skin cancer); *Bolanos v. Avila*, No. 09–1208, 2009 WL 3151328, at *4 (D. N.J. Sept. 24, 2009) (cancer); *Latulippe*, 2008 WL 2704230, at *1 (cancer).

Moreover, the government respectfully submits that this Court should consider the health and safety risks posed to U.S. law enforcement who would be responsible for locating and arresting Michael Taylor if he fled while on bond. *See, e.g.*, *United States v. Morris*, No. 3:19-cr-573, 2020 WL 1694301, at *5 (N.D. Tex. Apr. 6, 2020) (taking into account "concerns for the safety of pretrial services officers who will have to install equipment in order to supervise [the defendant], and the United States Deputy Marshals who will have to go out and find and arrest him if he does not comply with any conditions of release, in the midst of the current pandemic").

### 3. Releasing Michael Taylor on bond could negatively impact U.S. foreign policy interests

There could be serious diplomatic repercussions if this Court were to release Michael Taylor on bond and he subsequently fled. Michael Taylor was among the American-led team that is alleged to have enabled Ghosn's escape. The Ghosn prosecution was one of Japan's most important cases. It would add insult to injury if the Americans who enabled Ghosn's escape were themselves able to evade justice, and the United States was thereby unable to fulfill its treaty obligations to Japan. *See, e.g.*, *Castenda-Castillo*, 739 F. Supp. 2d at 56 ("The potential for diplomatic embarrassment and its effect on foreign relations should a foreign fugitive be granted bail and abscond cautions against release.") (internal quotation marks and citation omitted). Japan is a strong treaty partner of the United States and a key ally. There is a serious risk that U.S. foreign policy interests would be adversely affected if Michael Taylor were to flee.

## CONCLUSION

For the foregoing reasons, the United States requests that Michael Taylor be detained until the conclusion of the extradition process.   Should, however, the court decide to grant bail to Michael Taylor, the United States requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order so that the government may consider whether to seek further review of this issue.

Date: May 20, 2020                                                ANDREW E. LELLING
                                                                           United States Attorney


                                                          By:      /s/ Stephen W. Hassink
                                                                           STEPHEN W. HASSINK
                                                                           Assistant United States Attorney

## CERTIFICATE OF SERVICE

I, Stephen W. Hassink, Assistant U.S. Attorney, do hereby certify that on May 20, 2020, I served a copy of the foregoing on all registered parties by electronic filing on ECF.

                                                                   /s/ Stephen W. Hassink
                                                                   Stephen W. Hassink
                                                                   Assistant U.S. Attorney