UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | Case No. 20-mj-1069-DLC |
| MICHAEL L. TAYLOR | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | Case No. 20-mj-1070-DLC |
| PETER M. TAYLOR | ) | |
| | ) | |

**DEFENDANTS' MOTION TO QUASH ARREST WARRANTS OR, IN THE ALTERNATIVE, FOR RELEASE PENDING FINAL DISPOSITION ON REQUEST FOR EXTRADITION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND .................................................................. 3

ARGUMENT ....................................................................................................................... 6

    I.    The Court should quash the provisional warrants because there is no probable cause to
support the Taylors' arrests ............................................................................................ 6

        A.    The Fourth Amendment and the U.S.-Japan Extradition Treaty require probable cause
for issuance of a provisional warrant ...................................................................... 7

        B.    The U.S. Complaints do not establish probable cause because they do not allege a
crime under Japanese law ...................................................................................... 11

        C.    The United States cannot extradite for the prosecution of a crime not requested by
Japan ..................................................................................................................... 15

        D.    The Japanese arrest warrants for the Taylors allege a different violation than the
offense for which the United States has sought extradition, but that offense is a
misdemeanor ......................................................................................................... 16

    II.    Alternatively, the Court should release the Taylors on conditions because they are likely
to succeed on the merits of the extradition request and they are neither flight risks nor dangers
to the community ........................................................................................................ 17

        A.    Special circumstances justify releasing the Taylors on bail ...................................... 18

        B.    The Taylors are not flight risks ................................................................................. 23

        C.    The Taylors are not dangers to the community ........................................................ 31

        D.    Michael Taylor is the sole caretaker for his elderly stepfather .................................. 31

        E.    The COVID-19 virus has recently entered the detention facility .............................. 32

        F.    The relevant factors considered in combination also support a finding of "special
circumstances" justifying release on conditions .................................................... 33

CONCLUSION .................................................................................................................. 33

## <u>Table of Authorities</u>

**Page(s)**

**Cases**

*ACLU v. Black Horse Pike Regional Bd. Of Educ.*,
  84 F.3d 1471 (3d Cir. 1996)..........................................................................................19

*Alan A. v. Verniero*,
  970 F. Supp. 1153 (D.N.J. 1997) ................................................................................19

*In re Extradition of Boeyink*,
  2004 WL 6074945 (E.D. Va. Jan. 28, 2004) ..............................................................11

*In re Bowey*,
  147 F. Supp. 2d 1365 (N.D. Ga. 2001) .......................................................................21

*Calley v. Callaway*,
  496 F.2d 701 (5th Cir. 1974) ......................................................................................19

*Caltagirone v. Grant*,
  629 F.2d 739 (2d Cir. 1980)......................................................................................8, 9

*Carroll v. United States*,
  267 U.S. 132, 162 .........................................................................................................7

*Collins v. Univ. of New Hampshire*,
  664 F.3d 8 (1st Cir. 2011).............................................................................................7

*Matter of Extradition of Drumm*,
  150 F. Supp. 3d 92 (D. Mass. 2015) ...............................................................18, 24, 29

*Drumm v. McDonald*,
  2016 WL 111411 (D. Mass. Jan. 11, 2016) ................................................................18

*In re Extradition of Gonzalez*,
  52 F. Supp. 2d 725 (W.D. La. 1999)...........................................................................22

*Kin-Hong v. United States*,
  926 F. Supp. 1180 (D. Mass. 1996) ............................................................................24

*In re Komel Nacif-Borge*,
  829 F. Supp. 1210 (D. Nev. 1993) ..............................................................................33

*In re Metzger*,
  17 F. Cas. 232 (S.D.N.Y. 1847)..................................................................................10

*In re Mitchell*,
   171 F. 289 (S.D.N.Y. 1909) ........................................................................22

*In re Extradition of Molnar*,
   182 F. Supp. 2d 684 (N.D. Ill. 2002) ....................................................21, 33

*In re Extradition of Orellana*,
   2000 WL 1036074 (S.D.N.Y. July 26, 2000) .........................................8, 11

*Parretti v. United States*,
   122 F.3d 758 (9th Cir. 1997) ..............................................................10, 11

*Parretti v. United States,*
   143 F.3d 508 (9th Cir. 1998) .....................................................................10

*In re Rob[b]ins*,
   27 F. Cas. 825 (D.S.C. 1799) .....................................................................10

*Rosado v. Civiletti,*
   621 F.2d 1179 (2d Cir. 1980) ......................................................................8

*Matter of Extradition of Russell*,
   805 F.2d 1215 (5th Cir. 1986) ...................................................................11

*Sahagian v. United States*,
   864 F.2d 509 (7th Cir. 1988) .......................................................................9

*Salerno v. United States*,
   878 F.2d 317 (9th Cir. 1989) .....................................................................19

*In re Santos*,
   473 F. Supp. 2d 1030 (C.D. Cal. 2006) ...............................................20, 21

*In re Extradition of Skaftouros*,
   643 F. Supp. 2d 535 (S.D.N.Y. 2009) ..........................................8, 10, 11

*United States v. Alvarez-Machain*,
   504 U.S. 655 (1988) ....................................................................................16

*United States v. Castaneda-Castillo*,
   739 F. Supp. 2d 49 (D. Mass. 2010) ........................................................3, 19

*United States v. Georgiadis*,
   819 F.3d 4 (1st Cir. 2016) ...........................................................................15

*United States v. Kattar, et al.*,
　　No. 91-cr-10247-DPW (D. Mass 1991)................................................26

*United States v. Kin-Hong*,
　　83 F.3d 523 (1st Cir. 1997)...........................................................19

*United States v. Kin-Hong*,
　　110 F.3d 110 (1st Cir. 1997).........................................................16

*United States v. Lawrence*,
　　3 U.S. (3 Dall.) 42 (1795) ............................................................10

*United States v. Merritt*,
　　945 F.3d 578 (1st Cir. 2019)...........................................................8

*United States v. Ramnath*,
　　533 F. Supp. 2d 662 (E.D. Tex. 2008) .....................................21, 25

*United States v. Rauscher*,
　　119 U.S. 407 (1886)......................................................................16

*United States v. Taitz*,
　　130 F.R.D. 442 (S.D. Cal. 1990). .................................................33

*United States v. Williams*,
　　611 F.2d 914 (1st Cir. 1979).........................................................24

*Van Cauwenberghe v. Biard*,
　　486 U.S. 517 (1988)......................................................................16

*In re Washington*,
　　2007 WL 128906 (W.D.N.Y. Jan. 12, 2007).................................11

*Wong Sun v. United States*,
　　371 U.S. 471 (1963)................................................................7, 11

**Statutes**

18 U.S.C. § 2.......................................................................................14

18 U.S.C. § 3.......................................................................................14

18 U.S.C. § 3142(g) ............................................................................23

**Other Authorities**

Fed. R. Crim. P. 4 .................................................................................7

Roberto Iraola, *The Federal Common Law of Bail in International Extradition Proceedings*,
17 Ind. Int'l & Comp. L. Rev. 29, 41 (2007) ....................................................................19

*Jokai Keiho* (3d Edition) (2013) Kobun-Do ..............................................................................12

Christopher D. Man, *Extradition and Article III: A Historical Examination of "the Judicial Power of the United States,"*
10 Tul. J. Int'l & Comp. L. 37 (2002) .....................................................................10, 18

Penal Code of Japan, Article 25 ......................................................................................5, 16

Penal Code of Japan, Article 63 ...........................................................................14, 17, 24

Penal Code of Japan, Article 71 .................................................................................2, 5, 16

Penal Code of Japan, Article 97 ............................................................................12, 13, 14

Penal Code of Japan, Article 98 ...................................................................................12, 13

Penal Code of Japan, Article 103 ............................................................................... *passim*

Nathaniel A. Persily, *International Extradition and the Right to Bail*,
34 Stan. J. Int'l Law 407 (1998) ................................................................................19

Treaty of Extradition Between the United States of America and Italy,
Jan. 18, 1973, 26 U.S.T. 493; T.I.A.S. No. 8052 ..................................................9

Treaty on Extradition Between the United States of America and Japan,
Mar. 3, 1978, 31 U.S.T. 892, T.I.A.S. No. 9625 ...................................... *passim*

Treaty on Extradition Between the United States of America and Spain,
May 29, 1970, 22 U.S.T. 737, T.I.A.S. No. 7136, *as amended*, Jan. 25, 1975, 29 U.S.T. 2283, T.I.A.S. No. 8938 ....................................................................................9

U.S. Const. amend. IV ........................................................................................... *passim*

## INTRODUCTION

Michael Taylor and Peter Taylor move the Court to quash the provisional warrants issued for their arrest because the Complaints for Provisional Arrest with a View Towards Extradition (Dkt. 1, "U.S. Complaint(s)") on their face fail to establish probable cause that the Taylors committed a crime in Japan for which they may be extradited.  The United States' burden to establish probable cause that an extraditable offense occurred is required by both the Fourth Amendment to the Constitution and The Treaty on Extradition Between the United States of America and Japan, Mar. 3, 1978, 31 U.S.T. 892, T.I.A.S. No. 9625 ("Treaty").

