UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF ) | |
| THE EXTRADITION OF ) | Case No. 20-mj-1069-DLC |
| MICHAEL L. TAYLOR ) | |
| ) | |
| ) | |
| IN THE MATTER OF ) | |
| THE EXTRADITION OF ) | Case No. 20-mj-1070-DLC |
| PETER M. TAYLOR ) | |

# GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF EXTRADITION

The United States, through the undersigned counsel, respectfully submits this memorandum of law in support of Japan's requests for the extraditions of Michael L. Taylor and Peter M. Taylor.

## INTRODUCTION

The Taylors are international fugitives from justice. They are alleged to have entered Japan's sovereign territory for the sole purpose of enabling the escape of Carlos Ghosn Bichara ("Ghosn"), the multimillionaire former CEO and Chairman of the Board of Directors of Nissan Motor Co., Ltd. ("Nissan"), who was under indictment in Japan for committing financial crimes. The Taylors' alleged plot to smuggle Ghosn out of Japan was one of the most brazen and well-orchestrated escape acts in recent history, involving a dizzying array of luxury hotel meetups, fake personas, bullet train travel, and the chartering of a private jet. Ultimately, Ghosn was hidden in a large black box, spirited out of Japan via private jet without detection by Japanese authorities, and transported to Lebanon. Lebanon has no extradition treaty with Japan and thus Ghosn was able to thwart Japan's criminal justice system. The Taylors were paid handsomely for their services. They received more than $1.3 million from Ghosn and his family members between October 2019 and May 2020, and Ghosn recently acknowledged that he is "helping everyone who stood by me as much as I can, financially and in any way I can."[1] After Michael Taylor returned from Lebanon to Massachusetts, he boasted about his exploits in an interview with Vanity Fair.[2]

Ghosn escaped on December 29, 2019. On January 30, 2020, the Tokyo District Court issued arrest warrants for the Taylors. Upon learning that the Taylors had returned to Massachusetts from Dubai, United Arab Emirates, the government of Japan submitted to the United States requests for

---

[1] *See* Ex. A (wire transfer records reflecting $862,500 in payments from Ghosn to Peter Taylor's company, Promote Fox, in October 2019); Ex. B (Coinbase letter dated July 20, 2020 detailing $500,000 in cryptocurrency payments from Ghosn's son, Anthony Ghosn, to Peter Taylor); Ex. C (*Carlos Ghosn Helping Those Who Helped Him Flee to Lebanon*, ASSOCIATED PRESS, July 12, 2020).
[2] *See* Ex. D (*How Carlos Ghosn Escaped Japan, According to the Ex-Green Beret Who Snuck Him Out*, VANITY FAIR (July/August 2020)).

1

their provisional arrests under the countries' bilateral extradition treaty (the "Treaty").[3] The Taylors were provisionally arrested on May 20, 2020. Japan submitted its formal extradition requests to the Department of State on June 29, 2020, in accordance with the requirements of the Treaty. Pursuant to 18 U.S.C. § 3184, this Court must now hold an extradition hearing to determine whether to certify the Taylors' extraditions to Japan for the Secretary of State's surrender decision.

The Court should certify the Taylors' extraditions to Japan for the Secretary of State's surrender decision because the requirements for such certification have been met: (1) this Court has subject matter jurisdiction to conduct the extradition hearing; (2) the Court has personal jurisdiction over the Taylors; (3) the Treaty is in full force and effect; (4) the offense for which extradition is sought falls within the scope of the Treaty; and (5) there is probable cause to believe that the Taylors committed such offense. *See* 18 U.S.C. § 3184; *see also, e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984).

## BACKGROUND

### I. Statement of the Facts

The facts of this case have never been in dispute. Japan alleges that the Taylors enabled Ghosn to flee Japan while he was awaiting trial for financial crimes he is alleged to have committed while serving as Nissan's CEO and/or Chairman of the Board of Directors.[4] Ghosn's alleged crimes include conspiring with others to grossly understate his compensation in Nissan's Annual Reports, shifting heavy financial losses of his asset management company to Nissan, transferring

---

[3] *See* Ex. E (Treaty on Extradition Between the United States of America and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892).

