UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF<br>THE EXTRADITION OF<br>MICHAEL L. TAYLOR | Case No. 20-mj-1069-DLC |
| IN THE MATTER OF<br>THE EXTRADITION OF<br>PETER M. TAYLOR | Case No. 20-mj-1070-DLC |

**MEMORANDUM IN OPPOSITION TO EXTRADITION**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

I.   THE TAYLORS ........................................................................................................ 2

II.  THE TAYLORS' ARREST AND DETENTION ............................................................. 3

III. PROCEDURAL BACKGROUND.................................................................................. 5

LEGAL STANDARDS ......................................................................................................... 5

I.   EXTRADITION ........................................................................................................ 5

II.  THE COURT CAN AND MUST INTERPRET FOREIGN LAW .................................... 7

ARGUMENT ....................................................................................................................... 7

I.   THE TEXT OF ARTICLE 103 AND PRECEDENTS DO NOT APPLY TO THE
     TAYLORS ................................................................................................................ 7

II.  THE COURTS' PREVIOUS DECISIONS SHOULD BE REVISITED WITH A
     COMPLETE RECORD ............................................................................................. 14

III. UNITED STATES COURTS HAVE APPLIED AMBIGUITY IN AMERICAN
     LAW CONSISTENT WITH THE TAYLORS' POSITION ............................................ 18

CONCLUSION................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*,
  138 S. Ct. 1865 (2018) ........................................................................................7

*Bouie v. City of Columbia*,
  378 U.S. 347 (1964) .............................................................................18, 19, 20

*Collins v. Univ. of N.H.*,
  664 F.3d 8 (1st Cir. 2011) ...................................................................................6

*Matter of Extradition of Aguasvivas*,
  2018 WL 6416814 (D. Mass. Dec. 6, 2018) .......................................................6

*Matter of Extradition of Drumm*,
  150 F. Supp. 3d 92 (D. Mass. 2015) ...................................................................6

*In re Extradition of Hilton*,
  2013 WL 1891327 (D. Mass. May 3, 2013) ........................................................6

*Pasquantino v. United States*,
  544 U.S. 349 (2005) ............................................................................................7

*Rimini Street, Inc. v. Oracle USA, Inc.*,
  139 S. Ct. 873 (2019) ........................................................................................18

*United States v. Kin-Hong*,
  110 F.3d 103 (1st Cir. 1997) ...........................................................................5, 6

*Wong Sun v. United States*,
  371 U.S. 471 (1963) ............................................................................................6

**Statutes**

18 U.S.C. § 1071 ......................................................................................................17

18 U.S.C. § 3146 ......................................................................................................12

18 U.S.C. § 3184 ........................................................................................................6

**Other Authorities**

Fed. R. Civ. P. 44.1 ...................................................................................................7

Fed. R. Crim. P. 26.1 .................................................................................................7

**INTRODUCTION**

After all the preliminary litigation that has occurred, the remaining issues have been reduced to really one—did Michael or Peter Taylor commit an extraditable crime in Japan. Relying entirely on the point of view of the very Japanese prosecutor litigating the case, the government says they did.  The Taylors have demonstrated that they did not.  Before these current pleadings, both this Court and the District Court were studying the issues in the context of requests for bail, writs, and injunctive relief with all the requirements of those proceedings.  Now, the full record has been sent.  If our courts view that record through what Japanese law and precedent actually state versus what U.S. law forbids or what some think Japanese law should forbid, the better view is the Taylors'.  The best evidence that the Taylors committed no crime is the fact that there has *never* been a case in Japan that charged or resulted in a conviction for the Taylors' alleged conduct—assisting a person violate bail conditions who was not being sought by the police and who was not in detention and who was free on conditions of release.

It should be telling that the U.S. authorities continue to spend so much time reciting the facts of what happened in a manner befitting a spy thriller, ranging from "luxury hotel meetups, fake personas, bullet train travel, and the chartering of a private jet," to Mr. Ghosn being "spirited out of Japan via private jet" "hidden in a large black box."  (Dkt. 48 at 1.)  Behind the sensational story, however, the government has—to date—glossed over what is the insurmountable hurdle to extradition: even if everything the government alleges were true, those facts do not amount to an extraditable crime under Japanese law.

Although the U.S. and Japanese governments now claim that the Taylors violated Article 103 of the Japanese Penal Code, a careful reading of that provision and its application to every reported case show that it is inapplicable here.  While the alleged conduct may strike Americans

familiar with U.S. law as a felony, and while Japan's anger over the offense may cause it now to wish that it had made such an offense a felony (rather than the immigration misdemeanor that it is now), a truly objective and fair reading of the words of the statute, in context with the words of other related statutes, and the cases that have been decided leads to the conclusion that the Taylors committed no extraditable crime under existing Japanese law.

