UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | Case No. 20-mj-1069-DLC |
| MICHAEL L. TAYLOR | ) | |
| | ) | |
| | ) | |
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | Case No. 20-mj-1070-DLC |
| PETER M. TAYLOR | ) | |

## GOVERNMENT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF EXTRADITION

The United States, through the undersigned counsel, respectfully submits this reply memorandum of law in support of Japan's requests for the extraditions of Michael and Peter Taylor.

## **INTRODUCTION**

The Taylors' singular basis for opposing extradition is their claim that Japan misinterpreted its own law in seeking their extraditions for an offense that purportedly does not apply to their conduct. However, the Taylors have cited no precedent, and the government is aware of none, where extradition was denied based on a fugitive's opinion of foreign law that contravenes the interpretation substantiated by the foreign government seeking extradition. There is no basis for this Court to depart from the clear and uniform caselaw in the instant proceeding, particularly given the fact that Japan's interpretation of its own law is supported by the plain language of the applicable statute, Japanese caselaw, and even a Japanese treatise submitted by the Taylors themselves.

To date, three different courts have examined the issue of whether the Taylors committed the offense for which Japan requests their extraditions: Enabling the escape of criminals under Article 103 of the Japanese Penal Code. On January 30, 2020, the Tokyo District Court found probable cause to believe the Taylors committed that offense and issued warrants for their arrests, and those warrants have subsequently been renewed.[1] On July 10, 2020, this Court denied the Taylors' motion to quash the arrest warrants or to be released on bail after finding they were unlikely to succeed on their claim that Article 103 does not apply, reasoning that the Taylors' actions "would appear to fall squarely within the heartland of this portion of Article 103 where Ghosn had been charged with a crime and the respondents then reportedly harbored and/or helped him to escape to avoid prosecution."[2] And

---

[1] *See* Ex. L (original arrest warrant) and Ex. M (renewed arrest warrant) attached to the Government's Memorandum of Law in Support of Extradition ("Gov't Br.") in *In re Michael L. Taylor*, No. 20-mj-1069 (D. Mass.) as docket entries ("DE") 48-12 & 48-13 respectively. The docket in *In re Michael L. Taylor* is substantially similar to the docket in *In re Peter M. Taylor*, No. 20-mj-1070 (D. Mass.), and citations in this Reply will be to the former docket. Unless otherwise noted, exhibit citations hereinafter will refer to the exhibits attached to Gov't Br. at DE 48.

[2] *See* DE 41 (Memorandum On Respondents' Motion To Quash Arrest Warrants Or For Release From Detention, hereinafter, "Op.") at 9.

on August 7, 2020, the district court (Talwani, J.) denied the Taylors' habeas petition and motion for a preliminary injunction after finding they were unlikely to succeed in "their argument [that] Article 103 does not prohibit interfering with the Japanese criminal justice system by harboring Ghosn and enabling Ghosn to elude discovery by law enforcement and escape judgment from a Japanese court."[3] While the Taylors maintain that there is some flaw or mistake in each decision, in reality, the phantom "gap" in Japanese law through which they seek to evade justice does not exist.

The Taylors have not introduced any new evidence since the district court issued its decision, and their claims should be rejected largely for the same reasons previously articulated by this Court and the district court. Accordingly, the Court should certify the Taylors' extraditions to Japan for the Secretary of State's surrender decision.

## ARGUMENT

As the government explained in its opening brief, a fugitive should be certified as extraditable where: (1) the Court is authorized to conduct the extradition hearing; (2) the Court has personal jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the offense for which extradition is sought is covered by the treaty; and (5) there is probable cause to believe the fugitive committed such offense. *See* 18 U.S.C. § 3184; *see also, e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984). In this case, the Taylors have not contested the first three elements. They also have not contested the fourth element insofar as they do not dispute the fact that Article 103—the offense for which extradition is requested—carries a maximum punishment of more than one year imprisonment under Japanese law, and that the alleged conduct underlying that offense is punishable under federal law by more than one year imprisonment, as required by Article II of the

---

[3] *See Taylor v. McDermott*, No. 4:20-cv-11272 (D. Mass.), DE 44 (Memorandum and Order, hereinafter "Habeas Op.") at 13. References to other docket entries in the habeas proceedings will hereinafter begin with the prefix "HC DE."

U.S.-Japanese extradition treaty.[4]  Regarding the fifth requirement (probable cause), the Taylors have not contested any of the facts alleged by Japan in its extradition requests.  The only disputed issue then, is whether, as a matter of Japanese law, the Taylors' alleged conduct constitutes a violation of Article 103.  This issue is properly considered as part of the probable-cause inquiry, which is generally how the Taylors have framed the issue (*see, e.g.*, DE 49 at 2, 7, 13, 20 (hereinafter, "Opp'n")).  For the reasons set forth below, there is probable cause to believe the Taylors violated Article 103.