The legal defects in the U.S. Complaints are primarily two-fold.  First, the *sole* "offense" alleged in the U.S. Complaints—a charge for enabling the escape of an accused, Carlos Ghosn Bichara, from his bail conditions, purportedly in violation of Article 103 of the Japanese Penal Code—*is not a crime under Japanese law*.  "Bail jumping" is not a crime in Japan, a fact widely reported in Japan and so far beyond dispute that the Japanese government has begun considering whether it should amend the law to make such conduct a crime.  Enabling bail jumping is also not a crime.  Article 103 simply does not apply to someone who is alleged to have assisted a defendant to violate his or her bail conditions, and it has never been charged in such circumstances.

Second, the non-offense described in the U.S. Complaints is not even one of the offenses for which the Japanese arrest warrants were actually issued.  What the United States has stated in its complaints and what the Japanese have stated in the warrant are *not* the same.  Consequently, the United States did not seek or execute the arrest of the Taylors for any crime in Japan (assisting bail jumping) for which the Japanese government has sought the Taylor's extradition.  Rather, the supposed Japanese crime that is contained in the actual warrants (a misdemeanor immigration offense), even if properly presented in the U.S. Complaints, is not among the narrower set of crimes that are subject to extradition by the Treaty.

1

Here is where the story ends.  The plaintiff in this action is the United States, and this Court is required to evaluate the case that the United States chose to bring, and not the one that Japan apparently hoped the United States, in the United States' discretion, would bring.  Under the rule of specialty embodied in Article VII, Section 1 of the Treaty, Japan cannot "detain, prosecute, try nor punish a person surrendered under this Treaty for an offense other than that for which extradition has been granted," so the United States' request for this Court to authorize the Taylors' arrest so that they can be extradited for an offense that Japan cannot prosecute and has not sought to prosecute is baseless.

It has to be emphasized that the offenses for which Japan actually sought the Taylors' arrest are not subject to extradition under the Treaty.  Those offenses are (1) enabling Ghosn to leave Japan while bypassing immigration control and (2) harboring Ghosn after he committed the offense of bypassing immigration control.  These are the actual offenses that the Japanese warrants allege, and both are misdemeanors under Japanese law.[1]  (Exs. A & B (Taylor Arrest Warrants); Ex. C (Ghosn Interpol Red Notice, showing his arrest was not for violating Article 103, either).)  There is no mention of Article 103 in the underlying arrest warrants from Japan.  (*See* Exs. A-C.)  Accordingly, had the U.S. Complaints accurately described the alleged offenses in Japan, there still would be no probable cause for the provisional warrants, as only felony offenses may be the subject of an extradition request under Article II, Section 1 of the Treaty.

Even if the United States' lone conclusory and inaccurate allegation of a violation of

---

[1] From the time of their arrest until last week, the Taylors sought the warrants sent by the Japanese. The U.S. Attorney refused.  Only after the Court ordered the release was it revealed that, contrary to what was previously reported, the warrants do *not* mention Japanese Article 103 (escape) and instead cite only Article 71 (immigration).  That may explain the government's reluctance to provide them, but now that they have been provided, this reveals another fundamental flaw in the arrest as Article 71 (whether violated or not) could never be the basis for an extradition because it is only a misdemeanor.

Japanese law were sufficient to establish probable cause for the Taylors' arrest, the Court should at the very least release the Taylors on reasonable conditions pending the completion of extradition proceedings.  This Court and others recognize that substantial claims showing a high probability of success on the merits are special circumstances justifying bail in extradition cases.  *See, e.g.*, *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 56 (D. Mass. 2010).  Further, neither of the Taylors is a danger to the community or a realistic flight risk, especially given the fact that their true risk of a proper and lawful extradition and conviction at a fair trial is non-existent.  Both Taylors, father and son, are U.S. citizens and lifelong residents of Massachusetts with numerous ties to the country and district.  Neither is going anywhere and, in fact, both individuals voluntarily returned to Massachusetts from Lebanon (which has no extradition treaty with Japan) with full knowledge of the Japanese arrest warrants.  These are not the acts of persons who have any intention of attempting to avoid prosecution or extradition.  These, and the facts and circumstances set forth below, make it appropriate under federal common law for the Court to release the Taylors, subject to reasonable conditions, pending the conclusion of the extradition proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 29, 2019, Carlos Ghosn Bichara left Japan, thereby violating the conditions of his release pending trial on certain criminal charges.  (Ex. D (English translation of Japan order granting bail).)  Japanese authorities had charged Ghosn, the former CEO of Nissan, with crimes allegedly arising out the preparation of Nissan financial statements, including the alleged failure to fully disclose his compensation.[2]  The U.S. Complaints allege that, "[o]n April 25, 2019, the

---

[2] Japan's prosecution and treatment of Ghosn has been the subject of much international criticism. French President Emmanuel Macron, among others, repeatedly has criticized Japan's treatment of Mr. Ghosn, the conditions under which he was detained and questioned, and the lack of protection for his rights as an accused.  (*See* Ex. E.)  Ghosn has asserted that the Japanese prosecution was undertaken with a political objective, to oust Ghosn from the company and curtail the rising

Tokyo District Court released Ghosn on bond with conditions that included" a requirement that he obtain advance approval for any trips within Japan lasting three days or more, that he not hide or flee, and that he not make any overseas trips.  (U.S. Compls. ¶ 7(b).)  According to the U.S. Complaints, "[b]y fleeing Japan pending trial, Ghosn violated his bail conditions." (*Id.*)  The U.S. Complaints further specifically allege that the Taylors "and other individuals helped Ghosn flee from Japan while he was released on bail pending trial for financial crimes" (*id.* ¶ 7(a)), and purport to detail how they did so (*id.* ¶¶ 7(c)-(m)).  With respect to the crime allegedly committed by the Taylors, the U.S. Complaints allege only as follows:

> According to the information provided by the Government of Japan, Michael [and Peter] Taylor [have] been charged under Article 103 of the Japanese Penal Code with enabling the escape of Carlos Ghosn Bichara ("Ghosn"), who was indicted in Japan for financial crimes and had been released on bail pending his trial.

(*Id.* ¶ 5.)  As detailed *infra* in Section I.B, violating one's bail conditions, or "bail jumping," is not a crime in Japan; while one forfeits the bail and may subject oneself to a greater sentence on the underlying offense being prosecuted, there is no separately punishable crime.  Just as "bail jumping" is not a crime, neither is assisting someone to violate the conditions of his release. (Indeed, it would be a *non sequitur* and violate U.S. law and the Treaty requirement of extradition reciprocity to make it a crime to help someone else to do something that is itself not criminal.) The supposed charge alleged in Paragraph 5 of the U.S. Complaints, therefore, is actually not a

---

influence of the French company Renault, which formed an alliance with Nissan in 1999.  The *Wall Street Journal* reported that Nissan's then-CEO, Hiroto Saikawa, told colleagues at a 2019 dinner party that he believed that certain Nissan executives gathered evidence against Ghosn and gave it to Japanese authorities in an effort to derail any possibility of a full business combination between Nissan and Renault, fearing Nissan would fall to French control.  (*See* Ex. F.)  Senior United States lawmakers agree.  (Ex. G (letter from Senator Roger Wicker stating "[i]t has become clear that the abusive Japanese justice system was used to engineer what amounted to a corporate takeover at Nissan.").)  Since Ghosn left Japan, even the Japanese Prime Minister has been quoted as suggesting that this matter should have been handled internally at Nissan, not with a criminal prosecution.  (*See* Ex. H.)

crime in Japan.  The fact that this conduct is not an offense in Japan most likely explains why the Japanese government made no mention of Article 103 in the arrest warrants that Japan issued for the Taylors.  (*See* Exs. A & B.)

The U.S. Complaints also allege that Japanese warrants for the Taylors' arrests were issued on January 30, 2020, and renewed on February 28, 2020.  (U.S. Compls. ¶ 6.)  The Japanese warrant alleges that "[w]ithout receiving confirmation by immigration officer," Ghosn boarded a private jet and left Japan's territory.  (Ex. A at Annex 3.)  This is alleged to be a violation of Articles 71 and 25 of the Immigration Control and Refugee Recognition Act.  (*Id.* at 2.)  The warrant alleges that the Taylors and another man hid Ghosn "inside [] carrying luggage" and that they put the luggage onboard the jet, bypassing the immigration control point, thereby "assisting Ghosn's escape and aided by easing Ghosn's illegal leaving from Japan without receiving confirmation by immigration officer."  (*Id.* at Annex 3.)  The allegation in the Japanese warrant, therefore, is not that the Taylors violated Article 103 by enabling "the escape of Ghosn" from his bail conditions, as the U.S. Complaints allege (and which is not a crime in any event).  Instead, the warrant alleges that the Taylors committed an offense by aiding Ghosn to leave Japan "without receiving confirmation by immigration officer."  As detailed *infra* in Section I.D, this, at least, is arguably an actual crime under Japanese law, but it is only punishable as a misdemeanor. Therefore, extradition for that offense is not available under the Treaty.