[4] Unless otherwise noted, the facts set forth herein are principally derived from the factual summary contained in Japan's "Request for Extradition of Michael L. Taylor" and Japan's substantially similar "Request for Extradition of Peter Maxwell Taylor." The government attaches the former document hereto as Ex. F. Bates-stamped versions of the full extradition requests, which include the underlying evidence, have been submitted to counsel for the Taylors and the Court. The Bates-stamped versions are substantively the same as the originals submitted by Japan in hard copy but may not reflect all stamps or seals. The government will cite herein to the Bates-stamped version of the Michael L. Taylor extradition request, which is substantially similar to the Peter M. Taylor extradition request. The government relies upon, and incorporates fully herein, the entirety of the extradition requests.

$14.7 million from a Nissan subsidiary to a Saudi Arabian company managed by one of Ghosn's friends, and transferring $10 million from the Nissan subsidiary to a company located in the Sultanate of Oman, with $5 million of that total transfer intended for Ghosn's personal profit. *See* EX-Taylor, M.-00031 to EX-Taylor, M.-00032 at ¶ 2. Ghosn was indicted in Japan, arrested, and released on bail for these alleged crimes. *See* EX-Taylor, M.-00032.

In the months leading up to Ghosn's escape, Peter Taylor traveled to Japan at least three times, during which he met with Ghosn at least seven times. *See* EX-Taylor, M.-00608 to EX-Taylor, M.-00613 (immigration records); EX-Taylor, M.-00573 to EX-Taylor, M.-00579 (meeting records); EX-Taylor, M.-00381 to EX-Taylor, M.-00419 (video surveillance camera recording images). The day before the escape, on December 28, 2019, Peter Taylor arrived in Japan, proceeded to the Grand Hyatt Tokyo, and checked into Room 933. *See* EX-Taylor, M.-00488 to EX-Taylor, M.-00504 (hotel records); EX-Taylor, M.-00761 to EX-Taylor, M.-00771 (Record of Statements of Herlinde Waegenaer). He met later that afternoon with Ghosn in the lobby of the hotel. *See* EX-Taylor, M.-00276 to EX-Taylor, M.-00280 (video surveillance camera recording images); EX-Taylor, M.-00784 to EX-Taylor, M.-00788 (Record of Oral Statement of Ticzon Danilo Ejanda). During the meeting, Peter Taylor appears to have provided Ghosn with an extra key to his hotel room as evident from the fact that, the following day, Ghosn was able operate the hotel elevator and go to the ninth floor by himself, an action that required a key to a room on the ninth floor. *See* EX-Taylor, M.-00033 at ¶ 7 n.8; EX-Taylor, M.-00764 (Record of Statements of Herlinde Waegenaer).

On December 29, 2019—the day of the escape—Michael Taylor and George Antoine Zayek traveled on a private jet from Dubai, United Arab Emirates, to Kansai International Airport in Japan. *See* EX-Taylor, M.-00707 to EX-Taylor, M.-00717 (Interview Results Report); *see also* Ex. G (Record of Statements of Tomoyuki Matsui) at EX-Taylor, M.-00720 to EX-Taylor, M.-00723. The chartering of the jet appears to have cost $350,000. *See* Ex. H (MNG Jet Single Charter Agreement) at EX-

Taylor, M.-00526. In recounting the escape, Michael Taylor told Vanity Fair that his team had solicited a wide range of charter jet companies in an effort to identify one that would agree not to place Ghosn (referred to as the "VIP") on the manifest. *See* Ex. D (Vanity Fair article). In fact, Ghosn was omitted from the passenger manifest. *See* Ex. I (General declaration) at EX-TAYLOR, M.-00570. Further, flight support personnel in Japan responsible for obtaining the necessary flight approvals from Japan's Ministry of Land, Infrastructure, Transport and Tourism were told that the purpose of Taylor and Zayek's trip to Japan was to attend a concert in Osaka, and that there would only be two passengers on the return flight from Kansai International Airport to Dubai. *See* Ex. G (Record of Statements of Tomoyuki Matsui) at EX-Taylor, M.-00720 to EX-Taylor, M.-00722.[5]

Michael Taylor and Zayek landed at approximately 10:10 a.m. transporting, among other things, two large black boxes, and they told airport workers that they were musicians. *See* EX-Taylor, M.-00051 to EX-Taylor, M.-00066 (video surveillance camera recording images); Ex. J (Record of Statements of Kayoko Tokunaga) at EX-Taylor, M.-00738. They then proceeded to the Star Gate Hotel Kansai Airport, where they checked into rooms 4009 and 4609, and deposited the two large boxes into Room 4609. *See* EX-Taylor, M.-00066 to EX-Taylor, M.-00080 (video surveillance camera recording images); *see also* EX-Taylor, M.-00774 to EX-Taylor, M.-00781 (Report on Collection of Documents). They then left the hotel and boarded a bullet train bound for Tokyo. *See* EX-Taylor, M.-00089 to EX-Taylor, M.-00115 (video surveillance camera recording images).