Tellingly, over the course of this litigation, neither the U.S. nor the Japanese governments has pointed to a *single* analogous case where Japan applied Article 103.  Surely, this cannot be the first time someone has allegedly aided someone on bail in Japan to violate those conditions or leave the jurisdiction.  Yet, rather than point to any precedent applying Article 103 in this context, the governments instead rely on loose translations of key terms of art to backfill an offense to reach the facts they allege.  Because the government cannot show probable cause that either of the Taylors committed an actual extraditable offense under Japanese law, under the Treaty on Extradition Between the United States of America and Japan, Mar. 3, 1978, 31 U.S.T. 892, T.I.A.S. No. 9625 ("Treaty"), the government's request for extradition should be denied.

## BACKGROUND

## I.     THE TAYLORS

The Taylors' background is now well known to the Court.  *See, e.g.*, Dkt. 17 (Motion to Quash).[1]  In summary, Michael Taylor and his son, Peter Taylor, are both natural-born U.S. citizens.  Michael is a decorated military veteran, having served in the Special Forces for over a decade.  Around 1993, Michael founded a private protective services firm, which has diligently served clients domestically and abroad, including the U.S. government.  Michael's company has

---

[1] Unless otherwise noted, docket citations are to case 20-mj-1069-DLC.  The pertinent filings in the two extradition cases are substantively identical.

safely repatriated American citizens abducted overseas, including young children and journalists. Michael is a lifelong resident of Massachusetts, and has lived in the same home in Harvard, Massachusetts, with his wife and three children since 1991.

Peter Taylor is 27 years old and is also a lifelong resident of Massachusetts. He is a 2011 graduate of the Lawrence Academy, where he played football and basketball. After high school, Peter enrolled at Bentley University, majoring in economics and finance. When his family's assets were frozen as a result of criminal proceedings against his father in Utah, it was not possible for Peter to continue his studies at Bentley. He decided to enroll at the Lebanese-American University in Byblos, Lebanon, where his family had a modest condominium nearby. Peter commuted to the university and studied banking and finance; he graduated with a bachelor's degree in 2015. For the past several years, Peter has intermittently resided in Lebanon with his brother. Peter considers Massachusetts to be his home and has plans ultimately to reside there.

## II.   THE TAYLORS' ARREST AND DETENTION

The genesis of this matter was financial charges brought in Japan against Carlos Ghosn Bichara, the former Chairman of the Board of Directors and Chief Executive Officer of Nissan. After being charged, Ghosn was released on various conditions. The U.S. and Japanese governments allege that several months after the Tokyo District Court released Ghosn on bail, "[o]n December 29, 2019, [the Taylors] and other individuals helped Ghosn flee from Japan[.]" (Dkt. No. 1 ("U.S. Complaints") ¶ 7(a); *see also* Ex. A and Ex. B (Extradition Requests)[2] at EX-TAYLOR, M.-00032-33.)

Japan issued warrants for the Taylors' arrests on January 30, 2020, and renewed the warrants on February 28, 2020. (U.S. Compls. ¶ 6; *see* Exs. C and D (Warrants).) The arrest

---

[2] The extradition requests relating to Michael and Peter Taylor appear to be substantively identical. Below, we will refer only to the extradition request pertaining to Michael Taylor.

warrants themselves do not identify any specific crimes for which the Taylors' arrest is sought, instead simply referencing the Japanese prosecutor's Requests for Arrest Warrant. Those Requests expressly cite Articles 71 and 25 of the Immigration Control and Refugee Recognition Act (the misdemeanor offenses that had been the subject of the investigation), but do not cite to Article 103. (*See* Exs. C and D.)  To be sure, the Requests begin with a declaration that employs, in part, the words that make up the *title* of Article 103 (*i.e.*, "harboring of criminals"), but, as explained below, the language used in Annex 3 to describe the facts of the alleged offense are inconsistent with Article 103's plain terms and with the understanding and application of that statute. (*See* Ex. H (Second Supp. Cleary Decl.) ¶¶ 7-11.)

The issuance of the arrest warrants on January 30, 2020, was widely reported in the media, and the Taylors also believed that Interpol had issued Red Notices for their apprehension. (Ex. E, Marino Decl. ¶ 3.)  Nevertheless, with full knowledge and understanding of the risks, the Taylors returned to their home in Harvard, Massachusetts, with Michael Taylor returning in mid-February 2020, and Peter Taylor returning in March 2020. (*See id.*)

Several months later, on May 6, 2020, the government filed complaints for provisional arrest warrants in this District. (*See* U.S. Compls.)  Based on the information in the Complaints, the Court issued arrest warrants the same day. (*See* Dkt. 9 (Mots. for Detention) at 4.)  The Taylors were arrested on May 20, 2020. (*See id.* at 4.)  They have been held in federal custody at the Norfolk County Correctional Center ever since.