## I.   There is Probable Cause to Believe the Taylors Violated Article 103

### A.   The Taylors violated the plain terms of Article 103.

Article 103 provides that "[a] person who harbors or enables the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from confinement shall be punished by imprisonment with work for not more than 3 years or a fine of not more than 300,000 yen."  *See* Ex. Q (Watanabe Decl. ¶ 8).  Here, Japan alleges the Taylors helped Ghosn escape Japan "for the purpose of enabling him to get off with the punishment," through a carefully planned and meticulously executed series of maneuvers that evaded Japanese law enforcement detection.  *See, e.g.*, Exhibit M (renewed arrest warrant) at EX-Taylor, M.-00043.[5] Moreover, at the time of his escape, Ghosn was under indictment for financial crimes and therefore was "another person who has . . . committed a crime."[6]  Thus, Article 103 plainly applies to the Taylors' conduct, and the inquiry can and should end here.  *Cf., e.g.*, *Jimenez* v. *Quarterman*, 555 U.S. 113, 118 (2009) ("It is well established that, when the statutory language is plain, we must enforce it according to its terms.").

The Court should reject the Taylors' attempt to define the terms of Article 103 in a manner

---

[4] *See* Ex. E, Treaty on Extradition Between the United States of America and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892), Art. II(1)).

[5] The details of the escape are set forth in DE 48 at 2-7 (hereinafter, "Gov't Br.").

[6] *See* Habeas Op. at 11 ("Ghosn's alleged crime that positions him as 'another person who has . . . committed a crime' are the financial crimes for which he was indicted."); *see also* Ex. P (Yoshida Decl. ¶ 7) (Article 103 applies to escapees who are under investigation, indictment, or who have been convicted of crimes).

substantially different from their ordinary meaning.  *Cf., e.g., Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."); *Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014) ("It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.") (internal quotation marks and citation omitted).   Claiming "imprecision" in the translation of the statute, the Taylors argue that the term "enables the escape" or "inpi," as used in the first part of Article 103, can only mean "working against law enforcement authorities' *active* pursuit of a criminal to arrest him."  Opp'n at 8-9 (emphasis in original).  However, the Taylors' only support for this narrow and self-serving definition is their retained expert, who himself did not settle on this precise formulation until his second supplemental declaration.  *Compare, e.g.*, DE 49-7 (Cleary Decl. ¶ 14) (first declaration made no mention of "active pursuit" requirement). Moreover, as the district court noted, this proposed definition is "contradicted by the Japanese legal treatise originally submitted by [the Taylors] that states that *inpi*, in the sense of an act to 'enable the escape,' covers acts that hinder 'arrest <u>or</u> discovery' by law enforcement, therefore extending to situations when arrest is not law enforcement's present aim."  Habeas Op. at 11-12.[7]  Thus, the district court properly found that "the limitation offered by Professor Cleary – that the statute only applies to those who assist someone seeking to flee from a scene of a crime or an arrest or to escape confinement – is not persuasive."  *Id.* at 11 (internal quotation marks and citation omitted).  Contrary to the Taylors' claim, the district court was not laboring under some "apparent misunderstanding" (Opp'n at 15) in making this finding, and there is no basis for this Court to reach a different conclusion.

The Taylors also seek to graft an extra-textual requirement onto Article 103 whereby the escape must be proximate in time to the crime committed by the escapee (Opp'n at 11).  Based on

---

[7] The treatise was attached to the Taylors' motion to quash the arrest warrants or to be released on bail (*see* DE 17-10) and is reattached hereto as Ex. U for the Court's convenience.

this newly minted theory, the Taylors claim Article 103 does not apply because Ghosn's alleged financial crimes occurred years prior to his escape. However, the Taylors cite no support for this argument, not even to their own expert. While the Taylors contend such a limiting principle is necessary to avoid an unjust result where a crime occurred in the distant past, that policy argument fails to take account of statutes of limitations and other barriers to prosecution which make it unlikely that the suspect would be fleeing criminal proceedings, as was the case here. In any event, such a broad facial challenge to the statute should be reserved for the Japanese courts.

### B. Japanese caselaw supports the applicability of Article 103 to the Taylors' conduct.

As Japan notes, the Japanese Supreme Court has held that Article 103 "intends to punish a person who interferes with the criminal justice system in a *broad sense*, such as investigations, court proceedings and executions of sentences." *See* Ex. P (Yoshida Decl. ¶ 6) (quoting Judgment of Supreme Court, May 1, 1989 Kei-shu vol.43, No.5, p.405) (emphasis added). The Taylors' cramped view of Article 103 conflicts with the Japanese Supreme Court's instruction to construe the statute broadly. *See* Habeas Op. at 13 ("[T]he more capacious reading of the verb *inpi* is also supported by the Japanese Supreme Court's interpretation of Article 103[.]"). This conflict is best illustrated by the Taylors' concession that they "may have violated the statute, for example, if Mr. Ghosn had announced prior to his departure that he planned to flee, and police were actively seeking to apprehend him so as to prevent his departure." Opp'n at 16. Particularly given the mandate that Article 103 sweep broadly, the district court properly found that this "argument fails to convince where the mere difference in the hypothetical fact pattern from the actual facts is that the Taylors were effective in swiftly secreting Ghosn out of Japan before the authorities learned of Ghosn's violations of his conditions of bail." Habeas Op. at 12 n.6.[8]