That warrants, which were not sealed, had been issued against the Taylors in Japan and were publicly known and widely reported.  (*See, e.g.*, Exs. A & B.)  The Taylors became aware of the Japanese warrants very soon after they were issued through news reports and even direct inquiries from reporters asking them about the warrants.  Both men also were aware that Japan has an extradition treaty with the United States, but not with Lebanon.  At the time the Japanese

warrants were issued, the Taylors were both in Lebanon. Michael Taylor returned from Lebanon to his home in Massachusetts on February 23, 2020. Peter Taylor returned to Massachusetts on or about March 15, 2020.

Michael Taylor and his son, Peter Taylor, are both natural-born U.S. citizens. Michael Taylor's wife, and Peter Taylor's mother, Lamia, was born in Lebanon and is a dual citizen of the United States and Lebanon. The family's primary home for the last 30 years has been, and continues to be, in Harvard, Massachusetts. Mrs. Taylor owns a small condominium in Ghazir, Lebanon, at which the Taylors' oldest son (Rudy) now resides full-time. Peter Taylor has resided in Lebanon with his brother intermittently for the past several years, and for the majority of the past year and a half. Peter Taylor had planned to return to Lebanon on May 20 for perfectly proper business reasons—to work on developing his own digital marketing business and expanding his father's Vitamin 1 performance drink business (which Mr. Taylor started in Massachusetts more than six years ago) within the Lebanese market.

## ARGUMENT

### I.   THE COURT SHOULD QUASH THE PROVISIONAL WARRANTS BECAUSE THERE IS NO PROBABLE CAUSE TO SUPPORT THE TAYLORS' ARRESTS

As a fundamental Fourth Amendment matter (and a predicate issue under the Treaty), there was no probable cause to arrest the Taylors in the first place, and there is no probable cause to continue to hold them. The "offense" that the U.S. Complaints allege the Taylors committed simply is not a crime under Japanese law, negating any possible probable-cause finding. In fact, the alleged violation of Article 103 of the Japanese Penal Code set forth in the U.S. Complaints is not even the violation that Japan has sought to prosecute through its arrest warrant or to seek extradition to prosecute. The offense that Japan does seek extradition to prosecute, however, is punishable only as a misdemeanor, meaning there would be no probable cause with respect to an

extraditable offense because only felonies can be extraditable offenses.   Therefore, the U.S. Complaints do not, and cannot, establish probable cause and the Court must quash the provisional warrants.

### A.      The Fourth Amendment and the U.S.-Japan Extradition Treaty Require Probable Cause for Issuance of a Provisional Warrant

The Fourth Amendment to the Constitution guarantees that "no warrants shall issue [] but upon probable cause, supported by oath or affirmation[.]"   U.S. Const., amend. IV; *see also* Fed. R. Crim. P. 4(a) ("If the complaint or one or more affidavits filed with the complaint establish probable cause to believe that an offense has been committed and that the defendant committed it, the judge must issue an arrest warrant to an officer authorized to execute it.").   This probable cause requirement is replicated in Article III of the Treaty as well:

> Extradition shall be granted only if there is sufficient evidence to prove either that there is *probable cause* to suspect, according to the laws of the requested Party, that the person sought has *committed the offense for which extradition is requested* or that the person sought is the person convicted by a court of the requesting Party.

(emphases added); *see also* Treaty, Art. VIII, Section 3 (requiring Japan to submit a copy of its "warrant of arrest" and make a showing of "probable cause" that the relator "committed the offense for which extradition is requested").

As the Supreme Court has explained, "[t]he quantum of information which constitutes probable cause [is] evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed."   *Wong Sun v. United States*, 371 U.S. 471, 479 (1963) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).   Put another way, "[p]robable cause exists if the facts and circumstances within the issuing judge's knowledge and of which they had reasonably reliable information would suffice to warrant a prudent person believing that a person has committed a crime."   *Collins v. Univ. of New Hampshire*, 664 F.3d 8, 15 (1st Cir. 2011) (quotations, citation, and alterations omitted).   Importantly, "[t]he existence of probable cause

must be determined in light of the information known to the police at the time of the arrest." *United States v. Merritt*, 945 F.3d 578, 584 (1st Cir. 2019) (quotations and citation omitted).

In the context of extradition, it has long been established that "although the Constitution cannot limit the power of a foreign sovereign to prescribe procedures for the trial and punishment of crimes committed within its territory, it does govern the manner in which the United States may join the effort." *Rosado v. Civiletti*, 621 F.2d 1179, 1195 (2d Cir. 1980). Thus, where "the United States itself acts to detain a relator pending extradition, it is bound to accord him due process." *Id.* Courts have concluded or assumed almost universally that a provisional arrest and detainment under an extradition treaty must be accompanied by probable cause. This fundamental legal premise derives from two sources: (1) the Treaty itself, which as noted above is explicit with respect to Japan, and (2) the Fourth Amendment. *See, e.g.*, *Caltagirone v. Grant*, 629 F.2d 739, 747 (2d Cir. 1980) (concluding that the extradition treaty between the United States and Italy requires a showing of probable cause prior to provisional detention); *In re Extradition of Skaftouros*, 643 F. Supp. 2d 535, 547 (S.D.N.Y. 2009) (noting that the government must show probable cause under the Fourth Amendment even where it is not required to do so by the text of a treaty). Where a relator has shown that the government has failed to establish probable cause, release is required. *See, e.g.*, *In re Extradition of Orellana*, 2000 WL 1036074, at *8-10 (S.D.N.Y. July 26, 2000) (ordering release).

First, courts have interpreted treaty language to require a showing of probable cause prior to a provisional detention. For example, in *Caltagirone*, the Second Circuit determined that the extradition treaty between the United States and Italy imposed a probable cause requirement upon the government where the treaty required the requestor to provide "'such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed

8

... in the territory of the requested Party.'" 629 F.2d at 744 (quoting Treaty on Extradition Between the United States of America and Italy, Jan. 18, 1973, 26 U.S.T. 493; T.I.A.S. No. 8052) (alteration in *Caltagirone*). In the court's view, "[t]he Treaty's draftsmen clearly intended to streamline the … arrest procedure in urgent cases, but not by sacrificing the protection of the probable cause requirement." *Caltagirone*, 629 F.2d at 747. Although the court did not need to resolve the Fourth Amendment question, it nevertheless expressed "doubt that the tenuous relationship between an application for provisional arrest and a subsequent request for extradition implicates a sufficiently strong foreign policy interest in the executive to justify such a departure from usual Fourth Amendment protections." *Id.* at 747, 748.

Likewise, in *Sahagian v. United States*, 864 F.2d 509 (7th Cir. 1988), the Seventh Circuit noted that the Treaty between the United States and Spain required probable cause prior to a provisional arrest. Although less clear than the treaty with Italy, the Spanish treaty provided, as a prerequisite for obtaining a provisional arrest, that the requesting party provide "a description of the person sought, an indication of intent to extradite, a statement of the existence of an arrest warrant, and such 'further information, if any, as may be required by the requested Party.'" *Id.* at 511 (quoting Treaty on Extradition Between the United States of America and Spain, May 29, 1970, 22 U.S.T. 737, T.I.A.S. No. 7136, *as amended*, Jan. 25, 1975, 29 U.S.T. 2283, T.I.A.S. No. 8938). In rejecting plaintiff's due process arguments, the court observed that "the procedures set forth in [the treaty] did not deprive [plaintiff] of any constitutional rights" because "the federal officials obtained [plaintiff's] provisional arrest and detention pending extradition after obtaining an arrest warrant from a magistrate based upon a showing of probable cause," "[a]s contemplated by [the treaty]." *Sahagian*, 864 F.2d at 513. Notably, the treaty between the United States and Japan has a similar requirement that the requesting party furnish "such further information as may

9

be required by the laws of the requested Party." *See* Treaty, Art. IX.  And, as noted above, the Treaty twice emphasizes the need to establish "probable cause."