At approximately 2:30 p.m., while Michael Taylor and Zayek were making their way to Tokyo, Ghosn left his house without luggage, walked to the Grand Hyatt Tokyo, and went to Peter Taylor's room. *See* EX-Taylor, M.-00127 to EX-Taylor, M.-00157 (video surveillance camera recording

---

[5] The failure to disclose Ghosn as one of passengers on the flight from Kansai to Dubai also resulted in another document, entitled "Kansai International Airport Business Aircraft Operational Information," falsely stating that there would be only two passengers on the flight. That document was directed to the Director of Kansai Airport Branch Customs and the Director of Kansai Airport District Immigration Office, among others. *See* Ex. J (Record of Statements of Kayoko Tokunaga) at EX-Taylor, M.-00744.

4

images). Ghosn's luggage had been delivered to the hotel earlier in the day and received by Peter Taylor. *See* EX-Taylor, M.-00305 to EX-Taylor, M.-00315 (video surveillance camera recording images); EX-Taylor, M.-00784 to EX-Taylor, M.-00788 (Record of Oral Statement of Ticzon Danilo Ejanda).

Michael Taylor and Zayek arrived in Tokyo at approximately 3:24 p.m. and traveled by taxi to the Grand Hyatt, where they were greeted by Peter Taylor at the entrance of the hotel, and then the three men proceeded to Peter Taylor's room, where Ghosn was waiting. *See* EX-Taylor, M.-00104 to EX-Taylor, M.-00124 (video surveillance camera recording images). Then, all four men exited Room 933 together, carrying luggage. *See* EX-Taylor, M.-00168 to EX-Taylor, M.-00172 (video surveillance camera recording images). Peter Taylor separated from the rest of the group and traveled to Narita Airport, where he boarded a flight to China. *See* EX-Taylor, M.-00034 at ¶ 11; EX-Taylor, M.-00613 (immigration records). Meanwhile, Ghosn, Michael Taylor, and Zayek traveled back to the Star Gate Hotel in Kansai. *See* EX-Taylor, M.-00177 to EX-Taylor, M.-00215 (video surveillance camera recording images).

At approximately 8:14 p.m., Ghosn, Michael Taylor, and Zayek arrived back at the Star Gate Hotel, and Ghosn and Zayek proceeded to Room 4609 where the large black boxes had been deposited earlier in the day. *See* EX-Taylor, M.-00204 to EX-Taylor, M.-00211 (video surveillance camera recording images). Michael Taylor, meanwhile, headed to Room 4009 and proceeded to transfer luggage from that room to Room 4609. EX-Taylor, M.-00211 to EX-Taylor, M.-00215. At approximately 9:00 p.m., Michael Taylor went to Kansai International Airport by himself and approached an employee of the business-jet facility. *See* Ex. J (Record of Statements of Kayoko Tokunaga) at EX-Taylor, M.-00739 to EX-Taylor, M.-00740; *see also* EX-Taylor, M.-00217 to EX-Taylor, M.-00220 (video surveillance camera recording images). Michael Taylor asked the employee whether they would be going through a security check when they departed, to which the employee

5

replied no. *See* Ex. J (Record of Statements of Kayoko Tokunaga) at EX-Taylor, M.-00740. Michael Taylor subsequently handed the employee a "bundle of 10,000 yen bills, bundled by a hair elastic band." *Id.* The employee estimated that there was more than one million yen (more than $9,300 based on current conversion rates) in the bundle. *Id.*[6] Michael Taylor then returned to the hotel. *See* EX-Taylor, M.-00221 (video surveillance camera recording images).