Japan filed its formal requests for extradition on June 29, 2020. (*See* Exs. A and B.)  In its requests, the Japanese government includes a summary assertion that the Taylors violated Article 103 of the Japanese Penal Code. (Ex. A, EX-Taylor, M.00030.)  They also include the same declaration the Japanese prosecutor, Naoki Watanabe, provided in earlier proceedings before this

Court.  (*See* Dkt. 48-17 (EX-Taylor, M.-00815-19).)  But, Japan provides no further explanation of how Article 103 applies, no indication of any investigation of a violation of Article 103, and no indictment, information, complaint, or other charging document actually charging the Taylors with a violation of Article 103.

## III.    PROCEDURAL BACKGROUND

On June 8, 2020, the Taylors moved to quash the U.S. arrest warrants, or in the alternative, for bail pending the formal extradition hearing.  (*See* Dkt. 17.)  On July 6, 2020, while the Motion to Quash was pending, the Taylors filed a Habeas Petition, a Motion for Temporary Restraining Order, and a Motion for Preliminary Injunction, which was assigned to Judge Talwani.  (*See* No. 20-cv-11272 (D. Mass.) ("HC"), Dkts. 1 and 2.)  The Taylors filed the habeas case in view of the ongoing and imminent harms they were facing (and continue to experience) based on their improper arrest and detention.  The District Court denied the Motion for Temporary Restraining Order on July 9, 2020 (*id.*, Dkt. 33), but set a hearing on the Motion for Preliminary Injunction so as to have the benefit of this Court's opinion and additional time and briefing to consider the issues. The District Court ultimately denied the Motion for Preliminary Injunction and denied the habeas petition on August 7, 2020.  (*Id.*, Dkt. 44.)  All of these proceedings were framed around the legal presumptions and extra requirements for bail, writs, and injunctions.  The issue of the underlying request for extradition, along with all the record that will ever be, is now before the Court.

## LEGAL STANDARDS

## I.    EXTRADITION

"In the United States, the procedures for extradition are governed by statute …, which divides responsibility for extradition between a judicial officer and the Secretary of State." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997).  Where—at the government's request—the court issues a warrant for a relator's arrest, the court "then conducts a hearing to determine if '[it]

deems the evidence sufficient to sustain the charge under the provisions of the proper treaty.'" *Id.* (quoting 18 U.S.C. § 3184). "[T]he judicial officer's inquiry is limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered." *Kin-Hong*, 110 F.3d at 110. As the First Circuit has explained, the "bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *Id.*

Under the Treaty, extradition may be certified only where "the request for extradition … [is] accompanied by … such evidence as would provide probable cause to suspect, according to the laws of the requested Party, that the person sought has committed the offense for which extradition is requested." (Treaty Art. VIII, § 3.) It is well within the Court's purview to decide whether "the evidence supports a finding of probable cause as to each offense for which the relator's extradition is sought." *E.g.*, *Matter of Extradition of Aguasvivas*, 2018 WL 6416814, at *3 (D. Mass. Dec. 6, 2018); *Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 99 (D. Mass. 2015); *In re Extradition of Hilton*, 2013 WL 1891327, at *3 (D. Mass. May 3, 2013).

It is well established that "[t]he quantum of information which constitutes probable cause [is] evidence which would warrant a man of reasonable caution in the belief that a felony has been committed." *Wong Sun v. United States*, 371 U.S. 471, 479 (1963) (quotation and citation omitted). Put another way, "[p]robable cause exists if the facts and circumstances within the issuing judge's knowledge and of which they had reasonably reliable information would suffice to warrant a prudent person believing that a person has committed a crime." *Collins v. Univ. of N.H.*, 664 F.3d 8, 15 (1st Cir. 2011) (quotations, citation, and alterations omitted).

## II.     THE COURT CAN AND MUST INTERPRET FOREIGN LAW

It is critical to these proceedings, and squarely within the power of the Court, to interpret foreign law.  As the Supreme Court has explained, "[a] federal court should accord respectful consideration to a foreign government's submission, but is not bound to accord conclusive effect to the foreign government's statements."  *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869 (2018).  Instead, the Court should use the ordinary tools of statutory interpretation and other evidence, such as foreign legal experts, to resolve foreign law disputes as a matter of law.  *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."); Fed. R. Crim. P. 26.1; *see also Pasquantino v. United States*, 544 U.S. 349, 370 (2005) (explaining that Rule 26.1 improved upon the "more cumbersome" common-law approach for determining foreign law, and now "permits a court, in deciding issues of foreign law, to consider 'any relevant material or source—including testimony—without regard to the Federal Rules of Evidence.'") (quoting Fed. R. Crim. P. 26.1).

## ARGUMENT

## I.     THE TEXT OF ARTICLE 103 AND PRECEDENTS DO NOT APPLY TO THE TAYLORS

The government seeks the Taylors' extradition on the incorrect premise that there is probable cause that they violated Article 103 of the Japanese Penal Code.  Quite simply, the Taylors' alleged conduct did not breach Article 103, and could not be properly charged now, because they did not "harbor" Mr. Ghosn or help him to "escape," as the language actually is used or has been applied in Japan.  That is confirmed by the fact that Japan has not charged the Taylors under Article 103, and, in fact, has *never* charged anyone with violating Article 103 under similar circumstances.  In arguing otherwise, the government has taken advantage of a natural tendency

to view these issues through the prism of U.S. law and what our laws punish and declare to be a crime. Article 103 is a specific point in time offense; it is not a conspiracy statute. Article 103 is not an offense equal to being an accessory after the fact. Article 103 prohibits a person from harboring someone who has committed a crime.