---

[8] The Taylors errantly state that Ghosn "did not even violate his bail conditions until after the Taylors' alleged actions were complete." Opp'n at 12. As the district court noted, Ghosn's bail conditions included not hiding (Habeas Op. at 12

Consistent with the Japanese Supreme Court's guidance, other Japanese courts have found Article 103 applies in a broad range of cases with diverse fact patterns. *See* Ex. Q (Watanabe Decl. ¶¶ 9, 12); Ex. P (Yoshida Decl. ¶ 8); Ex. U (Japanese treatise). Critically, Japan has cited Article 103 cases where an arrest warrant had not been issued and the person who committed the crime was neither fleeing the scene of a crime nor a detention facility—in other words, the very fact pattern that the Taylors claim does not exist in the Japanese caselaw. *See* Ex. P (Yoshida Decl. ¶ 8); Habeas Op. at 12 ("The Japanese prosecutor . . . provides case citations where Article 103 has been interpreted to encompass acts that interfere with the justice system, separate and apart from enabling escape from an imminent arrest."). For example, the Sapporo High Court applied Article 103 to a person who acted as a scapegoat for his acquaintance who had driven while intoxicated. *See* Ex. P (Yoshida Decl. ¶ 8) (citing Judgment of Sapporo High Court, August 18, 2005, Ko-shu vol.58, No.3, p.40). The acquaintance was presumed dead, no warrant had been issued for his arrest, and the police were not actively pursuing him. *Id.* Notably, the Taylors have not identified a single case where a Japanese court held Article 103 was inapplicable under *any* circumstance.

Contrary to the Taylors' claim, the applicability of Article 103 does not turn on whether Japan has previously applied the statute in the case of a bailed defendant. Japanese courts have applied the statute in cases ranging from where the person who committed a crime was at complete liberty to situations where such a person escaped confinement. The fact that Ghosn falls in the middle of this spectrum does not render the statute inapplicable. Criminal cases often present some variation in the specific fact pattern and, as the First Circuit has succinctly put it, "[t]here is a first time for everything." *United States v. Nippon Paper Indus. Co., Ltd.*, 109 F.3d 1, 6 (1st Cir. 1997); *see also, e.g.*, *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) ("The claimed novelty of

---

n.6), which he certainly did by secreting himself in a box. Michael Taylor then smuggled Ghosn through the Kansai airport and onto the private jet that flew both men out of the country. *See* Gov't Br. at 6.

this prosecution does not help [the defendant's] cause, for it is immaterial that there is no litigated fact pattern precisely in point.") (internal quotation marks and citation omitted).  The critical fact, as the district court noted, is that the Taylors do not "present any evidence, interpreting the Japanese language or interpreting case citations, that compels a finding that the statute cannot apply to assisting a person released on bail evade discovery of law enforcement."  Habeas Op. at 12.  Indeed, at the preliminary injunction hearing, the district court was incredulous of the Taylors' argument that Japan was required to identify a case with the exact same facts.  *See* Ex. V (Transcript of July 28, 2020 Hr'g at 37:21-25) (The Court: "I mean, to say, 'Well, I have ten examples, but it doesn't cover this example,' but you have -- all of the examples, the inference I draw is that the courts are construing it broadly, the words 'committed a crime.'").[9]  Simply put, Article 103 provides no exception for enabling the escape of bailed defendants and the inference the Taylors seek to draw from the caselaw is not supported.

The Taylors now concede that they have not been charged as accessories to Ghosn's bail jumping, yet they maintain that the issue of bail jumping is still relevant "because the factual allegations proffered in support of the warrants for the Taylors' arrest describe exactly this sort of conduct." Opp'n at 10 (emphasis omitted).  This assertion is factually unsupported and legally meritless.  In the factual summary of the arrest warrant requests, the Tokyo District Public Prosecutors Office alleges that the Taylors helped Ghosn escape Japan "for the purpose of enabling him to get off with the punishment."  *See, e.g.*, Ex. M (renewed arrest warrant) at EX-Taylor, M.-00043.  The factual summary references bail only once, and that is in the prefatory statements regarding the Taylors' alleged knowledge of Ghosn's status as a defendant in Japanese criminal proceedings and the fact that Ghosn was "bailed under the conditions including neither hide nor escape and no overseas trip."  *Id.*  To be sure, Ghosn's violation of his bail conditions was a byproduct of his escape from Japan and the

---

[9] The transcript is attached hereto as Ex. V for the Court's convenience.

criminal proceedings entirely.  But this fact has no bearing on the applicability of Article 103.  *Cf.*, *e.g.*, *In re Vargas*, 978 F. Supp. 2d 734, 746 (S.D. Tex. 2013) (rejecting argument that the court should consider whether a non-extraditable offense could have been charged, noting the court "simply lacks authority to consider the Mexican prosecutors' charging decisions").

### C. The Japanese arrest warrants, declarations, and treatise support Article 103's applicability to the Taylors' conduct.