Second, in any event, "where a treaty does not already do so, the Fourth Amendment binds preliminary detentions in the United States to the probable cause standard." *Skaftouros*, 643 F. Supp. 2d at 547.[3]  The leading discussion on the topic is the Ninth Circuit's opinion in *Parretti v. United States*, 122 F.3d 758 (9th Cir. 1997), even though the opinion was subsequently withdrawn under the fugitive disentitlement doctrine when Parretti fled the United States, 143 F.3d 508, 509 (9th Cir. 1998) (en banc).  There, after determining that the applicable treaty with France did not contain any textual requirement for probable cause prior to a provisional arrest, the court reached the constitutional question and held that probable cause is required by the Fourth Amendment. *Parretti*, 122 F.3d at 770-73.  According to the court, the Warrant Clause's provision that "*no warrant issue but on probable cause is immutable.*" *Id.* at 771 (emphasis in original).  Thus, *id.*:

> [t]he Warrant Clause cannot be interpreted as allowing a lesser standard for arrests made for the purpose of enforcing treaty obligations than for arrests made for the purpose of enforcing our own domestic laws.  It speaks of probable cause as a necessary condition of every arrest warrant, regardless of the governmental purpose served by the arrest.  And it could be no other way.

---

[3] Even before the Extradition Act was passed, Presidents recognized the need to utilize courts to issue arrest warrants in the extradition context, rather than proceed by executive order, and federal judges found Article III of the Constitution self-executing in giving them authority to effectuate extradition treaties. *See, e.g.*, *In re Rob[b]ins*, 27 F. Cas. 825, 826-27, 832-33 (D.S.C. 1799).  As early as 1795, the Supreme Court recognized the authority of federal judges to refuse an Executive Branch request to extradite. *United States v. Lawrence*, 3 U.S. (3 Dall.) 42, 53 (1795).  Federal courts recognized that the involvement of federal judges in issuing arrest warrants in furtherance of an extradition, by constitutional necessity, requires that judges comply with the Fourth Amendment in issuing such arrest warrants. *In re Metzger*, 17 F. Cas. 232, 233 (S.D.N.Y. 1847); *see* Christopher D. Man, *Extradition and Article III: A Historical Examination of "the Judicial Power of the United States,"* 10 Tul. J. Int'l & Comp. L. 37 (2002) (analyzing early extradition law to show the need for judicial involvement and compliance with the Fourth Amendment).

The court went on to find that the government had not met the probable cause standard in that case, as its "showing consisted of nothing more than naked allegations." *Id.* at 775.

Since *Parretti*, virtually every court that has addressed the constitutional question has agreed that the Fourth Amendment requires a showing of probable cause prior to a provisional arrest pursuant to an extradition treaty. *See, e.g.*, *Skaftouros*, 643 F. Supp. 2d at 547; *Orellana*, 2000 WL 1036074, at *7.  In addition, many other courts have assumed, without deciding, that the Fourth Amendment requires probable cause. *See, e.g.*, *Matter of Extradition of Russell*, 805 F.2d 1215, 1217 (5th Cir. 1986) (assuming probable cause requirement without deciding); *In re Washington*, 2007 WL 128906, at *3 (W.D.N.Y. Jan. 12, 2007) (same); *In re Extradition of Boeyink*, 2004 WL 6074945, at *2 (E.D. Va. Jan. 28, 2004) ("[A] showing of probable cause may nevertheless be constitutionally required.").

**B.     The U.S. Complaints Do Not Establish Probable Cause Because They Do Not Allege a Crime Under Japanese Law**

At the very least, probable cause requires that the United States allege an actual crime was committed in seeking extradition. *See, e.g.*, *Wong Sun*, 371 U.S. at 479 ("The quantum of information which constitutes probable cause—evidence which would 'warrant a man of reasonable caution in the belief' *that a felony has been committed*—must be measured by the facts of the particular case.") (citation omitted, emphasis added).  The U.S. Complaints here fail to establish this most basic component of probable cause.

According to the U.S. Complaints, the Taylors "helped Ghosn flee from Japan while he was released on bail pending trial for financial crimes" (U.S. Compls. ¶ 7(a)) and they thus have been charged "under Article 103 of the Japanese Penal Code with enabling the escape of [Mr. Ghosn], who was indicted in Japan for financial crimes and had been released on bail pending his trial" (*id.* ¶ 5).  As Dr. William B. Cleary, a law professor at Hiroshima Shudo University in

Hiroshima, Japan, sets forth in his declaration (Ex. I), Article 103 makes it a crime punishable by up to three years' imprisonment to harbor or enable the "escape" of another person who has "committed a crime" punishable with a fine or greater punishment or "escaped from confinement." (*Id.*, ¶ 12; *see also* Art. 103, Japanese Law Translation Database System, Ministry of Justice, Japan.[4])  The statute uses the term "escape," which is a term of art under Japanese law that derives its meaning from Articles 97 (titled "Escape") and 98 (titled "Aggravated Escape").  (Ex. I ¶ 10.)[5] As used under those provisions, "escape" means that an individual has either fled the scene of a crime to evade police apprehension, or broken out of "confinement," which, in turn, refers to the physical restraints imposed on one's movement in a prison, jail, or other such detention facility. (*See, e.g.*, Ex. J, *Jokai Keiho* (3d Edition) (2013) *Kobun-Do*.)

There is not a single instance where Articles 97 or 98 has been applied to bail jumping— because bail jumping is plainly not a crime in Japan.  (Ex. I ¶ 10.)  Japan has never prosecuted anyone, including Ghosn, for "escaping" bail conditions.[6]  To the contrary, in the wake of Ghosn's departure from Japan, numerous news articles have reported on the fact that what Mr. Ghosn did was not a crime.  (*See, e.g.*, Ex. I, internal exhibits attached.)  As one such article explains, "[u]nder current law, [the] 'crime of escape' only applies to jail or detention facility escapees, not those who flee while out on bail."  (*Id.*, Internal Exhibit C.)  This fact has been roundly criticized among Japanese officials, legal commentators, and media members, to the point that the Japanese

---

[4] Available at http://www.japaneselawtranslation.go.jp/law/detail/?id=1960&re=02&vm=04.

[5] In fact, the Japanese word for "escape" that is used in Articles 97 and 98—"toso" (逃亡)— is the same word that is used to describe the Taylors' alleged conduct in Annex 3 to Japan's arrest warrants.  (Exs. A & B, Annex 3.)

[6] Indeed, Japan has not issued a warrant for Ghosn's arrest for escaping his bail conditions.  The "red notice" posted to Interpol indicates only the underlying financial crime charges for which he was released on bail in Japan.  (*See* Ex. C.)

government is reportedly considering adopting new laws that *would* make bail jumping a criminal offense. (*See id.* (reporting that Japanese Justice Minister Masako Mori has "indicated planned legal reforms that would expand the application of 'crime of escape' under the Criminal Law to accused individuals out on bail.")).

In charging the Taylors with violating Article 103, the United States is attempting to transform Japanese law to criminalize the act of *helping* someone engage in an act that is not *itself* criminal. Apart from raising profound due process and fairness concerns (which makes the United States' case for detention even more tenuous), this charge is unfounded as a matter of Japanese criminal law. Even assuming that the United States' allegations were true, the Taylors cannot be said to have violated Article 103 because they did not harbor or enable Ghosn—who was free on bail—in fleeing the scene of a crime or escaping confinement. (Ex. I ¶ 14.) Like Articles 97 and 98, Article 103 has never been interpreted or understood to apply to assisting someone to violate their bail conditions. (*Id.* ¶¶ 13-14.) In fact, recent Japanese cases establish that Article 103 is only chargeable when one harbors or enables "escapes" within the traditional meaning of the term—i.e., fleeing the scene of a crime, or breaking out of a detention facility.[7] The statute simply has no application to assisting someone to figuratively "escape" his or her bail conditions. At

---

[7] *See, e.g.*, Osaka District Court, Judgement, April 27, 2018 (Hanrei-Jiho) No. 2400, *aff'd*¸ Osaka High Court, Judgement, September 25, 2018 (Hanrei-Jiho) No. 2406 (defendant violated Article 103 where he hid fugitive seeking to evade initial police apprehension); Saitama District Court, Judgement, July 16, 2014 (Saikou Saibansho Keiji Hanreishu), *aff'd*, Tokyo High Court, Judgement, July 8, 2015 (Saikou Saibansho Keiji Hanreishu) (defendant violated Article 103 by disposing of evidence in effort to thwart friend's initial capture by police); Osaka District Court, Judgement, Apr. 17, 2003 (Hanrei-Taimuzu) No. 1127 (defendant violated Article 103 by harboring fugitive in home in order to prevent another's arrest while warrant outstanding); Yokohama District Court, Judgement, Jan. 30, 2015, No. 28230737 (defendant violated Article 103 by assisting another in escaping detention facility); Tokyo District Court, Judgement, May 22, 1992, No.28166476 (defendant violated Article 103 by helping another escape police car while in custody).

bottom, just as Ghosn's violation of his bail conditions was not a crime under Japanese law, neither was any assistance rendered by the Taylors.