At approximately 9:57 p.m., Michael Taylor and Zayek left Room 4609 with luggage, including the two large boxes, and departed for Kansai International Airport. *See* EX-Taylor, M.-00225 to EX-Taylor, M.-00242 (video surveillance camera recording images). There is no image of Ghosn leaving Room 4609. Instead, Ghosn was hiding in one of the two large black boxes transported by Michael Taylor and Zayek. Michael Taylor and Zayek arrived at Kansai International Airport by taxi at approximately 10:20 p.m. and were assisted with their luggage by airport personnel. *See* EX-Taylor, M.-00243 to EX-Taylor, M.-00246 (video surveillance camera recording images). One of the airport managers who helped unload the luggage from the taxi recalled that one of the boxes was so heavy that he had jokingly remarked to his colleagues, "Maybe there is a beautiful young lady in the box." *See* Ex. K (Record of Statements of Narikuni Kawada) at EX-Taylor, M.-00752. The manager also noted that the box was much heavier than it had been when he helped unload it from the private jet when Michael Taylor and Zayek arrived earlier that morning; the box now required four of five staff members to unload it from the taxi. *Id.* That box and the rest of the luggage passed through the security checkpoint without being screened and was loaded onto a private jet. *See* EX-Taylor, M.-00245 to EX-Taylor, M.-00256 (video surveillance camera recording images). Michael Taylor and Zayek boarded the jet and departed for Turkey at approximately 11:10 p.m. *See* EX-Taylor, M.-00034 at ¶ 12; EX-Taylor, M.-00257 (video surveillance camera recording images).

---

[6] The airport staff decided to return the money to Michael Taylor before he departed. *See* Ex. J (Record of Statements of Kayoko Tokunaga) at EX-Taylor, M.-00741.

Two days later, on December 31, 2019, Ghosn publicly announced that he was in Lebanon. EX-Taylor, M.-00034 at ¶ 13. The Taylors, for their part, did not immediately return to the U.S. following Ghosn's escape. Instead, they remained in Lebanon and/or the United Arab Emirates for approximately eight weeks in the case of Michael Taylor and eleven weeks for Peter Taylor.[7]

## II. Procedural History

Judge Yukiko Yomori of the Tokyo District Court issued warrants for the Taylors' arrests on January 30, 2020, and those warrants were renewed by Judge Yomori on February 28, 2020, when the Taylors remained at large. *See* Ex. L (original arrest warrant); Ex. M (renewed arrest warrant). Japan submitted to the United States requests for the Taylors' provisional arrests under Article IX of the Treaty after learning they had returned to the United States from Dubai. On May 6, 2020, the government acted on the provisional arrest requests by filing complaints in this District and obtaining arrest warrants issued by this Court, which were executed on May 20, 2020. On June 29, 2020, Japan transmitted its formal extradition requests to the Department of State.

The Taylors previously moved for the provisional arrest warrants to be quashed or, alternatively, to be released pending extradition proceedings. This Court denied the motion in an electronic order dated July 7, 2020 that was followed by a written opinion on July 10, 2020. *See* EX DE 40, 41 ("Op."). On July 6, 2020, the Taylors sought habeas and injunctive relief from the district court (Talwani, J.). On July 9, 2020, the district court denied the Taylors' motion for a temporary restraining order and, on August 7, 2020, the district court denied the Taylors' motion for a preliminary injunction and denied their habeas petition. *See Taylor v. McDermott*, No. 4:20-cv-11272 (D. Mass. 2020), DE 33, 44 ("Habeas Op." attached hereto as Ex. T).[8]

---

[7] *See* Docket Entry 17 (Motion to Quash Arrest Warrants) at 6 (According to the Taylors, Michael Taylor returned on February 23, 2020 and Peter Taylor returned on March 15, 2020). Citation to the extradition dockets will hereinafter begin with the prefix "DE" and will refer to the docket entries in *In the Matter of the Extradition of Michael L. Taylor*, Case No. 20-MJ-1069 (D. Mass).
[8] References to other docket entries in the habeas matter will begin with the prefix "HC DE."

### III. Legal Background

"Extradition is largely a concern of the Executive Branch" with a limited role carved out for the judiciary pursuant to the federal extradition statute, 18 U.S.C. § 3184. *Drumm v. McDonald*, No. 15-cv-14221, 2016 WL 111411, at *4 (D. Mass. Jan. 11, 2016). Pursuant to Section 3184, the extradition court must conduct an extradition hearing and make a probable cause determination under "the same . . . standard used in federal preliminary hearings." *Noeller v. Wojdylo*, 922 F.3d 797, 803 (7th Cir. 2019) (quoting *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006)). However, the country seeking extradition is not otherwise "required to try its case in a United States court." *Id.* at 804. That is because "an extradition hearing is not a criminal prosecution" and "the order of extraditability expresses no judgment on [the Taylors'] guilt or innocence." *Austin v. Healey*, 5 F.3d 598, 603 (2d Cir. 1993). If the extradition court finds that the fugitive is extraditable, it so certifies such findings to the Secretary of State, who ultimately decides whether to extradite the fugitive. *See* 18 U.S.C. §§ 3184, 3186. "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997).