Seizing on ambiguities in the statutory language introduced by the particulars of its translation into English and relying upon the natural view of U.S. law as an unstated backdrop informing the understanding of Article 103, the U.S. and Japanese governments have obscured the precise meaning of the words used in Article 103 so as to apply it to facts that have never before been understood to constitute a violation of that provision. Specifically, the term "harboring" has been detached from its Japanese moorings, which require that the person being harbored be someone who is actively sought by the police or who has escaped from physical confinement. Further, the phrase "has committed a crime," translated from Article 103, has now been read to apply not to the immigration offense Ghosn was in the process of committing or had just committed at the time of the Taylors' alleged actions, but instead to financial crimes Ghosn is alleged to have committed years earlier.

To do this, the U.S. and Japanese governments have capitalized upon the imprecision that accompanies the translation of technical statutory language from Japanese to English. In both the original Japanese paired with the manner in which it has been translated to English, Article 103 of the Japanese Penal Code provides, in full, as follows:

| Japanese | English |
|---|---|
| （犯人蔵匿等） | (Harboring of Criminals) |
| 第百三条 | Article 103 |
| 罰金以上の刑に当たる罪を犯した者又は拘禁中に逃走した者を | another person who has either committed a crime punishable with a fine or heavier punishment or has escaped from confinement |
| 蔵匿し、又は隠避させた者は | a person who harbors or enables the escape of |
| 三年以下の懲役又は三十万円以下の罰金に処する | is punished by imprisonment for not more than 3 years or a fine of not more than 300,000 yen |

Interpreted in English, Article 103 says:  A person who harbors or enables the escape of another person who has either committed a crime punishable with a fine or heavier punishment or has escaped from confinement is punished by imprisonment for not more than three years or a fine of not more than 300,000 yen.

As Dr. William B. Cleary, a law professor at Hiroshima Shudo University in Hiroshima, Japan, and someone not trying to support his own case in Japan, explains in his declaration, "[w]hile this English translation uses two verbs—'harbors or enables the escape of another'—to describe the operative conduct, the original Japanese text in fact employs a single verb—蔵匿, or '*inpi.*'"  (Ex. H ¶ 5.)  That verb comprises "a single concept that describes working against law enforcement authorities' *active* pursuit of a criminal to arrest him."  (*Id.* (emphasis added).)  By contrast, the word 逃走, or "*toso,*" used in Articles 97 ("Escape") and 98 ("Aggravated Escape"), and also in Annex 3 of the arrest warrants (*see* Exs. C and D), "has a very specific meaning in that it refers to escape from a place of physical confinement, such as a jail, prison or detention center." (Ex. H ¶¶ 6, 8.)

The physical confinement requirement of "*toso*" is why bail jumping is not a crime in Japan—bail restrictions simply are not a form of physical confinement so as to bring the act of "escaping" from them within the scope of any of the provisions criminalizing escape.  Neither the U.S. nor the Japanese government disputes that violating bail conditions is not a criminal offense under Japanese law, and numerous media reports and active legislative reform efforts make clear that it is not.  (Ex. F ¶¶ 10, 14.)[3]  For the same reason, there also is no provision of Japanese law that criminalizes the assisting of another person in violating his bail conditions.  While Article 100 criminalizes the assistance of another in escaping, the same word, 逃走, or "*toso*," is used in that statute as well, thus limiting the offense to escapes from a place of physical confinement.

We have repeatedly pointed this out not because the Taylors are charged with the non-existent offense of assistance to bail jumping (all parties agree they are not), but because *the factual allegations* proffered in support of the warrants for the Taylors' arrest describe exactly this sort of conduct, including explicit use of the word 逃走, or "*toso*," in reference to Ghosn's bail conditions.  Such conduct, *i.e.*, enabling Ghosn to escape (or "*toso*") from his bail conditions, is tendered as