The Tokyo District Court found probable cause to believe the Taylors' conduct falls within Article 103 when it issued, and then renewed, the warrants for their arrests.  *See* Ex. Q (Watanabe Decl. ¶ 5) (noting probable cause standard for issuance of arrest warrants); *see also, e.g., In re Pineda Lara*, No. 97-cr.-misc. 1, 1998 WL 67656, at *7 (S.D.N.Y. Feb. 8, 1998) ("The Czech magistrate, by virtue of his issuing the arrest warrant, viewed defendant's conduct as falling within [the extraditable offense]").  In addition, Japan has provided a detailed analysis of Article 103's applicability to the Taylors' conduct through its submission of declarations prepared by Public Prosecutor Naoki Watanabe, Tokyo District Public Prosecutors Office, and Masayuki Yoshida, the Japanese Ministry of Justice's Director of the Legislative Division, the latter of whom has had no involvement in the criminal proceedings against the Taylors.[10]  Among other things, the declarations make the following key points.

*First*, Japan has confirmed that for purposes of Article 103, "it does not matter if a person is under confinement, fleeing from the scene of a crime to evade police apprehension or in a position to be confined under an active warrant."  Ex. P (Yoshida Decl. ¶ 7).  Japan's conclusion

---

[10] Contrary to the Taylors' suggestion, it was entirely appropriate for Japan to submit declarations from Public Prosecutor Watanabe (in addition to Director Yoshida), in responding to the Taylors' challenges to the case he has brought.  Indeed, prosecutors in the United States and foreign countries alike routinely submit declarations in support of extradition that explain their countries' respective laws. *See, e.g., In re Pineda Lara*, 1998 WL 67656, at *6-7; *cf., In re Extradition of Jarosz*, 800 F. Supp. 2d 935, 945 (N.D. Ill. 2011) ("A rule that would exclude evidence merely because it stemmed from a public prosecutor rather than someone 'independent' of him—who that might be the brief does not pause to explain—is incompatible with the principle that the terms of an extradition treaty should be liberally construed so as to effectuate the intention of the parties to secure the open and reciprocal surrender of fugitives to be tried for extraditable offenses.").

is supported not only by the plain language of the statute and Japanese caselaw, as discussed above, but also by the broad construction of Article 103 set forth in the Japanese treatise first submitted by the Taylors. *See* Ex. U (Japanese treatise) (explaining that statute covers "crimes that involve encroaching upon the criminal justice functions of the state in the *broad sense*") (emphasis added).

*Second*, Japan has made clear that the issue of whether bail jumping is a crime in Japan is "not relevant at all to the determination of whether a third party's acts that enable the escape of a defendant released on bail constitute the crime of enabling the escape of criminals under Article 103." Ex. P (Yoshida Decl. ¶ 10). That is because "the crime of enabling the escape of criminals intends to punish a person who commits such acts as a principal, not as an accessory to another person who escapes." *Id.* ¶ 11. This Court and the district court previously reached the same conclusion. *See* Op. at 10 n.5 (The Taylors' "argument fails to appreciate that [they] have not been charged as accessories to Ghosn's bail jumping, but rather have been charged as principals for harboring or enabling a criminal's escape"); Habeas Op. at 11 ("[W]hether 'bail jumping' is a crime under Japanese law does not appear to affect the applicability of Article 103 to the Taylors' conduct."). To the extent there was any doubt, Japan notes that "in many cases, including supra, Judgment of Nagoya District Court, October 15, 2013, where the courts have convicted the defendants of enabling the escape of criminals under Article 103, the act of the escape itself was not punished." Ex. P (Yoshida Decl. ¶ 12).

*Third*, contrary to the Taylors' claim (Opp'n at 10-11, 13-14), Japan has explained that its use of the term "toso" in the factual summary of the arrest warrant requests, in addition to its inclusion of the term "inpi," was not specifically linked to Ghosn's bail conditions. *See* Ex. S (Watanabe Second Supp. Decl. ¶ 9). Rather, the term was used more generally to refer to "Ghosn's fleeing from the Japan's administration of criminal justice," including to "avoid detection by government officials, to avoid the rescission of bail and arrest, and to avoid the

criminal prosecution." *Id.* While the Taylors claim this is not an appropriate use of the term (Opp'n at 9), Japan has cited Article 103 caselaw similarly using "toso" to describe the escape of a criminal who was not confined or fleeing the scene of a crime to evade police apprehension, and for whom an arrest warrant had not yet been issued. *See id.* (citing Judgment of Nagoya District Court, October 15, 2013, Hanreihisho L06850550).[11]