Charging the Taylors with violating Article 103 is at odds with other parts of Japan's Penal Code as well. Article 63 of that Code provides: "The punishment of an accessory shall be reduced from the punishment for the principal." (Ex. I ¶ 15; *see* Art. 63, Penal Code, Japanese Law Translation Database System, Ministry of Justice, Japan[8].) But the legal theory underlying Japan's current extradition request would charge an accessory in *excess* of the principal—an outcome that is both unjust and illogical.[9] If the principal (Ghosn) committed no crime and could receive no punishment for jumping bail, it is contrary to Article 63 for the Taylors to be subject to criminal punishment for assisting him.[10]

This extradition request is extraordinary. When Japan sought extradition for a non-extraditable offense (a misdemeanor), the United States responded by seeking extradition for a purported felony that, due to the United States' misreading of Japanese law, has no application to these facts. In other words, the United States has sought the Taylor's extradition so that Japan can

---

[8] Available at http://www.japaneselawtranslation.go.jp/law/detail/?id=1960&re=02&vm=04.

[9] Under United States law, the punishment for an aider and abettor to a crime is commensurate with—not excessive of—the penalty of a principal. *See* 18 U.S.C. § 2. And the punishment for an accessory after-the-fact is less than the punishment for a principal. *See* 18 U.S.C § 3 ("Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned not more than 15 years.").

[10] Moreover, even if Mr. Ghosn had escaped from confinement and thus committed the crime of escape, a violation of Article 97 is a misdemeanor. (*See* Art. 97, Penal Code, Japanese Law Translation Database System, Ministry of Justice, Japan, *available at* http://www.japaneselawtranslation.go.jp/law/detail/?id=1960&re=02&vm=04.) Under Article 63, the Taylors necessarily would be subject to punishment less than that faced by Mr. Ghosn, and the offense would not be a non-extraditable misdemeanor in any event.

14

prosecute a non-crime that Japan has expressed no interest in prosecuting.  For precisely the same reason, the United States' motion for detention—doomed on the merits of extradition—falls well short of making the initial probable cause showing necessary to deprive two United States citizens of their constitutional rights to liberty.

### C.      The United States Cannot Extradite for the Prosecution of a Crime Not Requested by Japan

Extradition is simply a means to an end, by which a requesting state has sought extradition for an offense that state actually intends to prosecute.  In the strange situation here, in which the United States seeks to extradite the Taylors based on an offense for which Japan did not seek extradition, the whole point of these proceedings becomes moot.  As explained above, Article VIII, Section 3 of the Treaty requires Japan to submit a copy of the "warrant of arrest" because it matters.[11]  With respect to the offense charged in that warrant, Japan also must provide "[s]uch evidence as would provide probable cause to suspect, according to the laws of the requested Party, that the person sought has committed the offense for which extradition is requested."  Treaty, Art. VIII, § 3(c).  That is because "[e]xtradition shall be granted only if there is sufficient evidence to prove … that there is probable cause to suspect, according to the laws of the requested Party, that the person sought *has committed the offense for which extradition is requested*[.]"  Treaty, Art. III (emphasis added).  To put a finer point on it, under Article VII, Section 1, Japan cannot "detain, prosecute, try nor punish a person surrendered under this Treaty for an offense *other than that for which extradition has been granted*."  (Emphasis added.)

These are not unique requirements to this Treaty, but reflect the settled international law doctrine of specialty.  "That doctrine generally requires that an extradited defendant be tried for the crimes on which extradition has been granted, and none other."  *United States v. Georgiadis*,

---

[11] *See* footnote 1, *supra*.

15

819 F.3d 4, 9 (1st Cir. 2016) (quotations and citation omitted); *see also United States v. Kin-Hong*, 110 F.3d 110, 115 (1st Cir. 1997) ("The rule has two basic requirements: that the relator be tried for the crimes charged in the extradition warrant and that the relator not be re-extradited to another country.") (internal citation omitted).  "[T]he principle operates to ensure that the receiving state does not abuse the extradition processes of the extraditing state."  *Van Cauwenberghe v. Biard*, 486 U.S. 517, 525 (1988); *see also United States v. Alvarez-Machain*, 504 U.S. 655, 659-60 (1988); *United States v. Rauscher*, 119 U.S. 407, 430 (1886).

In short, the United States has asked this Court to engage in a process that is without a proper underlying legal basis and is a moot exercise in violation of Article III.  It has asked this Court to extradite the Taylors to be tried for a Japanese offense that does not exist, and for which Japan did not request their extradition.  And even if this Court did extradite the Taylors on this basis, the law of specialty would preclude Japan from trying them for any other offense.

### D. The Japanese Arrest Warrants for the Taylors Allege a Different Violation than the Offense for Which the United States Has Sought Extradition, But that Offense Is a Misdemeanor

The United States has explicitly rejected seeking the Taylors' extradition on the basis of the actual offense alleged in the arrest warrant from Japan, harboring or enabling Ghosn to avoid arrest for his violation of Articles 25 and 71 of the Immigration Control and Refugee Recognition Act by not receiving confirmation of his departure from immigration officers prior to leaving Japan, so this issue can quickly be dispensed with.[12]  The reason the United States has waived this

---

[12] We note that the United States' Complaints for Provisional Arrest, in footnote 1, allude to the fact that the Taylors have been charged with "an immigration offense that does not form the basis of this complaint for … provisional arrest."  The United States may have realized that the warrant was deficient, but its statement is an explicit waiver of any right to seek extradition on the basis of what it stated it was not using.  Yet, the fact is that the immigration offense, a misdemeanor, *is* the apparent basis for the Japanese request, likely because the Japanese recognize that bail jumping is not an offense at all.

argument is that it has no merit in the extradition context.  Under the Treaty, the only offenses that are extraditable are felonies, and the offenses alleged in the Japanese arrest warrants are misdemeanors.

While a genuine Article 103 violation carries a maximum punishment of three years, Article 63 limits the punishment that can be imposed on the Taylors for assisting Ghosn to violate the Immigration Control and Refugee Recognition Act to less than that imposed on Ghosn, which in turn, as discussed above, is limited to imprisonment of not more than one year.  For extradition to be available under the Treaty, the offense must be "punishable by the laws of both Contracting Parties by death, by life imprisonment, or by deprivation of liberty for a period of *more than one year*[.]"  Treaty, Art. II. (emphasis added).  As a result, the actual offense with which the Japanese have charged the Taylors would still not establish probable cause for an extraditable offense as that offense is a mere misdemeanor.

For all of the foregoing reasons, the Court should quash the warrants and order the release of the Taylors forthwith.

## II.   ALTERNATIVELY, THE COURT SHOULD RELEASE THE TAYLORS ON CONDITIONS BECAUSE THEY ARE LIKELY TO SUCCEED ON THE MERITS OF THE EXTRADITION REQUEST AND THEY ARE NEITHER FLIGHT RISKS NOR DANGERS TO THE COMMUNITY

Even if the United States or Japanese government's conclusory (and inaccurate) assertions were sufficient to support the arrest warrants, the Court still should release the Taylors because the lack of an extraditable offense, or any offense at all under Japanese law, constitutes a "special circumstance" justifying release on bail pending the conclusion of extradition proceedings, the Taylors are not flight risks, the Taylors are not dangers to the community, Michael Taylor has family obligations he must attend to, and the ongoing COVID-19 situation makes it unwise to detain the Taylors (who have both travelled internationally in the past several months) in close

proximity to others.

The familiar standards of the Bail Reform Act do not apply to extraditions; rather, the question of bail in extradition cases is governed by federal common law. *Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 96 (D. Mass. 2015) (Cabell, M.J.). We acknowledge that the federal common law generally recognizes a presumption against bail in extradition cases,[13] but that presumption may be overcome if a defendant proves both (1) that he is neither a flight risk, nor a danger to the community; and (2) that there are "special circumstances" that justify release on bail. *See, e.g.*, *id.*

### A.  Special Circumstances Justify Releasing the Taylors on Bail

The ultimate determination of whether "special circumstances" exist is a fact-specific and fact-intensive question committed to the Court's discretion. *Drumm v. McDonald*, 2016 WL 111411, at *3 (D. Mass. Jan. 11, 2016). Generally speaking, to be "special" a circumstance must be atypical, that is, it must be "more or less unique to the supplicant and not be one that is applicable to extraditees generally." *Id.* The circumstances that courts have held constitute "special circumstances" justifying bail in extradition proceedings include (1) a substantial likelihood of success in resisting extradition, (2) the likelihood of success in defending against the action in the requesting country, (3) the availability of bail for the underlying charges in the requesting country, and (4) the requesting country's allowance of admission to bail for those facing

---

[13] Despite this acknowledgment of the current state of the law, which is binding on this Court, defense counsel maintains that this legal understanding is outdated and unconstitutional, and seeks to preserve the issue in case of appeal. The Eighth Amendment creates a presumption for bail and that constitutional requirement is applicable to all federal judges when addressing bail issues, and such a constitutional right cannot be abrogated by treaty. Early extradition cases mistakenly treated extradition matters as some sort of exchange among sovereigns in which the individual at issue was a mere pawn, with relatively few rights. Following the expansion of constitutional rights generally in the intervening decades, extradition law has been slow to catch up in providing relators the full scope of the constitutional rights to which they are entitled, including under the Eighth Amendment. *See, e.g.*, Man, *supra* note 3, at 115.

an extradition hearing for the same offense.  Roberto Iraola, *The Federal Common Law of Bail in International Extradition Proceedings*, 17 Ind. Int'l & Comp. L. Rev. 29, 41 (2007) (compiling cases); *see also Castaneda-Castillo*, 739 F. Supp. 2d at 56 (specifically listing "substantial claims showing a high probability of success on the merits" and where "the requesting country would grant bail in a comparable extradition case" among judicially recognized special circumstances).