## ARGUMENT

The Court should certify the Taylors' extraditions to Japan for the Secretary of State's surrender decision because the requirements for such certification have been met. *See* 18 U.S.C. § 3184; *see also, e.g.*, *Zanazanian*, 729 F.2d at 626.

### I. The Court Has Subject Matter Jurisdiction to Conduct these Extradition Proceedings

This Court has subject matter jurisdiction to conduct these extraditions proceedings under the extradition statute, 18 U.S.C. § 3184, and Rule 1(e) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts ("Rules"). *See* 18 U.S.C. § 3184

(extradition proceedings may be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States"); Rule 1(e) ("Each United States Magistrate Judge appointed by this court is authorized to . . . [c]onduct extradition proceedings, in accordance with 18 U.S.C. Section 3184[.]").

## II. The Court Has Personal Jurisdiction Over the Taylors

This Court has personal jurisdiction over the Taylors pursuant to 18 U.S.C. § 3184 because they were found and arrested in the District of Massachusetts. *See* 18 U.S.C. § 3184 (the Magistrate Judge "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue his warrant for the apprehension of the person so charged"); *see also, e.g.*, *Pettit v. Walshe*, 194 U.S. 205, 219 (1904) ("The commissioner or judicial officer here referred to is necessarily one acting as such within the state in which the accused was arrested and found.").

## III. The Applicable Extradition Treaty is in Full Force and Effect

18 U.S.C. § 3184 provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States. Courts defer to the Executive Branch on the question of whether a treaty is in force. *See, e.g.*, *Terlinden* v. *Ames*, 184 U.S. 270, 288-89 (1902). Here, the United States has submitted a declaration from Karen K. Johnson, the Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser for the Department of State ("Johnson Declaration"), attesting to the fact that the Treaty in full force and effect between the United States and Japan. *See* Ex. N (Johnson Declaration ¶ 2).

## IV. The Extradition Treaty Encompasses the Offense for which Extradition is Requested

Article II of the Treaty provides, in relevant part, that "[e]xtradition shall be granted in accordance with the provisions of this Treaty for any offense . . . punishable by the federal laws of the United States and by the laws of Japan by death, by life imprisonment, or by deprivation of liberty for a period of more than one year." *See* Treaty, Art. II. In this case, the offense for which Japan seeks

extradition is "Enabling the escape of criminals," which corresponds to Article 103 of the Japanese Penal Code and carries a maximum three-year prison sentence. *See* Ex. O (Note Verbale), Ex. F (Request for Extradition of Michael L. Taylor at EX-Taylor, M.-00030); Ex. P (Yoshida Masayuki Declaration ¶ 5 n.1) (noting maximum penalty for an Article 103 violation was enhanced from two to three years in 2016). Accordingly, the Treaty's requirement that the offense for which extradition is sought be punishable under Japanese law by deprivation of liberty for a period of more than one year is satisfied. Notably, the First Circuit has held that "courts are duty bound to defer to a surrendering sovereign's reasonable determination that the offense in question is extraditable." *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995).[9]

In accordance with the above-referenced terms of the Treaty, the Court must also determine whether the alleged misconduct would constitute a felony in the United States if it had been committed here under similar circumstances, a requirement known as dual criminality. As the First Circuit has explained, "[t]he purpose of the dual criminality requirement is simply to ensure that extradition is granted only for crimes that are regarded as serious in both countries." *Kin-Hong*, 110 F.3d at 114 (1st Cir. 1997) (citing *Saccoccia*, 58 F.3d at 766). In evaluating whether dual criminality is met, the Supreme Court has held that "[i]t is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922); *see also, e.g.*, *Saccoccia*, 58 F.3d at 766 ("If the same conduct is subject to criminal sanctions in both jurisdictions, no more is exigible."); *Arias Leiva v. Warden*, 928 F.3d 1281, 1293 (11th Cir. 2019) (in evaluating dual criminality, "courts ask whether the conduct that the government describes would violate our laws if it occurred in this country").