---

[3] Japan has *never* prosecuted anyone, including Ghosn, for "escaping" bail conditions under either Articles 97 or Article 98, and neither the U.S. nor Japanese governments has argued that what Mr. Ghosn did in violating his bail conditions was a crime under Japanese law.  (Ex. F ¶ 10; *see also, e.g.*, Ex. J (Jiji News Article) ("The current criminal law, 'flight offenses,' targets inmates in prisons.  For this reason, it does not apply when in bail such as Ghosn.").)  Recognizing this fact, the Japanese government has been scrambling to criminalize bail jumping.  On March 6, 2020, referring to Ghosn's departure from Japan, the Japanese Minister of Justice told the legislature's Legal Committee that the Ministry had "recently consulted with the Legal Council on the establishment of criminal law to [address] the escape of these persons."  (Ex. K.)  She continued, "[i]n the future, based on the results of the deliberation, we will proceed with the necessary legislation."  (*Id.*)  Thereafter, on June 15, 2020, a committee of the Japanese Ministry of Justice met to discuss "the establishment of new penalties for [] escape … [while] on bail."  (Ex. J; *see also* Ex. L (Jomo News Article).)  That committee was charged with "the development of a criminal law to prevent the escape of [those] accused on bail and those who have been sentenced, and ensure the appearance on the trial date and the execution of the sentence."  (Ex. M (Legal Council Meeting Minutes).)

the factual predicate for the Taylors' alleged commission of the actual Japanese criminal offense of harboring. The disconnect between the asserted offense and the alleged factual conduct is substantial and significant. Put another way, the Japanese extradition request is premised upon re-packaging conduct that is widely recognized as not constituting a crime into an alleged violation of a separate series of offenses (harboring) by transposing one very different Japanese word for another. This game is facilitated by the translation of these two very different words—"*toso*" and "*inpi*"—using the same English word, escape.

Further, Article 103 encompasses "harboring" of a person who "has committed a crime." The governments have argued that Ghosn was a person who "has committed a crime" by virtue of the financial crimes of which he had been charged. These alleged crimes, however, occurred years before the Taylors' alleged conduct; indeed, Ghosn was arrested for those crimes long before he even met the Taylors. The temporal disconnect between the Taylors' alleged assistance and Ghosn's alleged crime highlights the obvious (and necessary) limitations imposed by the word "harboring." If "harboring" does not require an active attempt by the government to arrest or otherwise apprehend the subject (which it plainly does), then Article 103 would broadly criminalize assisting, at any time and in any circumstance, anyone who had ever committed or been accused of a crime no matter how long ago that might have been. Yet this is what the governments are forced to argue when they attempt to take conduct that falls short of the offense of Assistance in Escape (Article 100) and twist it into an offense under one of a separate series of offenses (Harboring Criminals) applying to conduct of a different nature.

Again, "the Japanese government has *never* attempted to apply Article 103 to *any* situation involving violation of bail conditions." (Ex. F ¶ 13 (emphasis added); *see also* Ex. G ¶ 8 ("[T]his

prosecution is unprecedented.").)  That is because Article 103 only criminalizes "working against law enforcement authorities' active pursuit of a criminal to arrest him."  (Ex. H ¶ 5.)

Put another way, based upon the plain language of the statute, a person can only violate Article 103 by assisting another under two distinct sets of circumstances—(1) when the subject is being pursued by police, such as in the immediate aftermath of committing the original offense, when there is a warrant for the subject's arrest, or when the authorities are otherwise actively seeking to apprehend the subject (for instance, *after* he has violated his bail conditions and the police seek to revoke his bail and take him into custody); or (2) following the subject's escape from confinement.  There is no provision criminalizing the current situation, where Mr. Ghosn had not escaped from confinement, where there was no warrant for his arrest, and where he was not being actively pursued by the police.  Ghosn was merely released on bail subject to certain restrictions.  No one was seeking to apprehend him, and he did not even violate his bail conditions until after the Taylors' alleged actions were complete.

While U.S. courts familiar with U.S. law (which does criminalize bail jumping in 18 U.S.C. § 3146) may be surprised at the existence of such a gap in the law, this is the law in Japan.  If Japan wants to criminalize this type of conduct, it is up to the Japanese legislature—and not this Court— to amend the law or adopt a new series of laws that encompass the alleged conduct of the Taylors. It may be difficult for anyone in the United States to accept that this gap exists and, therefore, there is a tendency to want to fill it—but the gap exists, as current efforts to fill it in Japan confirm.

Japanese scholars and practitioners reviewing this case agree that the Taylors did not commit a crime.  One article reported, for example:  "Helping someone jump bail isn't a crime in Japan … said Yunhai Wang, a professor of criminal law at Hitotsubashi University graduate school

in Tokyo.  Nobuo Gohara, a former prosecutor and vocal critic of Japan's criminal-justice system, concurred[.]"  (Ex. I.)

The extradition requests, for their part, are virtually silent on explaining how the Taylors' supposed conduct violated Article 103.  They say only: "In this case, [the Taylors] and Zayek provided assistance and enabled Ghosn's escape in violation of Article 103."  (Ex. A at EX-Taylor, M.-00030.)  The extradition requests also incorporate the original declaration of Mr. Watanabe— the Japanese prosecutor—who provides a similarly bare explanation.  (*See* Dkt. 48-17 (EX-Taylor, M.-00815).)