At bottom, Japan concludes that the Taylors' efforts to smuggle Ghosn out of Japan in a box aboard a private jet to a country that lacks an extradition treaty with Japan constitute acts that "enable[d] the escape of another person who has . . . committed a crime." Ex. Q (Watanabe Decl. ¶¶ 8, 11); Ex. S (Watanabe Second Supp. Decl. ¶ 7). Japan's interpretation of its own law is entitled to great deference. More than a century ago the Supreme Court held in the extradition context that "[i]t can hardly be expected of us that we should become conversant with the criminal laws of [the country seeking extradition], or with the forms of warrants of arrest used for the apprehension of criminals." *Grin v. Shine*, 187 U.S. 181, 190 (1902). Since *Grin*, U.S. courts have steadfastly adhered to bedrock principles of international comity and deferred to the requesting country's interpretation of its own laws in the extradition context. *See, e.g.*, *Noeller v. Wojdylo*, 922 F.3d 797, 806 (7th Cir. 2019) ("United States courts hearing extradition requests have consistently expressed an unwillingness to interpret foreign law to invalidate arrest warrants."); *Cornea v. U.S. Attorney General*, 771 F. App'x 944, 948 (11th Cir. 2019) (relying on the "authoritative statement" of the Greek government regarding its law to reject the fugitive's challenge to extradition based on the Greek statute of limitations); *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("[W]e recognize the chance of erroneous interpretation

---

[11] As Japan explains, "[t]he meaning of 'toso' is determined by the context in which it is used. When used in Articles 97 and 98 and used to describe 'another person who has ... escaped from confinement' in Article 103, it is limited by putting the condition of a certain type of confinement set forth by each article. Outside that context, e.g., in cases where the defendant enables the escape of 'another person who has . . . committed a crime,' like in this case, it is not limited in the same way." Ex. S (Watanabe Second Supp. Decl. ¶ 9). In any event, as the district court noted, the Taylors' heavy emphasis on the term "toso" is misplaced because the arrest warrant requests also use the term "inpi." *See* Habeas Op. at 10 n.5.

is much greater when we try to construe the law of a country whose legal system is not based on common law principles.") (internal quotation marks and citation omitted); *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016) (refusing to "second-guess" Bosnian government's determination of what constitutes an arrest warrant in Bosnia); *Melia v. United States*, 667 F.2d 300, 303 (2d Cir. 1981) ("We are . . . not expected to become experts in the laws of foreign nations.").[12]

The principle that a foreign country should not be required to prove to a U.S. court that it is properly construing its own laws is supported by general notions of international comity and "respect for the sovereignty of other nations." *In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980). It is further supported by the prudential policy of avoiding the substantial risk that a U.S. court might erroneously interpret the law of a foreign country. *Id.* ("The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters."). Moreover, deference is particularly appropriate in extradition proceedings because fugitives will have ample opportunity to contest issues of foreign law before the foreign courts if they are extradited, and those foreign courts are best equipped to adjudicate such matters. Placed into context here, if this is to be the exceptional case where Article 103 is found not to apply despite clear evidence that the Taylors obstructed justice, such a finding should be made upon a full record before the Japanese courts. *Cf. Pineda Lara*, 1998 WL 67656, at *7 ("A judge in the United States should . . . defer to a foreign judicial officer's or government official's reasonable interpretation of a statute where the statute is subject to more than one interpretation. Such deference is particularly appropriate where, as here, the Court's reading of the plain meaning of the statute is consistent with the views of the Czech magistrate and District State

---

[12] *See also, e.g.*, *In re Extradition of Nezirovic*, No. 7:12-mc-39, 2013 WL 5202420, at *15 (W.D. Va. Sept. 16, 2013) ("It would be a grave insult for this court to presume to tell the Government of Bosnia and Herzegovina what is or is not legitimate under Bosnian law."); *Marzook v. Christopher*, No. 96-cv-4107, 1996 WL 583378, at *5 n.4 (S.D.N.Y. Oct.10, 1996) ("In the context of extradition proceedings, it would be inappropriate for a court to review the demanding state's analysis of its own law."); *In re Extradition of Schumann*, No. 18-cr-283, 2018 WL 4777562, at *6 (N.D. Ill. Oct. 3, 2018); *In re Extradition of Blasko*, No. 1:17-MC-00067, 2018 WL 6044921, at *28-31 (E.D. Cal. Nov. 19, 2018); *Schmeer v. Warden of Santa Rosa Cty. Jail*, No. 3:14-cv-285, 2014 WL 5430310, at *5-6 (N.D. Fla. Oct. 22, 2014).

Prosecutor.") (internal citation omitted); *In re Lui,* 939 F. Supp. 934, 949 (D. Mass. 1996) ("[W]here the foreign statute can reasonably be interpreted in more than one way, the judicial officer in the United States should defer to any reasonable interpretation by the foreign judicial officer, even if the former, considering the matter *de novo,* might have interpreted the statute differently[.]").