As detailed above, the Taylors have a high probability of success on the merits of this extradition request, as the offense alleged in the U.S. Complaints is neither a crime under Japanese law nor even the crime alleged in the Japanese warrants seeking the Taylors' arrests.  Moreover, even if the U.S. Complaints were incorrectly read to coincide with the actual Japanese arrest warrants, the crimes set out in those warrants are misdemeanor offenses and, therefore, outside the scope of the offenses for which extradition can be requested under the Treaty.

### 1.      Likelihood of Success on the Merits

The probability of success against the underlying charge on which extradition is requested first appeared as a special circumstance in *Salerno v. United States*, 878 F.2d 317 (9th Cir. 1989), which stated in *dicta* that special circumstances include "the raising of substantial claims upon which the appellant has a high probability of success[.]"  *Id.* at 317.  Several courts have cited *Salerno* in acknowledging the probability of success as a special circumstance.  *See, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 524-25 (1st Cir. 1997).  Most courts examining the issue appear to apply the same standard as is applied in the preliminary injunction setting or on *habeas* appeals. Nathaniel A. Persily, *International Extradition and the Right to Bail*, 34 Stan. J. Int'l Law 407, 435 nn.154-55 (1998) (citing *Alan A. v. Verniero*, 970 F. Supp. 1153, 1171 (D.N.J. 1997) (citing, *inter alia*, *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n.2 (3d Cir. 1996)); *see also Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974)).

As detailed previously, the offense on which the U.S. Complaints are premised is not, in

fact, an actual criminal offense under Japanese law or one that Japan has sought extradition upon. Moreover, the Taylors' punishment, if any, for any of the actual offenses that are set forth in the Japanese arrest warrants necessarily cannot include a deprivation of liberty of more than one year, thus making extradition unavailable under the Treaty.

Courts have found special circumstances justifying release on bail in extradition cases where the merits of the request were far less questionable than in this case. For example, in *In re Santos*, 473 F. Supp. 2d 1030 (C.D. Cal. 2006), the defendant (Santos) was provisionally arrested after a Mexican judge issued a warrant for his arrest on charges of kidnapping and aggravated homicide. A week after Santos was taken into custody in the United States, a federal court in Mexico issued a written decision granting Santos's request for a writ of "amparo" (which translates to "judicial order of protection"). The amparo nullified and voided the warrant for Santos's arrest on the grounds that it was procedurally defective and because there was evidence that Santos had been tortured by Mexican police. The Mexican prosecutor then sought and obtained a second arrest warrant, which was *again* invalidated by a writ of amparo. The prosecutor then appealed the amparo invalidating the second arrest warrant, which meant that the warrant remained in effect during the pendency of the appeal. That appeal remained pending at the time that Santos sought bail in his U.S. extradition proceedings.

The district court granted Santos' request for bail, in part because the court found that the government ultimately was not likely to succeed on the merits of extradition. The court reasoned, *inter alia*, that "Mexican courts have twice invalidated Santos's arrest warrant in lengthy written decisions, casting doubt over the ultimate question whether probable cause exists to believe Santos committed the charged offenses." *Id.* at 1038-39. The Mexican proceedings in *Santos* cast doubt on the existence of probable cause in that case, but there does not appear to have been a question

whether the alleged crimes were actually crimes in Mexico. As such, this case raises even more doubt as to the merits of extradition than were presented by the confusing and contentions debates within the Mexican courts that the court found justified bail in *Santos*.

Further, in *United States v. Ramnath*, 533 F. Supp. 2d 662 (E.D. Tex. 2008), the defendant, an anesthesiologist, was provisionally arrested pending extradition to the United Kingdom to stand trial for "manslaughter contrary to Common Law on a patient." *Id.* at 664. The defendant allegedly injected a patient in the intensive therapy unit with a bolus of adrenaline over the objection of two more-senior physicians and a senior experienced nurse, without obtaining prior permission from the attending physician and in disregard of established hospital protocol for administering adrenaline. The patient immediately went into cardiac arrest and died.

After her arrest, the defendant sought bail on various grounds, including the fact that the government was not likely to succeed on the merits of its extradition request. The court agreed, holding that while there might be probable cause for purposes of extradition, the prosecutor would be hard-pressed to prove the defendant's guilt at trial in view of the defendant's "credible expert medical testimony that her actions constituted proper medical practice" such that "the breach of duty (negligence) element may not be established at trial." *Id.* at 680. The court then concluded that, taking into consideration all the circumstances surrounding the patient's health as well as English case law, "it seems unlikely that a fair, impartial, and properly instructed jury would find [the defendant's] conduct so bad in all the circumstances as to amount in their judgment to a criminal act." *Id.* at 680-81; *see also In re Extradition of Molnar*, 182 F. Supp. 2d 684, 689 (N.D. Ill. 2002) (despite the "weakness" of the special circumstances shown, finding that they existed and justified release of defendant wanted for extradition to Hungary); *In re Bowey*, 147 F. Supp. 2d 1365, 1368 (N.D. Ga. 2001) (granting bail in proceeding seeking extradition to France for trial

on charges of child abduction based upon court's determination that French case had "little prosecutorial merit, despite the technical merit the criminal charges may have"); *In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 741 (W.D. La. 1999) (granting release of defendant wanted by Mexico, finding little reliable evidence of guilt for offense charged).

In all of the above cases, substantial questions were raised highlighting the underlying weaknesses in the prosecution's evidence and whether it could ever hope to obtain a conviction. For each of these courts, this was enough to justify a finding of special circumstances and release on bail. Here though, the flaws in the extradition request are matters of law; none of the above cases presented the case of an extradition request based upon a non-existent crime or a crime that was a mere misdemeanor. No matter how good the evidence may be, that still cannot make something that is not a crime a crime, nor can it convert a misdemeanor to a felony. Even if the United States can prove every factual allegation asserted, the fact remains that there will still be no extraditable offense. Accordingly, the Taylors' likelihood of success on the merits is even stronger than was presented in any of the cases cited above finding special circumstances established.

Based on the foregoing legal authority, the plain and primary "special circumstance" here, which sets this case apart from most other extradition requests, is that the alleged actions of the Taylors, as described in the U.S. Complaints filed: (i) do not constitute a violation of Article 103 of the Japanese Penal Code (Article 103 is not even the basis for Japan's extradition request) and (ii) do not constitute an extraditable offense under the governing Treaty between the United States and Japan. In short, the "requirements of justice are absolutely peremptory" here, and it would be an injustice to hold these two U.S. citizens in custody any longer while this proceeding moves forward. *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909).

## 2.    There Has Already Been an Adjudication by a Third Country

Further highlighting the lack of a crime, Lebanon actually investigated the facts surrounding Mr. Ghosn's departure from Japan and *acquitted* the Taylors of any wrongdoing.  (*See* Ex. K, Declaration of Attorney Naoum Toubia Farah, with attached certified copy of the February 27, 2020 "denunciation concerning the acquittal" from the Ministry of Justice, Public Prosecution Office at the Court of Cassation, both in Lebanese and English (as translated by a sworn translator)).  This corroborates the points above regarding the lack of a crime, and it is also independent grounds defeating extradition.  Article IV, Section 2 of the Treaty provides that: "The requested Party may refuse extradition when the person sought has been tried and acquitted, or has undergone the execution of punishment in a third State for the offense for which extradition is requested."  The Taylors, therefore, have been investigated and prosecuted for this same alleged event by the Republic of Lebanon, and they have been adjudicated and acquitted.  The United States government as a whole, including this Court, should be careful not to offend the Republic of Lebanon by rejecting its finding in this matter, which is precisely why this provision of the treaty exists.  If Japan has any quarrel with the Republic of Lebanon's conclusion, that is a matter for the governments of Japan and Lebanon to address among themselves.