---

[9] In seeking habeas and injunctive relief before the district court, the Taylors argued that Japan had not sought their arrests under Article 103 or charged that offense. That argument was rejected by the district court. *See* Habeas Op. at 21. To the extent the Taylors press such arguments in connection with these proceedings, the government respectfully refers to, and incorporates fully herein, its briefing in the habeas matter and the accompanying declarations that were submitted therein. *See* HC DE 41 (The Taylors' Opposition to Petitioners' Motion for a Preliminary Injunction and Response to Habeas Petition) at 14-17; Ex. Q (Naoki Watanabe Declaration); Ex. R (Watanabe Supp. Decl.) and Ex. S (Watanabe Second Supp. Decl.).

Here, if a criminal defendant was being prosecuted in the United States, had been released on conditions pending trial, and fled to avoid prosecution by covertly boarding an international flight, such conduct would be punishable under U.S. law, including for example 18 U.S.C. § 751(a),[10] 18 U.S.C. § 1073,[11] 18 U.S.C. § 3148(a),[12] and 49 U.S.C. § 46314(b)(2).[13] Further, persons who facilitated the criminal defendant's escape by taking actions similar to those taken by the Taylors with respect to Ghosn would be co-conspirators and aiders and abettors. *See* 18 U.S.C. § 371;[14] 18 U.S.C. § 2(a).[15] The foregoing offenses all carry maximum punishments of more than one year imprisonment and therefore satisfy the dual criminality requirement in Article II of the Treaty.

## V. There is Probable Cause to Believe the Taylors Committed the Alleged Offense

The standard of proof to find the evidence "sufficient to sustain the charge" under 18 U.S.C. § 3184 is the familiar domestic requirement of probable cause. *See, e.g.*, *Collins*, 259 U.S. at 316 ("The

---

[10] Section 751(a) provides, in relevant part, that "[w]hoever escapes . . . from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate judge . . . shall, if the custody or confinement is by virtue of an arrest on a charge of felony . . . be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 751(a).

[11] Section 1073 provides, in relevant part, that "[w]hoever moves or travels in interstate or foreign commerce with intent . . . to avoid prosecution . . . under the laws of the place from which he flees, for a crime, or an attempt to commit a crime, punishable by death or which is a felony under the laws of the place from which the fugitive flees . . . shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1073.

[12] Section 3148(a) provides, in relevant part, that "[a] person who has been released under section 3142 of this title, and who has violated a condition of his release, is subject to . . . prosecution for contempt of court." 18 U.S.C. § 3148(a). Section 3148(c) provides that a prosecution for contempt can be initiated under 18 U.S.C. § 401. 18 U.S.C. § 3148(c). "[T]he statutory maximum for the offense of criminal contempt, 18 U.S.C. § 401, is life imprisonment." *United States v. Wright*, 812 F.3d 27, 32 (1st Cir. 2016).

[13] Section 46314(a) provides, in relevant part, that "[a] person may not knowingly and willfully enter, in violation of security requirements prescribed under section 44901, 44903(b) or (c), or 44906 of this title, an aircraft or an airport area that serves an air carrier or foreign air carrier." 49 U.S.C. § 46314(a). A person who commits such a violation "with intent to evade security procedures or restrictions . . . shall be fined under title 18, imprisoned for not more than 10 years, or both." *See* 49 U.S.C. § 46314(b)(2).

[14] Section 371 provides, in relevant part, that "[i]f two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371.

[15] Section 2(a) provides, in relevant part, that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). In addition, any actions taken by persons to cause the falsification of a passenger manifest or other documents submitted to a U.S. governmental entity, such as the U.S. Customs and Border Protection, would be punishable under 18 U.S.C. § 1001(a)(2). That provision provides, in relevant part, that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title, imprisoned not more than 5 years . . . or both." 18 U.S.C. § 1001(a)(2).

11

function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); *Benson v. McMahon*, 127 U.S. 457, 463 (1888) (extradition hearings are akin to "preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused"). Probable cause is established if there are "facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted).