Applying the plain language of Article 103 and the historical interpretation and application of that provision demonstrated by Japanese case law, the Court must determine that the government has not come forward with probable cause.  Even assuming the governments' factual allegations are true, as explained above, the Taylors cannot be said to have violated Article 103 because they did not "harbor" Ghosn—who was free on bail—by assisting him to flee the scene of a crime or an arrest or after escaping confinement.  (Ex. F ¶ 14; Ex. H ¶ 5.)  After all, "there is no allegation (and no evidence) that law enforcement authorities were actively seeking to arrest Mr. Ghosn when all of this occurred."  (Ex. H ¶ 10.)  Simply put, the "*inpi*" element of the Article 103 offense is not, and cannot be, satisfied.

Moreover, the U.S. and Japanese governments reference the harboring (蔵匿, or "*inpi*") portion of Article 103 as justification, while ignoring (except to dismiss as "colloquial" references) that *the factual allegations* that purportedly support the warrant use the very different word, 逃 走, or "*toso*," meaning specifically "escape from confinement" as used in Articles 97 ("Escape") and 98 ("Aggravated Escape").  However, this word, "*toso*," is used for the first time in this case with reference to a Japanese criminal defendant's (in this case, to Mr. Ghosn's) *bail conditions—*

13

a use that is completely inconsistent with the meaning of the word, the structure of Article 103, and the widely understood and acknowledged fact that "*toso*" is not, and never has been, understood to include "escape" from bail conditions.

Indeed, as the Japanese prosecutor acknowledges, this concept of "*toso*," or "escape from confinement," is "irrelevant" to Article 103—yet *the government insists that such allegations constitute a violation of Article 103.* What the government is attempting to do is to take factual allegations describing conduct that would fall within the scope of 逃走, or "*toso*," if release on bail were equated to confinement, which it plainly is not. Therefore, because the conduct cannot be charged under Article 97 or Article 100 (which prohibits assistance in escape, *i.e.*, "*toso*"), the government is taking that same conduct and attempting to allege it as a violation of Article 103, ignoring the fact that that statute deals with a completely different concept from "*toso*."

Tellingly, as noted above, Japan has *not* even charged the Taylors under Article 103. The language of the warrant request (using a portion of the title of Article 103 without citing it, and then using "*toso*" selectively in the description of the purported facts) seeks, at most, to allege a violation of Article 103 by suggestion, inference, or implication. As Dr. Cleary notes, "the issuance of an arrest warrant does not constitute a formal charge of any kind." (Ex. H ¶ 3.) Importantly, "[i]n the Japanese system, it is the indictment that serves to let the defendant know for what crime he or she is being charged, and the facts which the government intends to prove in support of that charge. (*Id.*) Mr. Watanabe has admitted that the Taylors have not been formally charged. (*See* Dkt. 48-19 ¶ 6.)

## II.   THE COURTS' PREVIOUS DECISIONS SHOULD BE REVISITED WITH A COMPLETE RECORD

In the habeas case, applying the heightened standard for success on the merits attendant to preliminary injunction motions, Judge Talwani preliminarily concluded that the Taylors were not

likely to prevail in showing that Article 103 was inapplicable.  (*See* HC, Dkt. 44.)  Putting aside the preliminary injunction standard, the key reason that the District Court found for the government was because it disagreed with Dr. Cleary's explanation of the meaning of "*inpi*":  "The limitation offered by Professor Cleary – that the statute only applies to those who assist someone seeking to 'flee from a scene of a crime or an arrest or to escape confinement' – is not persuasive."  (*Id.* at 11.)  The District Court based that conclusion by parsing the language in a Japanese law treatise and by crediting several cases cited by the Japanese prosecutor assigned to the case, Mr. Watanabe. (*Id.* at 11-12.)

But this is one of those instances where a court's preliminary conclusion should be reviewed again under more careful consideration.  Dr. Cleary decisively distinguished each of Mr. Watanabe's cases, and concluded that they "stand for the proposition that the first part of Article 103—*i.e.*, the clause which Mr. Watanabe asserts the Taylors have violated—applies to instances where one enables another person to escape apprehension by law enforcement."  (Ex. G ¶¶ 4-5.)

The District Court's apparent misunderstanding of the Taylors' argument is highlighted in a footnote purporting to refute Dr. Cleary's distinction of one Mr. Watanabe's cases.  (HC, Dkt. 44 at 12 n.6.)  In his declaration, Mr. Watanabe cited a case, Judgment of Osaka District Court, May 10, 2000, where the defendant was "indicted for and convicted of enabling the escape of another person who had committed a crime, in violation of Article 103 of the Penal Code, after enabling a person … [to] abscond by providing the person with a credit card so that the person could stay at a hotel under a pseudonym (the defendant's name)."  (Dkt. 48-17 ¶ 12.)  In his declaration, Dr. Cleary pointed out that in that case, "[a]t the time of the defendant's crime, the individual he was convicted of assisting had his bail *revoked* and therefore was subject to arrest." (Ex. G ¶ 4(c) (emphasis added).)  In refuting Dr. Cleary's distinction, the District Court said that