In denying their habeas petition, the district court noted the Taylors faced a "steep path" to succeed in their argument that Japan misinterpreted its own law "given necessary deference to foreign countries' understanding of their own law and as courts liberally construe the scope of extradition treaties." Habeas Op. at 8-9 (collecting cases). As they do here (Opp'n at 7), the Taylors attempted to persuade the district court to adopt a less deferential standard based on a non-extradition case, *Animal Science Products, Inc. v. Herbei Welcome Pharmaceutical Co. Ltd.*, 138 S. Ct. 1865 (2018), and Federal Rule of Civil Procedure 44.1. However, the district court found that "[a]pplying *Animal Sci* in the extradition context appears dubious given the unique framework extradition proceedings operate within and given that federal rules of procedure do not apply." Habeas Op. at 10 n.4.[13] In any event, the district noted that "even under that case, the court would still be required to accord 'respectful consideration' and 'substantial but not conclusive weight' to a foreign government's interpretation of its own law." *Id.* (citing *Animal Sci.*, 138 S. Ct. at 1869, 1875). Similarly here, this Court need not pinpoint the exact level of deference that should be accorded to Japan's interpretation of its own law because the Taylors' claims are meritless and should be rejected under any standard.

---

[13] There are multiple reasons why *Animal Science* does not apply in the extradition context. *First*, in that case, the Court considered how much deference to accord an *amicus* brief submitted by China's Ministry of Commerce in connection with a domestic civil class-action suit, *see* 138 S. Ct. at 1867, rather than an extradition matter where the fugitive will have the opportunity to raise arguments regarding foreign law before the foreign courts if extradited. *Second*, given the fact that the case was a civil matter, the Court relied heavily upon Federal Rule of Civil Procedure 44.1, *see id.* at 1874, but that Rule is inapplicable to 18 U.S.C. § 3184 extradition proceedings, which are not civil actions. *See, e.g., In re Smyth*, 61 F.3d 711, 720 (9th Cir. 1995) (finding "rules of evidence and civil procedure that govern" Article III proceedings "do not apply in extradition hearings"). *Third*, the Court specifically distinguished an earlier case—*United States v. Pink*, 315 U.S. 203, 218 (1942)—where it treated as conclusive evidence of foreign law a declaration submitted by a foreign country through official diplomatic channels. 138 S. Ct. at 1874-75. Here, like in *Pink*, the government of Japan has expressed its view that Article 103 applies to the Taylors' conduct through official diplomatic channels by seeking their extradition for that offense and submitting the declarations from Public Prosecutor Naoki Watanabe and Director Masayuki Yoshida. Accordingly, this case is more like *Pink* than *Animal Science*.

Fundamental principles of international comity loom large here.  In the reciprocal context, the United States would take great exception to a foreign court casting aside the U.S. government's explanation of its own laws, disregarding a probable cause determination made by a federal judge, and denying extradition based upon a "nuance of criminal statutory interpretation" (Opp'n at 18).  In this case, the Court should not override Japan's determination that Article 103 applies to the Taylors' conduct in undertaking its limited inquiry into whether the Taylors are extraditable.

**D. The Taylors' inapt analogies to U.S. law and claims regarding Japan's charging practices do not alter Article 103's applicability to their conduct.**

**1. The Taylors' analogies to U.S. law are inapt.**

After claiming that "the government has taken advantage of a natural tendency to view these issues through the prism of U.S. law" (Opp'n at 7-8), the Taylors themselves proceed to offer inapt analogies to U.S. law that do not alter the fact that Article 103 applies to their conduct.  Specifically, while not disputing that their conduct would be punishable under any of the federal laws cited by the government in its opening brief if committed here (*i.e.* dual criminality),[14] they make the straw-man argument that their conduct would not be punishable under a different statute, 18 U.S.C. § 1071 (Opp'n at 17).  The analogy does not hold, however, because Section 1071 contains terms that limit its scope which are not present in Article 103 of the Japanese Penal Code.  In particular, Section 1071 expressly requires there to have been an arrest "warrant or process . . . issued under the provisions of any law of the United States." 18 U.S.C. § 1071.  Article 103, by contrast, makes no mention of the existence of an arrest warrant.  Accordingly, the Taylors' citation to Section 1071 does not support their interpretation of Article 103.

The Taylors also contend the "government's conduct here is reminiscent" of a case in which the South Carolina Supreme Court violated the due process rights of sit-in demonstrators

---

[14] *See* Gov't Br. at 11 (citing 18 U.S.C. § 2, 18 U.S.C. § 371, 18 U.S.C. § 751(a), 18 U.S.C. § 1073, 18 U.S.C. § 3148(a), 18 U.S.C. § 401, and 49 U.S.C. § 46314(b)(2)).

in the early 1960s by not giving them fair warning that their conduct was unlawful.  Opp'n at

18-19 (citing *Bouie v. City of Columbia*, 378 U.S. 347 (1964)).  The comparison is unsupported as

a matter of fact and law.  Factually, the Taylors were not protesting racial injustice but rather

helping a multimillionaire escape prosecution for serious financial crimes, including siphoning

off millions of dollars from the company for which he was CEO for the benefit of himself and

a friend.  *See* Gov't Br. at 2-3.  As a legal matter, controlling Supreme Court precedent makes

clear that the procedural safeguards embodied in the U.S. Constitution—including, specifically,

the prohibition against *ex post facto* laws—do not apply to "crimes committed without the jurisdiction

of the United States against the laws of a foreign country."  *Neely v. Henkel*, 180 U.S. 109, 122-23

(1901).  Moreover, the Taylors received all the process that would be due even if our Constitutional

standards applied to Japan because the plain language of Article 103 provided the Taylors with

fair warning that their conduct was illegal.[15]  *See, e.g.*, *United States v. Lanier*, 520 U.S. 259, 266

(1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute that

*neither* the statute nor any prior judicial decision has fairly disclosed to be within its scope[.]")