### B.    The Taylors Are Not Flight Risks

Although the Bail Reform Act is not controlling in extradition cases, its standards for evaluating an individual's risk of flight provide a useful frame of reference, 18 U.S.C. § 3142(g):

> The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
>
>> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(a) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(b) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, state, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Because there exists a presumption against bail in extradition cases, one seeking release must rebut this presumption by demonstrating that he is a "tolerable bail risk." *See United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979). This burden can be met in two ways: (1) by establishing that he does not present a risk of flight, or (2) by demonstrating that there exist conditions of release that will reasonably assure his presence at future proceedings. *Kin-Hong v. United States*, 926 F. Supp. 1180, 1189-90 (D. Mass.), *supplemented*, 927 F. Supp. 517 (D. Mass. 1996), and *rev'd on other grounds*, 83 F.3d 523 (1st Cir. 1996).

Here, the charged offense involves no violence or drugs. In fact, the statute on which the extradition request is premised, Article 103, even if it applied and even if the punishment were not separately limited by Article 63, contemplates a maximum penalty under any circumstance of no more than three year's imprisonment and a fine of not more than 300,000 yen (which is the equivalent of approximately $2,770 USD). Unlike many extradition matters where the Defendant faces the prospect of decades of incarceration in a foreign prison, the potential penalty here really provides no incentive for flight. Even if they were so inclined, which they are not, it is certainly "possible to fashion a set of conditions to adequately mitigate the risk of flight." *Drumm*, 150 F.

Supp. 3d at 97; *see also Ramnath*, 533 F. Supp. 2d at 670-71 (holding that the risk of flight could be negated by imposing special conditions of release despite finding the "presence of some evidence of flight risk").   To do otherwise would risk that the Taylors could face far greater imprisonment while denied bail than they may be sentenced to if convicted of the alleged misdemeanors in Japan.

### 1.   Michael Taylor Is Not a Flight Risk

The United States unfairly and inaccurately describes Michael Taylor as an "extraordinary" flight risk and an "expert" on the subject (No. 20-mj-1069, Dkt. 9 at 15-17), speculating without any basis that he might flee the country "in order to avoid justice," or escape "to an underground domestic location" (*id.* at 17).   In fact, Mr. Taylor has never done any such thing.   To the contrary, Mr. Taylor has now *twice* voluntarily returned to the United States from overseas and thereby subjected himself to arrest despite being under no compulsion to do so.   In 2012, when he learned he and his company were being charged with offenses arising out of the procurement of a government contract, he voluntarily returned from overseas to answer the charges.   When he returned to the United States in February of this year, he was aware of the Japanese arrest warrants and that the United States was one of the few nations that had an extradition treaty with Japan. Yet he returned to his long-time residence and stayed there in plain sight, in the very first place the United States government or the Japanese government would think to look for him.   These are not the actions of a person who has any intention of fleeing.

Michael Taylor is a lifelong resident of Massachusetts, and has lived in the same home in Harvard, Massachusetts, with his wife and three children since 1991.   He cares for his adoptive stepfather, a disabled veteran, who suffers from diabetes and limited mobility.   Mr. Taylor also coaches youth and high school football and is a highly regarded and well-known mentor to young men—many of whom come from dysfunctional or broken homes—in his neighborhood and

community.

Mr. Taylor is a decorated military veteran, having served in the Special Forces for over a decade.  He founded a private protective service firm in or about 1993, American International Security Corporation, and has diligently performed services for clients, including the United States Government, domestically and internationally for many years.

The United States makes a passing reference to Mr. Taylor's involvement in the "extraction" of certain individuals from foreign countries.  It is true that Mr. Taylor, at the request of, or with the knowledge of, federal law enforcement, has successfully rescued and returned to the United States the young children of United States citizens who were abducted by one parent and taken away to another country, usually to the Middle East.[14]  Due to Mr. Taylor's extraordinary efforts, the children involved were returned safely to their families in this country.  *The New York Times* also retained Mr. Taylor's company to assist in locating and facilitating the return of journalist David Rohde, who was abducted by the Taliban in Afghanistan.  The reporter, fortunately, returned to the United States.

So it is certainly true that Mr. Taylor has special and unique skills, which have proven of great value to the U.S. military, federal law enforcement, prominent U.S. businesses, and the American public generally.  His work with the U.S. military and federal agencies alone

---

[14] Mr. Taylor has assisted law enforcement in other ways over the years.  For several years beginning in the late 1980s, Michael Taylor worked with federal law enforcement as an undercover operative infiltrating an organized criminal organization that was involved in the importation of a large quantity of hashish into the United States, as well as money laundering and other serious offenses.  As a result of Mr. Taylor's efforts, the government was able to seize over 2,000 kilograms of high-quality hashish (with a street value of over $100,000,000) and obtain indictments against 12 individuals.  *United States v. Kattar, et al.*, Criminal No. 91-cr-10247-DPW (D. Mass 1991).  The lead defendant in the case was sentenced to 10 years in federal prison.  Over the years, Mr. Taylor has agreed to use his knowledge of and connections in the Middle East to assist various law enforcement agencies in a number of other investigations and operations.

underscores his respect for the system and faith in the U.S. judicial process.  He also has a proven and documented track record of always appearing for court proceedings and being fully compliant with court orders.  He has never engaged in flight to avoid justice, and has no reason to start now.

From media reports, the entire world knew that Japan had issued arrest warrants for the Taylors, back in January.  The Taylors were in Lebanon, a country with no treaty with the United States or Japan.  Yet, both Mr. Taylor and his son returned to the United States.  If the Taylors had any genuine concern with a criminal charge in Japan, they could have remained in Lebanon.  They did not.  They travelled back home to Massachusetts, fully aware of the existence of an extradition treaty between the United States and Japan and the risk that they could one day become embroiled in extradition proceedings.  For the past three months since his return, Mr. Taylor has been living openly in his own home, caring on a daily basis for his elderly, widowed stepfather who resides a short distance away, and operating his business.

The United States may address the fact that Mr. Taylor has had prior involvement with the criminal justice system, which is true, but that only further demonstrates his willingness to face the charges against him.  Back in 2007, Mr. Taylor was asked by an acquaintance from Special Forces to participate in a contract to train Afghan commando units.  Unbeknownst to Mr. Taylor, that person and others were involved in an improper payment scheme and Mr. Taylor got caught up in the investigation, which ultimately focused on an allegation that Mr. Taylor and his company received inside information about the procurement, a procurement integrity violation.  As this investigation was underway, Mr. Taylor met an FBI agent who, recognizing his innocence, offered to advocate for him within the Bureau and with the prosecutors.  The U.S. government ultimately charged Mr. Taylor with multiple alleged offenses in two separate indictments, one relating to the

27

procurement and the other brought by the Department of Justice, Public Integrity Section against Mr. Taylor and the FBI agent.

When the charges were filed in U.S. District Court in Salt Lake City, Mr. Taylor was overseas in the Middle East, in a country with no extradition treaty with the United States. The charges against him were extremely serious and he was potentially facing life imprisonment if convicted. He could have remained outside the country. However, he voluntarily returned to the United States and travelled to Utah to address the charges against him.

Despite the fact that his attorneys advised him to proceed to trial and that it was unlikely that he would ever be convicted on the pending charges, given concerns regarding his family, Mr. Taylor decided to enter an agreement with the government and plead guilty to two offenses, one from each of the separate cases against him. During the time that he was released on conditions following his plea, he was fully compliant, and returned to court for sentencing as required.[15]

After serving several months in custody following the imposition of sentence, Mr. Taylor was placed on supervised release. He complied fully with all conditions of his supervision. Ultimately, in 2016, the Court terminated Mr. Taylor's period of supervised release early so that he could continue to assist federal law enforcement with various complex investigations overseas. (*See* Case No. 4:16-cr-40014-TSH, D. Mass.)

In short, Michael Taylor is not an extraordinary flight risk; quite the contrary. He is a person who respects the justice system and has always abided by it, even in the face of great potential peril to himself. He has a documented history of appearing in court as required, and honoring whatever conditions of release or supervision that may be imposed upon him.

---

[15]  The Court may check with Probation Officer Laura Lavalley of the District of Massachusetts who supervised Michael Taylor while he was on release.

As this Court stated in *Drumm*, it is "possible to fashion a set of conditions to adequately mitigate the risk of flight." 150 F. Supp. 3d at 97. Here, there are conditions (e.g., posting of a bond, surrender of passport, travel restriction, and reporting obligations) that would mitigate any flight risk.

### 2.    Peter Taylor Is Not a Flight Risk

Peter Taylor is entitled to separate and individualized consideration on the issue of release. The United States baldly asserts that Peter Taylor "presents an enormous risk of flight" and that he possesses an "aptitude for hatching escape plans on a grand scale." (No. 20-mj-1070, Dkt. 9 at 15.) It also suggests that he was attempting to flee to Lebanon on May 20, which is why he was arrested. (*Id.* at 16-17.) Both arguments are specious and factually unsupported.