Here, the evidence submitted by Japan in support of its extradition requests amply supports a finding of probable cause to believe that the Taylors committed the offense for which Japan seeks their extradition: enabling the escape of criminals under Article 103 of the Japanese Penal Code. Article 103 provides that "[a] person who harbors or enables the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from confinement shall be punished by imprisonment with work for not more than 3 years or a fine of not more than 300,000 yen." *See* Ex. F (Request for Extradition of Michael L. Taylor) at EX-Taylor, M.-00030. Ghosn is "another person" who is alleged to have "committed a crime punishable with a fine or greater punishment." *Id.* at EX-Taylor, M.-00031 at ¶ 2 n.1 & n.2 (setting forth penalties for Ghosn's alleged offenses).[16] Further, Japan's formal requests for the Taylors' extraditions are replete with evidence that the Taylors enabled Ghosn's escape from Japan to Lebanon to avoid prosecution. Those acts include the following:

- Peter Taylor met with Ghosn seven times in the months leading up to the escape in order to plan the escape. *See* EX-Taylor, M.-00608 to EX-Taylor, M.-00613 (immigration records); EX-Taylor, M.-00573 to EX-Taylor, M.-00579 (meeting records); EX-Taylor, M.-00381 to EX-Taylor, M.-00419 (video surveillance camera recording images).

---

[16] Japan has confirmed, with supporting caselaw, that Article 103 applies to persons who have enabled the escape of a criminal defendant under indictment but who has not yet been convicted. *See* Ex. P (Masayuki Yoshida Decl. ¶ 7).

- The day before the escape, Peter Taylor gave Ghosn a key to his hotel room at the Grand Hyatt Tokyo so that Ghosn could access the room himself on the day of the escape. *See* EX-Taylor, M.-00033 at ¶ 7 n.8; EX-Taylor, M.-00764 (Record of Statements of Herlinde Waegenaer).

- On the day of the escape, Peter Taylor received Ghosn's luggage from a third-party so that Ghosn could travel to the Grand Hyatt without luggage and not attract attention. *See* EX-Taylor, M.-00305 to EX-Taylor, M.-00315 (video surveillance camera recording images).

- On the day of the escape, Michael Taylor, along with Zayek, escorted Ghosn from Tokyo to Osaka and led him to one of their rooms at the Star Gate Hotel. Inside the hotel room was a large black box that Taylor and Zayek had transported from Dubai. Ghosn hid himself in that box. *See* EX-Taylor, M.-00067 to EX-Taylor, M.-00080 (video surveillance camera recording images); EX-Taylor, M.-00176 to EX-Taylor, M.-00211 (video surveillance camera recording images).

- Michael Taylor and Zayek transported the box containing Ghosn from the Star Gate Hotel to Kansai International Airport and onto the private jet they had chartered. All three men then departed Japan on the private jet. *See* EX-Taylor, M.-00225 to EX-Taylor, M.-00257 (video surveillance camera recording images).

The Taylors have never disputed that they engaged in the foregoing acts. Instead, in their prior motions, they have argued that probable cause is lacking because bail jumping is not a crime in Japan and that Article 103 applies only in situations where the escapee is fleeing the scene of a crime or breaking out of a detention facility. Those arguments were soundly rejected by this Court, which found that the Taylors "would appear to fall squarely within the heartland of this portion of Article 103 where Ghosn had been charged with a crime and [the Taylors] then reportedly harbored and/or helped him to escape to avoid prosecution." *See* Op. 8-10; *see also* HC DE 41 (Opposition to Petitioners' Motion for a Preliminary Injunction and Response to Habeas Petition) at 17-20; Ex. P (Yoshida Decl.); Ex. Q (Watanabe Decl.); Ex. S (Watanabe Second Supp. Decl.). These arguments were similarly rejected by the district court. *See* Habeas Op. at 8-13. In short, there is probable cause to believe the Taylors committed the offense of "Enabling the escape of criminals" under Article 103 of the Japanese Penal Code.

## CONCLUSION

The Court should certify the Taylors' extraditions to Japan for the Secretary of State's surrender decision.

Date: August 7, 2020

                                                    Respectfully submitted,

                                                    ANDREW E. LELLING
                                                    United States Attorney

By:   */s/ Stephen W. Hassink*
       Stephen W. Hassink
       Assistant United States Attorney

       */s/ Philip A. Mirrer-Singer*
       Philip A. Mirrer-Singer
       Trial Attorney

## CERTIFICATE OF SERVICE

I, Stephen W. Hassink, Assistant U.S. Attorney, do hereby certify that on August 7, 2020, I served a copy of the foregoing on all registered parties by electronic filing on ECF.

                                                      */s/ Stephen W. Hassink*
                                                      Stephen W. Hassink
                                                      Assistant U.S. Attorney