"the case still supports the proposition that Article 103 can apply to those who assist others who have already been arrested and indicted evade the justice system." (HC, Dkt. 44 at 12 n.6.) The District Court therefore concluded that "Petitioners' argument fails to convince where the mere difference in the hypothetical fact pattern from the actual facts is that the Taylors were effective in swiftly secreting Ghosn out of Japan before the authorities learned of Ghosn's violations of his conditions of bail." (*Id.*)

Respectfully, the District Court misunderstood the distinction. Dr. Cleary explained that Article 103 does not apply to helping someone jump bail because that does not involve helping someone flee the scene of a crime, flee arrest, or escape from confinement. The government cited the Osaka Court decision in trying to break down the line drawn by Dr. Cleary by showing that Article 103 was applied to someone who had been granted bail. But the government's point fails because bail *had been revoked*, so this was on the prosecutable side of the line explained by Dr. Cleary as a case where the defendant aided someone to flee arrest (after bail was revoked). In other words, the person in that case was in the position of a person who "had committed a crime" *and* was in the position of being pursued to be apprehended by the authorities. Thus, this case does nothing to move the line explained by Dr. Cleary.

Article 103 does not prohibit aiding someone to flee from arrest *or anything just as bad*; it uses carefully defined terms to specify the conduct that is prohibited. Here, the word chosen was "*inpi*" and a defendant can only "*inpi*" (i.e., enable the escape) of a person who is *actively* being pursued. (*See* Ex. H ¶ 5.) The Taylors may have violated the statute, for example, if Mr. Ghosn had announced prior to his departure that he planned to flee, and police were actively seeking to apprehend him so as to prevent his departure. But they did not under the facts here. The line between legal and criminal behavior under Article 103 is not drawn at arrest or indictment, as the

District Court suggested; rather, it is drawn based on whether authorities are actively pursuing a subject or if he has escaped from confinement.

The point is also illustrated by U.S. law.  Take, for example, 18 U.S.C. § 1071, titled "concealing person from arrest."  That provision makes it a crime for a person to "harbor[] or conceal[] any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person[.]"  *Id.*  A classic application would be against a person providing a safe house for a fugitive.  But, if there is no fugitive, there can be no harboring or concealment, and thus no crime.  Naturally, if the police are not seeking a person, then how can one "harbor" or "conceal" him?  The same is true here. Who are the Taylors "harboring" Ghosn from?  The police were not looking for him, and he had broken no laws until he committed an immigration violation by leaving Japan.

To be sure, as a policy matter, the District Court may be right that the reasons to want to prosecute someone who helps someone else flee arrest are very similar to the reasons to want to prosecute someone who helps someone else jump bail.  Nobody would fault Japan for prohibiting both kinds of conduct for the same reasons (as the U.S. does), but the fact of the matter is that Japan has not yet done so.

This sort of evolution in the law happens as our understanding of what constitutes good policy changes.  The United States, for example, followed the common law in defining burglary as a crime that occurred at night.  Over time, a majority of jurisdictions came to realize that a daytime burglary could be just as dangerous, so they amended their statutes to delete the nighttime element.  But while courts may have found the daytime-nighttime distinction foolish, or even that a particular daytime offense was far worse from a policy perspective than a nighttime burglary, no

court ever took a red line to the statute books and crossed out the nighttime element so that it could convict for a daytime burglary.  Rather, the legislature would have to fill the gap in the law by making such a change to the statute, and it would apply prospectively only.  The same is true here.

The District Court, in effect, also shifted the burden to the defense by requiring the defense to prove a negative.  The District Court faulted Dr. Cleary for not "present[ing] any evidence, interpreting the Japanese language or interpreting case citations, that compels a finding that the statute cannot apply to assisting a person released on bail evade discovery by law enforcement." (HC, Dkt. 44 at 12.)  Dr. Cleary, however, has said since the beginning that he "ha[s] not been able to identify a single prior case where Japanese prosecutors charged a person (successfully or unsuccessfully) with enabling another person to violate his or her bail conditions."  (Ex. F ¶ 13; *see also* Ex. G ¶ 8 ("[T]he issue has never been litigated—precisely because this prosecution is unprecedented.").)  The fact that there is no example of any case applying Article 103 in the context in which Japan now seeks to apply it (particularly in a context that does not seem all that unusual) should cut against the government's interpretation.  *See, e.g.*, *Rimini Street, Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 880 (2019) (rejecting an interpretation of a statute that had never been applied historically in the way it was suggested).

## III.  UNITED STATES COURTS HAVE APPLIED AMBIGUITY IN AMERICAN LAW CONSISTENT WITH THE TAYLORS' POSITION

The government's conduct here is reminiscent of *Bouie v. City of Columbia*, 378 U.S. 347 (1964).  In that case, the South Carolina Supreme Court had affirmed the conviction of sit-in demonstrators for trespass under a state law, in a context that turned upon the nuance of criminal statutory interpretation, as the case here does.  There, the trespass statute had only been applied to people who entered a premises despite notice not to enter, but had never been applied to remaining on a premises after being asked to leave, which was the case as to the sit-in demonstrators.  *Id.* at

355.  After the incident, the South Carolina legislature amended the statute to make clear that it would apply in the sit-in context.