(emphasis added); *United States v. Balint*, 201 F.3d 928, 936 (7th Cir. 2000) (defendant "cannot

complain about the lack of court guidance available in 1994, when the statute itself was sufficient to

advise him his acts were criminal"); *cf.* Bouie, 378 U.S. at 355 ("Petitioners did not violate the statute

as it was written"); *Rogers v. Tennessee*, 532 U.S. 451, 457-58 (2001) (We found [in *Bouie*] that the South

Carolina court's construction of the statute violated this [fair warning] principle because it was so

---

[15] As the First Circuit has held, "[d]ue process does not require that criminal statutes delineate every conceivable type of conduct that could come within their purview."  *United States v. Mardirosian*, 602 F.3d 1, 8 n.4 (1st Cir. 2010); *see also, e.g.*, *United States v. Lanier*, 520 U.S. 259, 271 (1997) (due process requirements are not "designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited").

clearly at odds with the statute's plain language and had no support in prior South Carolina decisions.").[16]

### 2. Japan's charging process does not bear on the applicability of Article 103.

While the Taylors do not claim that the Treaty requires an examination of Japan's charging practices—nor could they, as discussed in more detail below—they ask the Court to infer that Article 103 does not apply from the fact that they have not been formally charged under that statute or otherwise. *See* Opp'n at 14 ("Tellingly . . . Japan has not even charged the Taylors under Article 103.") (emphasis omitted).[17]   Such an inference is unwarranted, and the Court should reject the Taylors' attempt to impose a formal charging requirement through the back door.

As the district court succinctly summarized, "Japan asserts the normal procedure in extradition cases is to issue arrest warrants, with sufficient information about the alleged crime to establish probable cause and which authorizes the arrest of the suspect, and that an extraditee is formally charged once arrested in Japan after extradition."   Habeas Op. at 21 (internal quotation marks and citation omitted); *see also* Ex. Q (Watanabe Decl. ¶¶ 5-7); Ex. S (Watanabe Second Supp. Decl. ¶¶ 2-6).   Consistent with the foregoing practice, the Tokyo District Court issued arrest warrants for the Taylors based on a finding of probable cause that they committed the offenses charged in the attached Tokyo District Public Prosecutors' Request for an Arrest Warrant (hereinafter, "Requests").   *See, e.g.*, Ex. M (renewed arrest warrant); *see also* Ex. S (Watanabe Second Supp. Decl. ¶ 8) (noting the "*charged*

---

[16] Also off the mark is the Taylors' citation to *Rimini Street, Inc. v. Oracle USA Inc.*, where the Supreme Court interpreted a statute consistently with more than 800 prior copyright decisions.  *See* 139 S. Ct. 873, 880 (2019).  In this case, by contrast, the Taylors have failed to cite a single case where a Japanese court held that Article 103 did not apply.

[17] The Taylors alternate between claiming that Japan has not issued a formal charging document and claiming that they have not been charged in any sense.  *See, e.g.*, Opp'n at 14 ("[A]n arrest warrant does not constitute a *formal* charge of any kind[.]") (emphasis added) (citation omitted).  However, when pressed by the district court to clarify their position, the Taylors' counsel explained as follows:  "There is no charge the way we in the United States use that phrase in the sense that -- what I mean – there's no indictment, there's no criminal information."  Ex. V (Habeas Hr'g Tr. at 26:5-9).

*offenses* in the arrest warrants dated January 30, 2020 and February 28, 2020 for Michael L. Taylor and Peter Maxwell Taylor") (emphasis added).[18]

While the Requests do not refer to Article 103 by number, consistent with Japanese practice, their first sentence identifies the name of the charged offense corresponding to a violation of Article 103—"han-nin-inpi"—which can be translated as either harboring of criminals or enabling the escape of criminals.  *See* Ex. Q (Watanabe Decl. ¶ 7 n.1&2); *see also* Habeas Op. at 10 n.5 ("[T]he arrest warrants named the Penal Code offense using the word *han-nin-inpi*, identifying the nature of the offense in Article 103 instead of listing the statute number, as is asserted to be common practice for arrest warrants in Japan.").  Indeed, even the Taylors concede that "the Requests begin with a declaration that employs, in part, the words that make up the title of Article 103."  Opp'n at 4 (emphasis omitted).  Although the Taylors contend this constitutes "alleg[ing] a violation of Article 103 by suggestion, inference, or implication," (Opp'n at 14), they fail to refute the fact that the method is consistent with Japanese practice.  Notably, Japan cites a textbook of warrant practices confirming that it is "not require[d] that the applicable penal article be identified."  Ex. S (Watanabe Second Supp. Decl. ¶ 3).  Further, the same day the arrest warrants were issued, the Tokyo District Public Prosecutors Office issued a press release announcing the arrest warrants for the Taylors based, in part, on their alleged violation of "Enabling the escape of criminals, Article 103 of the Penal Code."  Ex. R (Watanabe Supp. Decl. ¶ 4).