Peter Taylor is a native-born U.S. citizen and lifelong resident of Massachusetts with strong local ties. He is 27 years of age, and has no criminal history. He is a graduate of Lawrence Academy (Class of 2011), where he played football and basketball. He enrolled at Bentley University after high school, majoring in Economics and Finance. Given the criminal proceedings against his father in Utah, the family's assets were frozen and it was not possible for Peter to continue his studies at Bentley. He decided to enroll at the Lebanese-American University in Byblos, Lebanon. As mentioned, his family had a modest condominium in nearby Ghazir, Lebanon, and his older brother (Rudy) was then living and working full-time there. Peter Taylor commuted to the University and studied banking and finance. He graduated with a bachelor's degree in 2015.

After college, Peter Taylor returned to Massachusetts and, using his language skills, started a remote tutoring business for students in Lebanon. He occasionally travelled back to Lebanon to visit with family and friends, and to start a new business. In or about January 2019, Peter started a digital marketing business. He has spent the majority of the past 15 months residing with his

older brother in Lebanon and working on his digital marketing business and his father's Vitamin 1 business. He has engaged in business travel primarily to the United Arab Emirates, and occasional travel for pleasure to locations in Europe.

Despite spending much of his time in Lebanon over the past 15 months, Peter has regularly returned to the family home in Massachusetts. His domicile and primary residence are in Harvard, Massachusetts. His goal has been to ultimately return to Massachusetts full-time.

Peter too returned home to Massachusetts from Lebanon sometime in March 2020, being fully aware of the arrest warrant in Japan and the existence of an extradition treaty between the United States and Japan. Like his father, for the past two months Peter has been living openly at his home in Harvard, Massachusetts, and, were he desirous to flee or avoid U.S. proceedings, could have stayed in Lebanon where no extradition treaty with the U.S. or Japan is in effect.

Peter Taylor was obviously not aware of the (sealed) provisional arrest warrant issued by this Court on May 6, and he was not (as the government suggests) attempting to flee when he planned his return travel to Lebanon for May 20. The United States alleges that after it obtained the provisional warrants from this Court, "U.S. law enforcement subsequently discovered that Peter Taylor had booked a flight from Boston to Beirut, Lebanon—the same place to which Ghosn fled—departing on May 20, 2020, with a layover in London, United Kingdom." (No. 20-mj-1070, Dkt. 9 at 4.) But the government omits the fact that Peter had booked his flight ten days in advance—if he was intending to flee, he would have left much more quickly. Further, if he were intending to flee, he never would have returned to the U.S. from Lebanon in the first place. Peter was simply returning to his temporary residence in Lebanon to carry on with his life and conduct his business, as he had been doing for several months to a year before anything related to Mr. Ghosn or Japan.

30

Peter Taylor is not a flight risk, and neither the highly questionable criminal charge in Japan, nor the potential penalties associated therewith, provide him with any incentive to flee. He will fully abide by any and all release conditions that may be ordered by this Court.

### C.     The Taylors Are Not Dangers to the Community

There is no allegation of violence in the underlying alleged facts here, or any basis to believe that either of the Taylors poses a danger to the community. Peter Taylor has no criminal history whatsoever, and his father Michael Taylor is a distinguished former member of the U.S. Army Special Forces, who has also provided valuable services to the U.S. law enforcement community on multiple occasions, including the FBI, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco & Firearms, the U.S. Customs Service (now the Department of Homeland Security), and the Internal Revenue Service.

### D.     Michael Taylor Is the Sole Caretaker for His Elderly Stepfather

In addition to the unique and compelling circumstances previously discussed, there are also real-life and human-rights issues that should be considered by the Court, and lead the Court to conclude that the Taylors should be released on conditions.

Michael Taylor's adoptive stepfather, Robert Taylor, is 81 years old, widowed, and lives alone a very short distance from the Taylor family home in Harvard, Massachusetts. Mr. Taylor's father has various health issues. He is a disabled veteran suffering from severe hypertension, diabetes, and limited mobility. He is overweight and suffered a heart attack not long ago. Mr. Taylor serves as his sole caregiver. He visits with his father on a daily basis, attends to his medical and personal needs, buys food and groceries for him, helps him to prepare meals, insures he takes his medications as prescribed, and also takes other necessary steps to protect him from contracting the COVID-19 virus. He is clearly in the category of persons most vulnerable to the pandemic.

Michael Taylor and his youngest son, Peter, are the only family members available to care

for and attend to the needs of Michael's elderly father.  These past couple of weeks, while the Taylors have been detained, have been a real struggle for the family, and they have had to call upon the assistance of Mr. Taylor's middle son (Oliver) and neighbors to assist and temporarily look after Mr. Robert Taylor.  This arrangement cannot continue for long and is certainly not a long-term solution to his father's needs.

This circumstance calls for compassion on the part of the Court, and a recognition of the day-to-day harms and adverse consequences that will follow from the continued and unnecessary detention of the Taylors.  This extradition proceeding is likely to be pending for several months before it is concluded in the courts.  Leaving the patriarch of this family without a primary caregiver for an extended period of time will be extremely difficult and potentially devastating.

### E.      The COVID-19 Virus Has Recently Entered the Detention Facility

Well known to all of us, we are in the midst of the global COVID-19 pandemic.  The prison population has been hit particularly hard by this contagion.  As of this writing, the Bureau of Prisons reports over 5,800 total cases of COVID-19 among the prison population, and 78 inmate deaths.

Late last week it was reported by the U.S. Marshals Service that there has been an outbreak of COVID-19 at the Norfolk County Correctional Center where the Taylors are currently being detained.  At least 25 prisoners, including federal detainees, have tested positive for the virus. Despite the best efforts of the diligent corrections staff, they have not been successful in keeping the virus out of the facility.  While officials have announced that those who have tested positive will be quarantined, it is highly likely that the virus will continue to spread among the inmates, given the inability to engage in social distancing, the sharing of showers and restrooms, the dining arrangements, and the realities of the prison environment.

Michael Taylor, who is 59 years of age, had part of his left lung surgically removed several

years ago.  From time to time, he experiences breathing difficulties as a result of his physical condition.  If he were to contract the virus, which, given the present situation at the jail is a distinct possibility, he could face very serious medical complications.  This is yet another factor that should be considered by the Court, and should lead it to conclude that release on conditions is the just and appropriate outcome at this stage of the proceedings.

### F. The Relevant Factors Considered in Combination Also Support a Finding of "Special Circumstances" Justifying Release on Conditions

Even if a single factor standing alone does not meet the high threshold required for bail in extradition proceedings, the combination of several factors together may constitute "special circumstances" justifying release on conditions.  *See, e.g.*, *Molnar*, 182 F. Supp. 2d at 689 (citing *In re Komel Nacif-Borge*, 829 F. Supp. 1210, 1216 (D. Nev. 1993) and *United States v. Taitz*, 130 F.R.D. 442, 446 (S.D. Cal. 1990)).

The Taylors respectfully assert that the substantial likelihood that there is no extraditable offense to support the extradition request standing alone is a "special circumstance" that sets this case apart and should justify release.  However, when considered together with the other factors described above, this accumulation of circumstances should provide the Court with strong justification to release these two U.S. citizens—one a decorated veteran who has served his country admirably, both during and after his military service, and the other an impressive recent college graduate, with no criminal history whatsoever.

### CONCLUSION

For all the foregoing reasons, the Defendants respectfully request that the Court quash the provisional arrest warrants and order their immediate release, or, in the alternative, grant their motion and release them, subject to reasonable conditions of release, pending completion of extradition proceedings.

**ORAL ARGUMENT ON THIS MOTION IS REQUESTED**

Dated: June 8, 2020

Respectfully submitted,

By their attorneys,

*/s/  Paul V. Kelly*
Paul V. Kelly (BBO No. 267010)
Jackson Lewis, P.C.
75 Park Plaza
Boston, MA  02110
Tel (617) 367-0025
paul.kelly@jacksonlewis.com


*/s/ Abbe David Lowell (by permission)*
Abbe David Lowell (*pro hac vice*)
Christopher D. Man
Zachary B. Cohen
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036
Tel. (202) 282-5875
adlowell@winston.com

*Counsel for Michael and Peter Taylor*


*/s/ Daniel Marino (by permission)*
Daniel Marino (*pro hac vice*)
dmarino@marinofinley.com
Tillman J. Finley (*pro hac vice*)
tfinley@marinofinley.com
MARINO FINLEY LLP
800 Connecticut Avenue, N.W., Suite 300
Washington, DC  20006
Tel:  202.223.8888

*Counsel for Michael L. Taylor*

*/s/James P. Ulwick (by permission)*
James P. Ulwick (*pro hac vice*)
KRAMON & GRAHAM PA
One South Street, Suite 2600
Baltimore, MD  21202
Tel. (410) 752-6030
JUlwick@kg-law.com

*Counsel for Peter M. Taylor*

34

## CERTIFICATE OF SERVICE

I, Paul V. Kelly, certify that service of this motion was made on the above date by and through the ECF filing system.

*/s/  Paul V. Kelly*
Paul V. Kelly

4846-7978-7455, v. 1