As a policy matter, there is little difference between whether the notice comes before or after, but the language of the statute was critical.  The South Carolina Supreme Court upheld the convictions based on its interpretation of the state law at the time of the offense—a decision that it was entitled to make as the highest court authorized to interpret state law.  But the Supreme Court reversed on due process grounds for a lack of notice, finding that there was no valid prohibition in place until the South Carolina Supreme Court issued its opinion and that construction could not be applied retroactively.  *Id.* at 350 ("Petitioners contend, however, that by applying such a construction of the statute to affirm their convictions in this case, the State has punished them for conduct that was not criminal at the time they committed it….  We agree with this contention.")  As the Court explained:

> We think it clear that the South Carolina Supreme Court, in applying its new construction of the statute to affirm these convictions, has deprived petitioners of rights guaranteed to them by the Due Process Clause.  If South Carolina had applied to this case its new statute prohibiting the act of remaining on the premises of another after being asked to leave, the constitutional proscription of *ex post facto* laws would clearly invalidate the convictions.  The Due Process Clause compels the same result here, where the State has sought to achieve precisely the same effect by judicial construction of the statute.  While such a construction is of course valid for the future, it may not be applied retroactively, an[y] more than a legislative enactment may be, to impose criminal penalties for conduct committed at a time when it was not fairly stated to be criminal.

*Id.* at 362.

*Bouie* is the way the Court should apply the Japanese statute.  The plain language of Article 103 does not apply to people assisting someone not in detention and not at the time being pursued and it has never ever been applied in this context (although this cannot be such a rare crime), and Japan may very well amend its law to cover this now.  But that is not the law now nor at the time

the Taylors committed the alleged offense, so it is not an extraditable felony.  Even if a Japanese prosecutor could persuade this American court to give this novel construction to Japanese law, such a construction cannot be imposed retroactively.  It does not matter that aiding someone in fleeing arrest is not much different from a situation like bail jumping, where law enforcement would seek to revoke bail and pursue an arrest if they knew about it, any more than it did not matter in *Bouie* that there is not much difference in being told not to enter before entering a premises or being asked to leave once you do.

The statutory language is the key.  Here, the plain language of Article 103 does not apply to aiding bail jumping and it has never been applied in this context.  What is close or should have been does not count.  The liberty of two American citizens is at stake and they should not be forced to stand trial in Japan based on a made-up, after-the-fact interpretation, to which no Japanese court has ever subjected any of its own citizens or anyone else.  If Japan is upset that there is a gap in its law, Japan can amend its law to close it.  But just as this Court would not allow the United States government or the Massachusetts government to ensnare an American citizen with an *ex post facto* law, it owes the Government of Japan no greater deference to do the same.

## CONCLUSION

For the reasons explained above, the Court should deny the government's motion and grant the Taylors' immediate release.  The government has not established, and cannot establish, probable cause that the Taylors have committed an extraditable offense, as the alleged actions simply do not fall within the realm of Article 103.

Dated:  August 17, 2020

Respectfully submitted,

By their attorneys,

/s/  Paul V. Kelly
Paul V. Kelly (BBO No. 267010)
Jackson Lewis, P.C.
75 Park Plaza
Boston, MA  02110
Tel (617) 367-0025
paul.kelly@jacksonlewis.com

/s/ Abbe David Lowell (by permission)
Abbe David Lowell (*pro hac vice*)
Christopher D. Man
Zachary B. Cohen
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036
Tel. (202) 282-5875
adlowell@winston.com

*Counsel for Michael and Peter Taylor*

/s/ Robert Sheketoff
Robert Sheketoff (BBO# 457340)
One McKinley Square
Boston, MA  02119
Tel. (617) 367-3449
sheketoffr@aol.com

/s/ Daniel Marino (by permission)
Daniel Marino (*pro hac vice*)
dmarino@marinofinley.com
Tillman J. Finley (*pro hac vice
forthcoming*)
tfinley@marinofinley.com
MARINO FINLEY LLP
800 Connecticut Avenue, N.W., Suite 300
Washington, DC  20006
Tel.  202.223.8888

*Counsel for Michael L. Taylor*

<u>/s/James P. Ulwick (by permission)</u>
James P. Ulwick (*pro hac vice*)
KRAMON & GRAHAM PA
One South Street, Suite 2600
Baltimore, MD  21202
Tel. (410) 752-6030
JUlwick@kg-law.com

*Counsel for Peter M. Taylor*

## CERTIFICATE OF SERVICE

I, Paul V. Kelly, certify that service of this motion was made on the above date by and through the ECF filing system.

*/s/  Paul V. Kelly*
Paul V. Kelly