The Taylors cite their proposed expert's statement that "the issuance of an arrest warrant does not constitute a formal charge of any kind."  Opp'n at 14.  This has no bearing on the applicability of Article 103.  The Treaty does not require the issuance of any charging document as a prerequisite to extradition.  *See* Treaty, Art. VIII (setting forth required documents).  In fact, the Treaty does not use

---

[18] Incorporating the Request by appending it to the arrest warrant is consistent with Japanese practice.  *See* Ex. S (Watanabe Second Supp. Decl. ¶ 2) ("An arrest warrant may be prepared by appending the written request for said arrest warrant[.]") (citing Article 145 of Japan's Rules of Criminal Procedure).

the term "charge" at all.  This was no accidental omission.  There is a split amongst extradition treaties regarding the inclusion of a required charging document, even amongst treaties that were signed around the same time.  *Compare, e.g.*, Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. TREATY DOC. NO. 97-8 (1981), Art. 9(3)(a) (request for extradition shall be accompanied by "[a] copy of the indictment or its equivalent").  The United States and Japan decided their extradition treaty should not include a charging document requirement.  *See, e.g.*, *Assarsson*, 635 F.2d at 1243 ("If the parties had wished to include the additional requirement that a formal document called a charge be produced, they could have so provided.").[19]

The caselaw is clear and uniform that a charging document is not required unless the treaty so demands.  *See, e.g.*, *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 987 (D. Or. 2011) ("Every court that has addressed this issue has concluded that a formal charging document is not required as a condition precedent for extradition.") (collecting cases).[20]  But even if this Court were to reach a different conclusion, the arrest warrants (inclusive of the Requests) would satisfy any such requirement.[21]  *See* Habeas Op. at 21 ("Though Petitioners assert . . . [Japan] has not sent charging documents to the United States to support their extradition request . . . evidence from the Japanese government shows otherwise.").  The warrants identify the Taylors, recite the charged offenses, and

---

[19] Even if there were any ambiguity as to what the Treaty requires, well-established canons of treaty construction mandate that it be construed liberally, and therefore not to impose an extra-textual charging document requirement.  *See, e.g.*, *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933) ("[I]f a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."); *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) ("[E]xtradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement[.]").

[20] *See also, e.g.*, *Emami v. U.S. Dist. Court*, 834 F.2d 1444, 1448 (9th Cir. 1987) ("The Seventh Circuit's reasoning [in *Assarsson*] demonstrates that grafting such a requirement as Emami proposes on to the treaty in the instant case is inadvisable."); *In re Lam*, No. 1:08-mj-247, 2009 WL 1313242, at *3 (E.D. Cal. May 12, 2009) (rejecting fugitive's argument that "since no charges are pending against him, extradition should be denied on that basis"); *Kaiser v. Rutherford*, 827 F. Supp. 832, 834 (D.D.C. 1993) ("[N]o court has ever held that the filing of formal charges is a prerequisite for extradition under the Treaty[.]").

[21] Indeed, based on the same document, the Taylors acknowledged in their habeas petition that they were charged with an immigration offense.  *See* HC DE 1 (Emergency Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Injunctive Relief) ¶ 2 ("the Japanese government's only actual *charge* asserts that the Taylors aided in a misdemeanor immigration offense") (emphasis added).

17

provide a description of the facts underlying the charged offenses.  The fact that the warrants might not adhere to all the rituals of a U.S.-style charging document is immaterial.  *See, e.g., Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) (finding Mexican arrest warrant could constitute a charging document even if it was not analogous to a U.S. indictment based on "established approach of giving credence to foreign proceedings"); *In re Sarellano*, 142 F. Supp. 3d 1182, 1186 n.2 (W.D. Okla. 2015) (finding arrest warrant "is a charging document" in the sense that "it identifies the offense in the [Zacatecas] criminal code, sets out the essential facts of the alleged crime, and details the evidentiary basis for the charge.") (internal quotation marks and citation omitted).  Requiring anything more of Japan would not only be inconsistent with the plain terms of the Treaty but would also improperly interfere with its domestic criminal procedures to which they have adhered in this case.

## CONCLUSION

The Court should certify the Taylors' extraditions to Japan for the Secretary of State's surrender decision.

Date: August 26, 2020

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   */s/ Stephen W. Hassink*
Stephen W. Hassink
Assistant United States Attorney

*/s/ Philip A. Mirrer-Singer*
Philip A. Mirrer-Singer
Trial Attorney

18

## **CERTIFICATE OF SERVICE**

I, Stephen W. Hassink, Assistant U.S. Attorney, do hereby certify that on August 26, 2020, I served a copy of the foregoing on all registered parties by electronic filing on ECF.

*/s/ Stephen W. Hassink*
Stephen W. Hassink
Assistant U.S. Attorney